IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

CRAIG L. JOHNSON,

                      Plaintiff,       Civil Action No.
                                    9:18-CV-0096 (DNH/DEP)

    v.

DR. LAWRENCE FEIN, *et al.*,

                    Defendants.

─────────────────────────────

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

CRAIG L. JOHNSON, *Pro Se*
17-A-1173
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13403

FOR DEFENDANT FEIN:

THORN GERSHON TYMANN    ERIN P. MEAD, ESQ.
and BONANNI, LLP          MATTHEW H. McNAMARA, ESQ.
5 Wembley Court
P.O. Box 15054
Albany, NY 12205

FOR COUNTY DEFENDANTS:

O'CONNOR, O'CONNOR      ANNE M. HURLEY, ESQ.
LAW FIRM
20 Corporate Woods Boulevard
Albany, NY 12211

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action brought by *pro se* plaintiff Craig L.

Johnson, a New York State prison inmate, against defendant Dr.

Lawrence Fein ("Dr. Fein"), an orthopedic physician and a partner with

OrthoNY, as well as several medical personnel employed by the County of

Saratoga, pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges,

*inter alia*, that while he was confined in the Saratoga County Correctional

Facility ("SCCF") as a pretrial detainee, Dr. Fein was deliberately

indifferent to his serious medical needs, in violation of his Fourteenth

Amendment rights.

By order of this court, initial discovery in this matter was limited to

the issue of Dr. Fein's relationship with the County of Saratoga. That initial

discovery now having been completed, Dr. Fein now moves for the entry

of summary judgment dismissing plaintiff's claims against him, arguing that

the undisputed facts reflect that Dr. Fein did not act under color of state

law when providing medical treatment to the plaintiff. For the reasons set

forth below, I recommend that Dr. Fein's motion be granted.

I.    <u>BACKGROUND</u>[1]

Dr. Fein is a physician licensed to practice medicine in the State of

New York. Dkt. No. 78-4 at 1. Since 2012, he has been a partner with

OrthoNY, a domestic limited liability partnership. Dkt. No. 78-6; *see* Dkt.

No. 78-4 at 2. Dr. Fein is not employed by the County of Saratoga, and

---

[1]    Although plaintiff has opposed Dr. Fein's motion for summary judgment, his opposition fails to comply with Local Rule 7.1(a)(3) in responding to Dr. Fein's Statement of Material Facts. *See generally* Dkt. No. 81. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).

Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, plaintiff was specifically warned of the consequences of failing to properly respond to the Local Rule 7.1(a)(3) Statement. Dkt. No. 78-25 at 1 n.1. Despite this pointed warning, plaintiff failed to "set forth a specific citation to the record where the factual issue arises" when denying certain statements involved in Dr. Fein's Local Rule 7.1(a)(3) Statement. N.D.N.Y. L.R. 7.1(a)(3); *see, e.g.*, Dkt. No 81-1, ¶¶ 5, 8, 13.

Accordingly, I will deem any facts contained in Dr. Fein's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g.*, *Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any other facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

neither he nor OrthoNY has a contractual relationship with the County.

Dkt. No. 78-4 at 2.

Although Dr. Fein occasionally treats inmates from the SCCF, the treatment of inmates generally comprises a very small percentage of his practice. Dkt. No. 78-4 at 3. According to Dr. Fein,

> [w]hen I do treat an inmate, I communicate with the medical staff at the correctional facility where the inmate is incarcerated for the purposes of coordinating the medical care and treatment to be provided, however, I exercise my own independent medical judgment when rendering care and treatment.

Dkt. No. 87-4 at 3.

On July 27, 2016, plaintiff was arrested and subsequently confined to the SCCF as a pretrial detainee. *See generally* Dkt. No. 51. Plaintiff alleges that during the course of that arrest, he sustained multiple injuries, including an injury to his right shoulder. *See generally id*.; *see also* Dkt. No. 78-5.

Plaintiff initially received pain medication and an x-ray for his injury. Dkt. No. 78-4 at 2; Dkt. No. 78-5 at 1. At some point, however, medical personnel at the SCCF determined that plaintiff required an orthopedic consultation. Dkt. No. 78-4 at 2. Defendant Jennifer Keefer, M.D., the medical director of the SCCF, approved that consultation, and personnel

4

from the facility scheduled plaintiff for an appointment with OrthoNY. Dkt. No. 78-4 at 2.

In anticipation of his orthopedic consultation, plaintiff completed an OrthoNY "patient intake sheet," outlining his medical history and complaints. Dkt. No. 78-3 at 4-8. Plaintiff was examined by Dr. Fein on September 1, 2016, at which point Dr. Fein administered a cortisone injection. Dkt. No. 78-5 at 16-17. When plaintiff continued to complain of shoulder pain at a follow-up appointment on October 13, 2016, Dr. Fein suspected that he had sustained a rotator cuff tear and ordered magnetic resonance imaging ("MRI") testing of his right shoulder. Dkt. No. 78-4 at 3; Dkt. No. 78-5 at 12-15. That MRI confirmed plaintiff's rotator cuff tear. Dkt. No. 78-5 at 24-25. Dr. Fein thereafter referred plaintiff to a colleague for surgery, and did not render any further treatment to the plaintiff. Dkt. No. 78-4 at 3.

Following plaintiff's medical treatment, the County of Saratoga was billed by OrthoNY for the treatment. Dkt. No. 78-4 at 3; *see also* Dkt. No. 78-4 at 6.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about January 22, 2018. Dkt. No. 1. On January 23, 2018, District Judge David N. Hurd issued an order

5

administratively closing the action and denying plaintiff's application to proceed *in forma pauperis* ("IFP") as incomplete. Dkt. No. 5. On February 2, 2018, plaintiff filed a second, completed application for IFP status, together with an inmate authorization form. Dkt. Nos. 6, 7. After the action was reopened, Judge Hurd issued a decision and order dated February 21, 2018, granting plaintiff's IFP application. Dkt. Nos. 8, 9.

In that same decision and order, in accordance with 28 U.S.C. §§ 1915(e) and 1915A, Judge Hurd reviewed the sufficiency of plaintiff's complaint and noted the following with respect to Dr. Fein:

> Johnson's complaint lacks any facts suggesting that Dr. [Fein] is a state actor for the purposes of a § 1983 action. Dr. [Fein] did not treat plaintiff at the jail and plaintiff has failed to plead a 'close nexus' between Dr. [Fein] and the medical staff at [S.C.C.F] to suggest that he was connected to the alleged deliberate indifference to his medical care. Accordingly, plaintiff's claims against Dr. [Fein] are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

Dkt. No. 9 at 11. As a result, plaintiff's medical indifference claim was dismissed against Dr. Fein without prejudice. *Id.* at 20.

On April 2, 2018, plaintiff availed himself of the opportunity to amend his complaint. Dkt. No. 14. In that pleading, plaintiff alleged that Dr. Fein

acted under the color of law because he was "under a contract employed by the Saratoga County to attend to inmates[.]" *Id.* at 3 (errors in original). Upon reviewing the sufficiency of plaintiff's amended complaint, by decision and order dated April 16, 2018, Judge Hurd concluded that plaintiff had "sufficiently alleged that [Dr. Fein] was acting under the color of state law for the purposes of Section 1983." Dkt. No. 15 at 11 (citing *Young v. Smith*, No. 07-CV-6312, 2008 WL 4561605, at *4 (W.D.N.Y. Oct. 10, 2008); *Davis v. Cole-Hoover*, No. 03CV550, 2004 WL 1574649, at *10 (W.D.N.Y. June 14, 2004)).[2] Dr. Fein interposed an answer to plaintiff's amended complaint on August 16, 2018. Dkt. No. 44.

On September 18, 2018, Judge Hurd granted plaintiff's motion for permission to file a second amended complaint ("SAC"), and that pleading was accepted for filing. Dkt. Nos. 38, 50. In that amended pleading, according to plaintiff, *inter alia*, Dr. Fein was "in a joint contract with the County of Saratoga." Dkt. No. 50 at 4. Dr. Fein interposed an answer to the SAC on September 26, 2018, denying the material allegations of that pleading. Dkt. No. 55.

---

[2]    Copies of all unreported decisions are attached hereto for the convenience of *pro se* plaintiff.

Following a telephone conference on September 28, 2018, the court granted Dr. Fein's request to limit initial discovery to the issue of his relationship with the County of Saratoga. Dkt. No. 54. That discovery having been completed, Dr. Fein now moves seeking the entry of summary judgment, dismissing plaintiff's claims. Dkt No. 78. On October 19, 2018, plaintiff responded in opposition to defendants' motion, Dkt. No. 81, and Dr. Fein has since filed a reply in further support of his motion, Dkt. No. 84. The remaining defendants have not taken a position with respect to the motion. Dr. Fein's motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

8

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Need for Additional Discovery

In opposition to Dr. Fein's motion, plaintiff suggests that he has been deprived of the opportunity to properly respond to the motion for summary judgment because Dr. Fein failed to answer his interrogatories. *See, e.g.*, Dkt. No. 81-1 at 3 ("Plaintiff request here that the [c]ourt investigate the County's relationship with OrthoNY, for none of the plaintiff' s interrogatories were answered for plaintiff to conclude one way or the other."). In his reply, Dr. Fein has provided the court with a copy of plaintiff's interrogatories, and argues that plaintiff's interrogatories are irrelevant to Dr. Fein's status as a state actor.[3] Dkt. No. 84 at 4; *see generally* Dkt. No 84-1. Dr. Fein has also submitted a copy of his affidavit, which was previously supplied to plaintiff in connection with the limited, court-ordered discovery addressing his relationship with the County of Saratoga. Dkt. No. 84-3.

To oppose Dr. Fein's summary judgment motion on the ground that he was deprived of an adequate opportunity to engage in discovery,

---

[3]    I note that all discovery unrelated to Dr. Fein's state actor status was stayed on September 28, 2018. Dkt. No. 54.

plaintiff was required to file an affidavit "showing: '(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.' " *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x. 11, 13 (2d Cir. 2013) (quoting *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (internal quotation marks omitted)). The Second Circuit has recognized that even a *pro se* litigant's "failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *Lunts*, 515 F. Appx. at 13-14 (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)); see also *Falso v. Rochester City Sch. Dist.*, 460 F. App'x 60, 61-62 (2d Cir. 2012) ("[The plaintiff] did not submit an affidavit in the district court setting forth the additional facts he sought to discover under Fed. R. Civ. P. 56(d). That omission is 'itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' ") (quoting *Paddington Partners*, 34 F.3d at 1137).

Plaintiff has not met his burden under Rule 56(d). On November 20, 2018, plaintiff filed a letter request with the court, in which he stated the

following:

> [T]he plaintiff has submitted a set of interrogatories to both attorneys (Hurley and McNamara) for each of the defendants to reply to as they attested to during our 1st conference, but have failed to respond. As a measure of good faith practices, can a remainder be sent to them, requesting a response?"

Dkt. No. 71 at 1 (errors in original). By text order dated November 26, 2018, the court denied plaintiff's letter request, noting that all discovery had been stayed except with respect to Dr. Fein's status as a state actor. Dkt. No. 73.

In opposition to the present motion, plaintiff did not file an affidavit objecting to the adequacy of discovery afforded to him or requesting additional time to conduct discovery. *See generally* Dkt. No. 81. In addition, and more significantly, plaintiff fails to explain how a response to his interrogatories would potentially have raised a genuine issue of material fact with respect to Dr. Fein's status as a state actor.[4]  Dkt. No.

---

[4]      By way of example, plaintiff presented to the following interrogatories to Dr. Fein for response:

- How long have you been in medical practice, with a license?
- What side effects can one expect from a cortisone injection being a diabetic?
- Have you ever, at any employment been bought up on charges of negligence or medical malpractice? If so, when, where, and why?

12

84-3. Because plaintiff failed to file an affidavit contesting the adequacy of discovery, or even identify what discoverable materials he did not receive related to the limited discovery authorized to proceed by the court, I conclude that to the extent plaintiff's papers can be construed as asserting a claim that discovery was inadequate, that claim should be rejected.

    C.    State Actor

    In support of his motion for summary judgment, Dr. Fein argues that he did not act under color of state law, and as a result, he cannot be subjected to liability pursuant to 42 U.S.C. § 1983. Dkt. No. 78-24 at 4-10. Dr. Fein argues that in light of the fact that he is a private physician with no contractual agreement with the County of Saratoga, there is no triable issue of material fact, and that the record firmly establishes that plaintiff cannot satisfy the compulsion test, the close nexus test, or the public function test, the three theories under which he could be properly regarded as a state actor. *Id.* In opposition, plaintiff argues, *inter alia*, that Dr. Fein was a state actor because he was aware of plaintiff's status as a pre-trial detainee and because he was paid by the County of Saratoga for his

---

    • What would you do different if giving the opportunity?

*See generally* Dkt. No. 84-1 (errors in original).

medical services. [Dkt. No. 81 at 6](Dkt. No. 81 at 6).

### 1.    Legal Standard – Generally

Section 1983 "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)). It " 'is not itself a source of substantive rights[,] . . . but merely provides 'a method for vindicating federal rights elsewhere conferred[.]' " *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In order to state a claim pursuant to section 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

State action is an essential element of any section 1983 claim. *Gentile v. Republic Tobacco Co.*, No. 95-CV-1500, 1995 WL 743719, at *2 (N.D.N.Y. Dec. 6, 1995) (Pooler, J.) (citing *Velaire v. City of Schenectady*, 862 F. Supp. 774, 776 (N.D.N.Y. 1994) (McAvoy, J.)); *see DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 311 (2d Cir. 1975) ("A private party

violates [section] 1983 only to the extent its conduct involves state

action."); *Wilson v. King*, No. 08-CV-0509, 2008 WL 2096593, at *1

(N.D.N.Y. May 16, 2008) (Sharpe, J.). To that end, a private party may

become a state actor only under the following, limited conditions:

> (1) [when] the entity acts pursuant to the coercive
> power of the state or is controlled by the state ('the
> compulsion test'); (2) when the state provides
> significant encouragement to the entity, the entity is
> a willful participant in the joint activity with
> the state, or the entity's functions are entwined with
> the state policies ('the joint test' or 'close nexus
> test'); or (3) when the entity has been delegated a
> public function by the state ('the public function
> test').

*Sybalski v. Indep. Grp. Home Living Program Inc.*, 546 F.3d 255, 257 (2d

Cir. 2008); *see also Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012).

## 2.    The Compulsion Test

Under the compulsion test, private action may become state action if

it results for the state's exercise of coercive power, or the state provides

significant overt or covert encouragement. *See Blum v. Yaretski*, 457 U.S.

991, 1004 (1982); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 840-41

(1982); *Sybalski*, 546 F.3d at 257; *Jackson v. Barden*, No. 12 CIV. 1069,

2018 WL 340014, at *14 (S.D.N.Y. Jan. 8, 2018); *Doe v. Rosenberg*, 996

F. Supp. 343, 349-50 (S.D.N.Y. 1998) (noting that "pure medical

judgment" dispelled "any notion of state compulsion."), *aff'd* 166 F.3d 507 (2d Cir. 1999). Mere approval or acquiescence is insufficient. *Blum*, 457 U.S. at 1004.

Here, despite plaintiff's conclusory protestations to the contrary, no reasonable factfinder could conclude that the County of Saratoga exercised coercive power over, or provided significant overt or covert encouragement to, Dr. Fein. Plaintiff does not dispute that Dr. Fein "exercised his independent medical judgment in treating plaintiff based upon the applicable standard of care." Dkt. No. 78-25 at 4, Instead, plaintiff complains about the medical treatment that Dr. Fein provided to him at two medical appointments. Dkt. No. 81-1 at 6. Beyond plaintiff's conclusory assertion that he has satisfied the compulsion test because Dr. Fein was "significant[ly] encouraged," there is simply no evidence that the medical treatment rendered by Dr. Fein was anything other than the product of his personal medical judgment, free from the influence of the County of Saratoga. Dkt. No. 78-4. Dr. Fein's treatment decisions resulted from "pure medical judgment," which dispels any notion of state compulsion. *Doe*, 996 F. Supp. at 357; *see also Davis v. Cole-Hoover*, No. 03-CV-0550, 2004 WL 1574649, at *10 (W.D.N.Y. June 14, 2004) ("[T]he medical decisions of private doctors at issue here do not reflect government

16

influence or inducement."). Accordingly, the actions of the Dr. Fein cannot be attributed to the County of Saratoga under a theory of state compulsion.

### 3.    The Joint or Close Nexus Test

To prevail under the joint or close nexus test, the plaintiff must show that the state " 'has so far insinuated itself into a position of interdependence with [the defendant] ... that it must be recognized as a joint participant in the challenged activity.' " *Momot v. Dziarcak*, 208 F. Supp. 3d 450, 456 (N.D.N.Y. 2016) (McAvoy, J.) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)); *see also Rosenberg*, 996 F. Supp. at 349 ("The close nexus/joint action test requires Plaintiff to demonstrate a sufficiently close nexus between the State and the challenged action of the [private] regulated entity so that the action of the latter may be fairly treated as that of the State itself." (internal quotation marks omitted)). "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004 (emphasis in original). Accordingly, mere "[c]ommunications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient

17

to make the private party a state actor." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005*); see also Bryant v. Steele*, 93 F. Supp. 3d 80, 91-92 (E.D.N.Y. 2015); *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010).

In this instance, no reasonable factfinder could conclude that Dr. Fein and the County of Saratoga were joint participants in connection with the specialist's treatment of plaintiff's shoulder injury. The record reflects that following a brief course of conservative treatment by medical personnel at the SCCF, plaintiff was approved for an orthoepic consultation. Dkt. No. 78-5 at 1-8. Medical personnel at the facility then contacted OrthoNY and scheduled an appointment for plaintiff. Dkt. No. 78-4 at 2. In anticipation of that visit, plaintiff completed new patient intake paperwork, which was faxed from the SCCF to OrthoNY. Plaintiff was examined by Dr. Fein on two occasions and, following each visit, he provided plaintiff's medical records to medical personnel at the SCCF, consistent with the generally accepted professional standards of medical care. Dkt. No. 78-4 at 3. In the absence of evidence of a concerted effort or plan between Dr. Fein and the County of Saratoga, these mere communications are insufficient to transform Dr. Fein into a state actor. The actions of the Dr. Fein therefore cannot be attributed to the County of

Saratoga under a close nexus theory.

### 4.   The Public Function Test

To be considered a state actor under the public function test, "the plaintiff must show that the private party used powers 'traditionally the exclusive prerogative of the State.' " *Burgess v. Cty. of Rensselaer*, No. 03-CV-0652, 2006 WL 3729750, at *4 (N.D.N.Y. Dec. 18, 2006) (quoting *Rendell-Baker*, 457 U.S. at 842). In general " '[t]he provision of medical care to incarcerated prisoners is a public function, even if private physicians contract with the government to provide those services.' " *Padilla v. Corr. Care Sols.*, No. 17-CV-1150, 2018 WL 550610, at *3 (N.D.N.Y. Jan. 22, 2018) (quoting *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 365 (S.D.N.Y. 2001)); *see also West v. Atkins*, 487 U.S 42, 56 (1988)) ("It is only those physicians authorized by the State to whom the inmate may turn.").

However, "[w]ith regard to doctors who treat prison inmates, the Supreme Court has held that it is 'the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State in a suit under 42 U.S.C. § 1983." *Padilla*, 2018 WL 550610, at *3 (internal quotation marks omitted) (quoting *Doe v. Torres*, No. 05 CIV. 3388, 2006 WL 290480, at *9

19

(S.D.N.Y. Feb. 8, 2006)); *see also West*, 487 U.S. at 55-56) ("[A] physician employed by [a state] to provide medical services to state prison inmates . . . act[s] under color of state law for purposes of [section] 1983 when undertaking his duties in treating [a prisoner's] injury.")). Thus, "[t]he crucial inquiry in determining whether a physician who provides medical services to inmates is a state actor for purposes of [section] 1983, is the relationship among the State, the physician, and the plaintiff." *Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (Hurd, J.) (citing *West*, 487 U.S. at 56); *see also Sykes v. McPhillips*, 412 F. Supp. 197, 204 (N.D.N.Y. 2006).

In *West*, the Supreme Court concluded that the defendant-physician, who had contracted with the state to furnish medical services within the confines of the prison to inmates confined to state prisons, was acting "under color of state law for purposes of [section] 1983" when he treated the plaintiff-inmate. *West*, 487 U.S. at 57. In so holding, the Supreme Court observed that the state "bore an affirmative obligation to provide adequate medical care to [the inmate]; the [s]tate delegated that function to [the defendant-physician]; and [the defendant-physician] voluntarily assumed that obligation by contract." *Id.* at 56; *see also Nunez*, 72 F. Supp. 2d at 27.

20

Here, no reasonable factfinder could conclude that the County of Saratoga has delegated its obligation to provide medical care to inmates to Dr. Fein or that he voluntarily assumed that obligation by contract. Plaintiff points to a number of circumstances which, he suggests, together demonstrate that Dr. Fein voluntarily assumed that function, including Dr. Fein's awareness that plaintiff was an inmate, the fact that OrthoNY provided "regular" treatment to inmates from the S.C.C.F., and OrthoNY's continuing doctor-patient relationship with plaintiff. Dkt. No. 81-1 at 2, 3; *see also* Dkt. No. 75. Even when these circumstances are viewed in the light most favorable to plaintiff, as the court, no reasonable factfinder could conclude that Dr. Fein used powers "traditionally the exclusive prerogative of the State." *Burgess*, 2006 WL 3729750, at *4 (internal quotation marks omitted).

In contrast to plaintiff's bald assertions that a contractual relationship existed, however, Dr. Fein has submitted an affidavit in support of his motion for summary judgment, in which he asserts:

> Neither I, nor OrthoNY, has any contract to provide medical services for inmates or employees with the County of Saratoga, [the S.C.C.F.], or any other Saratoga County correctional facility. There is no arrangement with myself or OrthoNY with the County of Saratoga, [the S.C.C.F.,] or any other Saratoga County correctional facility to provide

> medical services to inmates or County employees.
> There is no special relationship between myself or
> OrthoNY and the County of Saratoga, [the
> S.C.C.F.,] or any other Saratoga County
> correctional facility to provide medical services to
> inmates or County employees."

Dkt. No. 78-4 at 2; *see also* Dkt. No. 78-3 at 3. In addition, Dr. Fein

acknowledges that although he does occasionally treat inmates, inmates

constitute a very small percentage of the patients seen by his orthopedic

practice. Dkt. No. 78-4 at 3.

I note that Dr. Fein did not treat plaintiff within the confines of the

correctional facility, subject to all of the pressures and constraints resulting

from security concerns. *See West*, 487 U.S. 56 n. 15 ("Unlike the situation

confronting free patients, the nonmedical functions of prison life inevitably

influence the nature, timing, and form of medical care provided to

inmates."). Instead, after plaintiff was referred for an orthopedic consult by

medical personnel at the SCCF, he was examined by Dr. Fein examined

plaintiff at OrthoNY's office. Under these circumstances, the actions of the

Dr. Fein cannot be attributed to the County of Saratoga under the public

function theory.

In sum, because no reasonable factfinder could conclude that Dr. Fein was a state actor under any recognized theory, I recommend that his motion for summary judgment be granted.

C.    State Law Claims

Finally, in opposition to Dr. Fein's motion, plaintiff argues that the court should exercise supplemental jurisdiction over a state law medical malpractice claim against Dr. Fein. Dkt. No. 81 at 7. In reply, Dr. Fein argues that plaintiff's SAC fails to assert a medical malpractice claim, and to the extent that it does, plaintiff failed to comply with certain state statutory requirements. Dkt. No. 84-2 at 5 (citing N.Y. C.P.L.R. § 3012-a).

A district court may, in its discretion, entertain supplemental jurisdiction over state law claims, even where all federal causes of action have been dismissed, to further " 'fairness' or 'judicial efficiency,' or to resolve any 'novel or unsettled issues of state law.' " *Trade Wind Distrib., LLC v. Unilux Ag*, No. 10-CV-5716, 2011 WL 4382986, at *8 (E.D.N.Y. Sep. 20, 2011) (quoting *Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 388 (2d Cir. 2000)). "[I]n the usual case in which all federal-law claims are eliminated before trial, [however,] the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise

23

jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988); *accord Kroshnyi*, 2014 WL 5572456, at *5; *see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J. concurring) ("[A] district court ought not to exercise supplemental jurisdiction over purely state-law claims [where all federal claims are dismissed] unless there are strong reasons for doing otherwise.").

In this case, Judge Hurd undertook a thorough review of each of plaintiff's pleadings pursuant to 28 U.S.C. §§ 1915(e) and 1915A, and concluded that plaintiff had only asserted—or attempted to assert—claims related to deliberate indifference to serious medical needs. Dkt. Nos. 9, 15, 50; *see generally* Dkt. No. 51. Judge Hurd's did not construe plaintiff's SAC as asserting a cognizable state law claim against Dr. Fein. It would be inappropriate for the court to retain supplemental jurisdiction over a state law claim that did not survive the court's *sua sponte* initial review.

IV.    SUMMARY AND RECOMMENDATION

Initial discovery in this action was limited to whether Dr. Fein is a state actor for purposes of liability pursuant to 42 U.S.C. § 1983. That discovery having closed, and Dr. Fein now having moved for summary judgment on that issue, I conclude that no reasonable factfinder could

24

determine that Dr. Fein was a state actor under the compulsion, close nexus test, or public function theories when treating the plaintiff. Accordingly, it is hereby respectfully

RECOMMENDED that defendant Dr. Lawrence Fein's motion for summary judgment (Dkt. No. 78) be GRANTED and that all claims asserted against him be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

---

[5]    If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation/order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

25

David E. Peebles
U.S. Magistrate Judge

Dated:      March 25, 2019
            Syracuse, New York

2006 WL 3729750
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Brian M. BURGESS, Plaintiff,

v.

COUNTY OF RENSSELAER; Rensselaer County
Sheriff's Department; Daniel Keating, Larry
Walraed, Robert Loveridge, Harold Smith, Don
Hogan, and Morteza S. Naghibi, M.D., in their
individual and official capacities; Kathleen
Jimino, in her official capacity; John Does # 1
though 9; Adept Health Care Service, Inc.; Sherry
Lynn Mac Isaac, R.N.; Pauline T. Rose, L.P.N.;
Barbara Jean Cicognami, R.N.; Rosemary Sorel,
L.P.N.; and Jane Does # 1 through 2, Defendants.

No. 1:03-CV-00652 (NPM-RFT).
|
Dec. 18, 2006.

## Attorneys and Law Firms

Robert D. Wilcox, Wilcox Law Firm, Troy, NY, for the
Plaintiff.

Thomas J. O'Connor, Napierski, Vandenburgh &
Napierski, L.L.P., Albany, NY, for the Defendants,
County of Rensselaer; Rensselaer County Sheriff's
Department; Daniel Keating, Larry Walraed, Robert
Loveridge, Harold Smith, Don Hogan, and Morteza S.
Naghibi, M.D., in their individual and official capacities;
Kathleen Jimino, in her official capacity; and John Does
# 1 though 9.

James D. Lantier, Gabrielle Hope, Smith, Sovik,
Kendrick and Sugnet, P.C., Syracuse, NY, for the
Defendants, Adept Health Care Service, Inc.

Bruce S. Huttner, Donohue, Sabo, Varley & Armstrong,
P.C., Albany, NY, for the Defendants, Sherry Lynn Mac
Isaac, R.N. and Rosemary Sorel, L.P.N.

Joseph J. Perkins, Elizabeth J. Grogan, Wilson, Elser,
Moskowitz, Edelman & Dicker, LLP, Albany, NY, for the
Defendant, Barbara Jean Cicognani, L.P.N.

*Memorandum, Decision and Order*

NEAL P. McCURN, Senior District Judge.

**\*1** In this civil rights action plaintiff Brian Burgess
alleges that while he was held as a pre-trial detainee
at the Rensselaer County Jail ("the Jail"), each of
the 25 defendants named herein deprived him of his
constitutional rights in one way or another. Named as
defendants are the County of Rensselaer ("County");
the Rensselaer County Sheriff's Department; Daniel
Keating, the County Sheriff; Larry Walraed, the County
Undersheriff; Robert Loveridge, a Sheriff's Department
colonel; Harold Smith, a Sheriff Department lieutenant;
Don Hogan, Sheriff Department Forensic Coordinator;
Mortez S. Naghibi, M.D., Jail Physician; Kathleen
Jimino, Rensselaer County Executive; John Does No. 1-9;
Adept Health Care Service, Inc. ("Adept"); Sherry Lynn
Mac Isaac, R.N., Pauline T. Rose, L.P.N., Barbara Jean
Cicognani, L.P.N. and Rosemary Sorel, L.P.N., nurses
who purportedly worked at the Jail as employees of
Adept.; and Jane Does No. 1 & 2.

The crux of plaintiff's argument is that if, among
other things, the defendants had "regular[ly] and
continuous[ly] observe[ed][his] activities and/or [his]
medical condition[,]" he would not have fractured his left
hip while incarcerated. Doc. # 55, exh. A thereto (Co.) at
13, ¶ 54. The first four of plaintiff's ten causes of action
are based upon 42 U.S.C. § 1983. Additionally, he alleges
six supplemental state law claims: (1) medical malpractice;
(2) breach of contract [1]; (3) intentional and/or negligent
infliction of emotional distress; (4) negligence; (5) gross
negligence; and (6) negligent supervision and retention of
employees.

On January 25, 2006, the court heard oral argument with
respect to the defense motions for summary judgment
brought pursuant to Fed.R.Civ.P. 56. The court reserved
decision. Following constitutes the court's decision in this
matter.

### I. Parties' Submissions

Prior to oral argument, the court alerted counsel to what
it deemed to be certain deficiencies in their motion papers-
deficiencies which made resolving the court's task on these
motions unnecessarily arduous. At that time the court

took a fairly hardline approach in terms of what it would and would not deem to be part of the record. Upon further reflection, however, because it does not believe that parties should bear the brunt of their counsels' transgressions, and "because it does not wish to apply the Rules with a rigidity that would undermine the interests of justice," *Hudson v. Internal Revenue Service,* No. 03-CV-172, 2004 WL 1006266, at \*4 n. 9 (N.D.N.Y. March 25, 2004) (internal quotation marks and citation omitted), the court has retreated somewhat from its stated position prior to oral argument. Although "adverse to the conservation of judicial resources[,]" [2] *Kilmer v. Flocar, Inc.,* 212 F.R.D. 66, 69 ((N.D.N.Y.2002) (citations omitted), and although the court was "not required to consider what the parties fail[ed] to point out in their Local Rule [7.1 ... ] statements[,]" this court "in its discretion ... has opt[ed] to conduct an assiduous review of the record[.]" [3] *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (internal quotation marks and citations omitted); *see also Badlam v. Reynolds Metals Company,* 46 F.Supp.2d 187, 193 n. 2 (N.D.N.Y.1999) (court "parsed the record" where "the brunt of counsel's neglect w[ould] [have been] .... borne by their clients"). Thus, although it could have, the court "did *not* turn a blind eye to the facts elsewhere available[.]" *See Little v. Cox Supermarkets,* 71 F.3d 637, 641 (7 th Cir.1995) (emphasis added). Counsel are forewarned that the court will not be so lenient in any future submissions which are similarly lacking.

## II. Defendants

**\*2** Based upon several concessions by plaintiff, the court grants the motions for summary judgment as to Jane Does 1 & 2; John Does 1-9; the Rensselaer County Sheriff's Department ("the Sheriff's Department" or "the Department"); and Kathleen Jimino, sued solely in her official capacity as Rensselaer County Executive. Granting these motions reduces the number of defendants from 25 to eleven. Further, despite the plain language of the complaint wherein plaintiff alleges that he is suing a number of the municipal defendants both in their individual and in their official capacities, during oral argument he changed his position. Now, plaintiff maintains that he is suing the following municipal defendants *solely* in their *individual capacities:* Daniel Keating, the County Sheriff; Larry Walraed, the County Undersheriff; Robert Loveridge, a Sheriff's Department colonel; Harold Smith, a Sheriff Department lieutenant; Don Hogan, Sheriff Department Forensic Coordinator;

and Mortez S. Naghibi, M.D., Jail Physician. The court will proceed with its analysis accordingly.

## III. *42 U.S.C. § 1983*

Plaintiff's first four causes of action are based upon 42 U.S.C. § 1983, [4] which allows citizens to sue a state official for the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983. To establish a claim under 42 U.S.C. § 1983, a plaintiff "must show that: 1) a person acting under color of state law committed the conduct complained of and 2) that the conduct deprived the Plaintiff[ ] of some constitutional right." *Shpigler v. Etelson,* No. 05 Civ. 6206(CLB), 2005 WL 2874792, at \*6 (S.D.N.Y. Nov. 1, 2005) (citing *Daniels v. Williams,* 474 U.S. 327 (1986)).

The nurses contend that they are entitled to summary judgment with respect to plaintiff's first and third causes of action because plaintiff Burgess cannot establish either that they were state actors or that they deprived him of a constitutional right. For obvious reasons, the municipal defendants are not challenging their status as state actors. Like the nurses, however, the municipal defendants contend that they are entitled to summary judgment with respect to the first and third causes of action because plaintiff cannot establish that any of them deprived him of a constitutional right. The court will address each of these arguments in turn.

### A. State Actor

The facts underlying the state actor issue are not in dispute, only the application of the law to said facts. The court will proceed with its analysis accordingly.

"The fundamental purpose of § 1983 is to provide compensatory relief to those deprived of their federal rights by state actors." *Brown v. Community Action Organization, Inc.,* No. 03-CV-295S, 2005 WL 2412817, at \*2 (W.D.N.Y. Sept. 29, 2005) (internal quotation marks and citations omitted). Thus, "a court assessing the viability of a § 1983 claim must first determine whether the actions alleged were committed under color of state law." [5] *Id.* (citation omitted). The nurses contend that they are not state actors because they did not have a contract with the state to provide medical services to those retained at the Jail. Rather, defendant nurses explain

2006 WL 3729750

that they worked for defendant Adept, a company which "provides a variety of nursing services in a number of different settings." Doc. 55 at 9. Given the absence of a contract directly between the nurses and the County, the nurses claim that their relationship with plaintiff was nothing more than that of any "nurse and ... patient[.]" *Id.* Hence the nurses reason that they cannot be held liable under section 1983 as they were not state actors when providing medical care to plaintiff.

**\*3** Plaintiff counters that the nurses are state actors because they were employed by Adept, which *did* have a contract with the County to provide nursing care to Jail detainees. Thus, plaintiff alleges that he was deprived of his constitutional rights by "persons for whom the county is responsible and who were responsible to the county." Doc. 74 at 2 (citations omitted).

To support their argument that they are not state actors, the nurse defendants rely heavily upon *Nunez v. Horn,* 72 F.Supp.2d 24 (N.D.N.Y.1999). In *Nunez,* the court held that the defendant physician who (1) operated on the plaintiff inmate at a hospital outside the prison; (2) did not have a contract with the state to render such services; and (3) was not a prison employee was not a state actor. To be sure, like the doctor in *Nunez,* the defendant nurses were not jail employees; nor did they, as individuals, have a contract with the County to provide nursing services. The lack of a contractual relationship between the nurses and the County is not dispositive of the state actor issue herein. That is especially so given the fact that the defendants nurses were employed by Adept, an entity which albeit private did have a contract with the County to provide nursing services to ail detainees; and is itself a state actor. Under the terms of that contract, the County reimbursed Adept, which in turn paid the nurses for providing their services to Jail detainees. Thus, in contrast to *Nunez,* there *was* a contractual relationship between the defendant nurses and the County, albeit not a direct one.

*Nunez* is also distinguishable from the present case because the defendant nurses did *not* "freely perform [their] medical duties in a much more physician-controlled environment[,]" *i.e.* a private non-prison hospital. *Nunez,* 72 F.Supp.2d at 27. Rather, the nurses here were rendering their medical services within the confines of a county jail where "the nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care

provided to inmates such as [the plaintiff] ." *See West v. Atkins,* 487 U.S. 42, 57 n. 15 (1988). Given these factual differences between *Nunez* and this action, the defendant nurses' reliance upon *Nunez* is misplaced. What is more, even a cursory examination of the relevant state actor jurisprudence demonstrates that the nurses are state actors.

"When, as here, the defendant is a private ... individual, in order to satisfy the state action requirement, the allegedly unconstitutional conduct must be fairly attributable to the State." *Szekeres v. Schaeffer,* 304 F.Supp.2d 296, 306 (D.Conn.2004) (internal quotation marks and citation omitted). "Numerous Supreme Court cases have identified the 'host of facts that can bear on the fairness of such an attribution.' " *Community Action Organization,* 2005 WL 2412817, at \*3 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296 (2001)). Succinctly put, "a private activity is deemed state action: (1) when there is a close nexus between the private and state actors, (2) when the private activity is a product of state compulsion, *or* (3) when the private activity is a public function." *Turturro v. Continental Airlines,* 334 F.Supp.2d 383, 394 (S.D.N .Y.2004) (footnote omitted) (emphasis added).

**\*4** Application of the public function test to the record as presently constituted provides further support for the conclusion that the defendant nurses are state actors. To be considered state actors under that test, the plaintiff must show that the private party used powers "traditionally the exclusive prerogative of the State." *Rendell-Baker,* 457 U.S. at 842. "The standard to declare a function to belong exclusively to the state is strict, and an extraordinarily low number of functions have been held to be public." *Turturro,* 334 F.Supp.2d at 396. Nonetheless, it is well-settled that "the provision of medical care to ... prisoners is a public function, even if private physicians contract with the government to provide those services." *Young v. Halle Housing Associates, L.P.,* 152 F.Supp.2d 355, 365 (S.D.N.Y.2001) (citing *West v. Atkins,* 487 U.S. 42, 54 (1988)). In part the underlying rationale for that conclusion is that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *See Estelle v. Gamble,* 429 U.S. 97, 103 (1976). As the Supreme Court explained more fully in *West:*

Case 9:18-cv-00096-DNH-ML     Document 88     Filed 03/25/19     Page 30 of 132

It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care ... West could receive ... was that provided by the State. If the Doctor ... misused his power by demonstrating deliberate indifference to the plaintiff's serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish the plaintiff by incarceration and to deny him a venue independent of the State to obtain needed medical care.

*West,* 487 U.S. at 56.

Even though the issue in *West* was whether a private doctor who was under contract with the state to provide medical care to inmates at a state prison hospital was a state actor for section 1983 purposes, nothing in *West* or its progeny suggests that a distinction should be made between doctors and nurses in that setting. Because *Nunez* is readily distinguishable from the present case and because the defendant nurses herein were engaging in a public function, the court denies their summary judgment motion to the extent they are claiming that they are not state actors. This conclusion is bolstered by the fact that given its contractual relationship with the County to provide nursing services to County jail inmates, as the nurse defendants acknowledge in their reply memorandum, "Adept may very well be a state actor for the purpose of § 1983[.]" Doc. 75 at 5. *See Sherlock v. Montefiore Medical Center,* 84 F.3d 522, 527 (2d Cir.1996) (citation omitted) ("The fact that a municipality is responsible for providing medical attention to persons held in its custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided[.]") "[B]y extension," then, the nurses, as employees of a state actor are also state actors. *See Riester v. Riverside Community School,* 257 F.Supp.2d 968, 972 (S.D.Ohio 2002) (where community school was found to be a state actor, so were its employees and management companies); *cf. Davis v.*

*Cole-Hoover,* No. 03CV550, 2004 WL 1574649, at *10 (W.D.N.Y. June 14, 2004) ("The question of whether [the hospital] (and its affiliated medical personnel) is a state actor ... turns on the contractual relationship [the hospital] had with DOCS [the Department of Correctional Services].")

### B. Deprivation of a Constitutional Right

**\*5** Section 1983 "is not in itself a source of substantive rights, but instead proves a method for vindicating federal rights elsewhere conferred." *Kearsey v. Williams,* No. 99 Civ. 8646 DAB, 2005 WL 2125874, at *2 (S.D.N.Y. Sept. 1, 2005) (internal quotation marks and citations omitted). In the present case, plaintiff relies upon five separate constitutional amendments as the bases for his section 1983 claims. In his first cause of action, plaintiff alleges that *all* of the individual defendants denied him medical treatment, and this denial amounted to deliberate indifference to his serious medical needs in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. The second cause of action is against certain Jail officials for failure to intercede on plaintiff's behalf when his rights were being violated. Plaintiff's third cause of action is substantially similar to his first, except that it is couched solely in terms of the Due Process Clause of the Fourteenth Amendment, and it names therein only two municipal defendants-Forensic Coordinator Hogan and Dr. Naghibi-along with the nurses. Plaintiff's fourth cause of action alleges that the municipal defendants, with the exception of the doctor, through their "policies, procedures, customs and practices ... violated [his] civil rights ... under the First, Fourth, Fifth, Eighth and Fourteenth Amendments[.]" Co. at 18, ¶ 70.

Of the five amendments to which plaintiff Burgess cites in his complaint, only one directly applies here-the Fourteenth. On the face of it, the freedoms which the First Amendment protects, such as "speech, press, religion, assembly, association and petition for redress of grievances[,]" *Malloy v. Hogan,* 378 U.S. 1, 5 n. 4 (1964) (and cases cited therein), are not implicated herein; and plaintiff has not attempted to explain how they might be. Accordingly, to the extent plaintiff's fourth cause of action is predicated upon alleged violations of the First Amendment, the court *sua sponte* grants summary judgment in defendants' favor. Likewise, there is no readily apparent basis for plaintiff's reliance upon the Fourth Amendment which protects against "unreasonable searches and seizures," U.S. CONST.

amend. IV, and plaintiff offers none. Thus the court *sua sponte* grants summary judgment in defendants' favor in this regard as well.

Plaintiff fares no better when it comes to the Fifth Amendment, which applies only to the federal government. *Sylla v. City of New York,* No. 04-cv5692, 2005 WL 3336460, at * 2 (E.D.N.Y. Dec. 8, 2005) (citing *Public Utilities Commission of District of Columbia v. Pollak,* 343 U.S. 451, 461 (1952)). "Where, as here, defendants are municipal, rather than federal entities and officials, a due process claim under the Fifth Amendment must be dismissed." *Id.* (citation omitted). Thus plaintiff has improperly invoked the Fifth Amendment, and the court *sua sponte* grants summary judgment in defendants' favor in this regard as well. Likewise, because plaintiff Burgess was an *un* convicted pre-trial detainee at the times of the events complained of herein, and not an inmate, his reliance upon the Eighth Amendment is misplaced. *See R. Dye v. Virts,* No. 03-CV-6273L, 2004 WL 2202638, at *3 n. 1 (W.D.N.Y. Sept. 28, 2004) ("At all relevant times, plaintiff was a *pretrial detainee,* not a prisoner, and as such, the Eighth Amendment does not apply.")[6] In light of the foregoing, the only source of the constitutional right which plaintiff is seeking to vindicate is his Fourteenth Amendment due process right to adequate medical treatment.

### *1. Due Process*

**\*6** Because the nurse defendants' state actor argument is unavailing, and because there is no dispute that the municipal defendants are state actors, the issue becomes whether any of these defendants deprived plaintiff of his right to adequate medical care. At this juncture the court also will address this issue in terms of the individual municipal defendants.

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition *and* did so because of his deliberate indifference to that need." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citation omitted) (emphasis added). These requirements serve different purposes. "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citations omitted).

### *a. "Serious Medical Condition" and/or "Need"*

For purposes of these motions only, during oral argument the defendants willingly conceded that plaintiff's alcohol withdrawal syndrome ("AWS") constitutes a serious medical need or condition. *See* Tr. at 15. Given this concession,[7] the court will move on to address the deliberate indifference element.

### *b. "Deliberate Indifference"*

What was implicit in the parties' written submissions became explicit during oral argument: They disagree as to the legal standard to be applied in deciding whether a given defendant was deliberately indifferent. Defendants urge the court to employ a subjective standard, whereas plaintiff urges the use of an objective standard. To support the use of a subjective standard, defendants rely upon *Farmer v. Brennan,* 511 U.S. 825 (1994), wherein the Supreme Court held that an official acts with deliberate indifference when he *"knows of* and disregards an excessive risk to inmate health or safety[.]" *Id.* at 837 (emphasis added). The *Farmer* Court further held that such actual knowledge may be inferred from "evidence that the risk was obvious or otherwise must have been known to a defendant[.]" *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (citing *Farmer,* 511 U.S. at 842). In contrast, relying upon Second Circuit case law, plaintiff Burgess maintains that this court should employ "an objective standard, requiring determination of what the official knew or should have known," *Weyant,* 101 F.3d at 856 (citing *Liscio v. Warren,* 901 F.2d 274, 276-77 (2d Cir.1990)).

Plaintiff Burgess has the better argument. In assuming the applicability of the *Farmer* actual knowledge standard, the defendants fail to take into account plaintiff's status. In contrast to Farmer, who was an inmate, plaintiff Burgess was an *un* convicted pre-trial detainee at the time of the acts complained of herein. Burgess' status is significant because as previously stated, as a pre-trial detainee his claims of inadequate medical care are analyzed under the Due Process Clause of the Fourteenth Amendment, *See Richardson v. Nassau County,* 277 F.Supp.2d 196,

201 (E.D.N.Y.2003), rather than under the Eighth Amendment, which was the constitutional basis for the plaintiff inmate's claims in *Farmer.* The Second Circuit's rationale for applying what has been described as a "more protective standard[,]" *Gulett v. Haines,* 229 F.Supp.2d 806, 815 (S.D.Ohio 2002) (footnote omitted), is grounded in its conviction "that an unconvicted detainee's rights are *at least as great as* those of a convicted prisoner." *Weyant,* 101 F.3d at 856 (citing, *inter alia, City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244 (1983)) (emphasis added).

**\*7** To be sure, "the Supreme Court has not stated whether the [*Farmer* actual knowledge] standard should be applied in the due process context [.]" *Weyant,* 101 F.3d at 856. However, given the Second Circuit authority directly on point, this court will analyze plaintiff's deliberate indifference claims in terms of whether each of the individual defendants knew or should have known of plaintiff Burgess' serious medical condition, as have other courts within this Circuit. *See, e.g., Pettus v. Horn,* No. 04 Civ. 459, 2005 WL 2296561, at \*3 (S.D.N.Y. Sept. 21, 2005) (citation omitted) (granting summary judgment to nurse and doctor on deliberate indifference claim where there was no evidence to support plaintiff's assertion that those defendants "should have known that he suffered from something other than an ear infection"); *Frazier v. Captain,* No. 96 CIV. 2639, 1999 WL 1084241, at \*2 (S.D.N.Y. Dec. 1, 1999) (denying summary judgment on deliberate indifference claim where corrections officer "who was able to see [plaintiff] through the cell window, might well have known, or be charged with knowledge, that [plaintiff] was having an asthma attack[ ]").

Once it is determined that a plaintiff's medical condition was objectively serious, the issue becomes "whether there is enough record evidence to support an inference that any defendant acted with a sufficiently culpable state of mind in the treatment of [or failure to treat] those serious medical needs." *Id.* at 144 (internal quotation marks and citation omitted). Such a state of mind "describes a mental state more blameworthy than negligence[.]" *Id.* (citations omitted). It "is a mental state equivalent to criminal recklessness, *i.e.* a conscious disregard of a substantial risk of serious harm." *Young-Flynn v. Horn,* No. 03-CV-3434JG, 2005 WL 3544087, at \*3 (E.D.N.Y. Dec. 28, 2005) (citation omitted). "Thus, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully

establish Eighth Amendment liability." *Kemp v. Wright,* No. 01 CV 562, 2005 WL 893571, at \*4 (E.D.N.Y. April 19, 2005) (internal quotation marks and citation omitted). By the same token though, "a plaintiff is not required to show that the defendant acted for the very purpose of causing harm or with knowledge that harm will result." *Young-Flynn,* 2005 WL 3544087, at \*3 (internal quotation marks and citations omitted).

As the foregoing demonstrates, "mere negligence will not support a section 1983 claim; the conduct complained of must shock the conscience or constitute a barbarous act." *Hannah v. Chouhan,* No. 3:04-CV-314, 2005 WL 2042074, at \*3 (D.Conn. Aug. 24, 2005) (internal quotation marks and citations omitted). Similarly, "mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000) (internal quotation marks and citations omitted).

**\*8** Nor does "mere disagreement over the proper treatment" create a constitutional deliberate indifference claim. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). "So long as the treatment is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a [ ] [constitutional] violation." *Id.* Likewise, "a claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983." *Hannah,* 2005 WL 2042074, at \*3. Nor are "[d]isagreements over medications, diagnostic techniques ... forms of treatment, or the need for specialists or the timing of their intervention ... adequate grounds for a[s]ection 1983 claim." *Rush v. Artuz,* No. 00 Civ. 3436, 2004 WL 1770064, at \*9 (S.D.N.Y. Aug. 6, 2004) (internal quotation marks and citation omitted).

"To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." *Denis v. N.Y.S. Department of Correctional Services,* No. 05Civ.4495, 2006 WL 217926, at \*13 n. 16 (S.D.N.Y. Jan. 30, 2006) (internal quotation marks and citation omitted); *see also Turner v. Goord,* 376 F.Supp.2d 321, 326 (W.D.N.Y.2005) (citations omitted) ("To establish

deliberate indifference, ..., plaintiff must prove that the defendant had a culpable state of mind and intended wantonly to inflict pain.)

Because the thrust of plaintiff Burgess' deliberate indifference claim is a claimed delay in providing medical care, it should be noted that *"intentional* denial or *delay* in accessing medical care may evidence deliberate indifference." *Richardson v. Nassau County,* 277 F.Supp.2d 196, 203 (E.D.N.Y.2003) (emphasis added). In fact, in certain circumstances, a five or six hour delay may rise to the level of deliberate indifference. *See Davidson v. Harris,* 960 F.Supp. 644, 648 (W.D.N.Y.1997), *citing Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984). However, "the reason for the delay is more significant than its duration." *Grant v. New York City Dep't of Corrections,* No. 94-Civ.-2793, 1996 WL 14463, at *4 (S.D.N.Y. Jan. 16, 1996), *citing Archer,* 733 F.3d at 16. Courts have reserved a finding of deliberate indifference based on a delay in accessing medical care "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life threatening and fast degenerating' condition for three days; or delayed major surgery for over two years." *Freeman v. Strack,* No. 99-Civ.-9878, 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000), *quoting Demata v. New York State Correctional Dep't of Health Servs.,* No. 00-0066, 198 F.3d 233 (Table), 1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations omitted). Nonetheless, it is important to remember that "an inadvertent failure to provide adequate medical care is not tantamount to deliberate indifference." *Richardson,* 277 F.Supp .2d at 203 (internal quotation marks and citation omitted).

**\*9** There is no need to repeat the entire body of summary judgment law which has developed since what has been dubbed the *Celotex* trilogy, [8] but some aspects do bear repeating. It is beyond dispute that "[t]he burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment." *Denis v. N.Y.S. Department of Correctional Services,* No. 05 Civ .4495, 2006 WL 217926, at *9 (S.D.N.Y. Jan. 30, 2006) (citing, *inter alia, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). "The movant may discharge this burden by demonstrating ... that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). The court must keep firmly in mind, and not lose sight of

the fact that in opposing these defense motions, "it is ... plaintiff [ ] [Burgess'] burden to produce the evidence that can establish ... deliberate indifference." *See Jane Doe II v. City of Hartford,* No. Civ.3:01CV1026(AHN), 2005 WL 2009051, at *3 (D.Conn. Aug. 22, 2005) (citing *Celotex,* 477 U.S. at 322-23)). Thus, defendants will be entitled to summary judgment as to the due process claims, if they can show an absence of evidence to support plaintiff's claims of deliberate indifference.

### *i. Defendant Sorel*

In arguing that she was not deliberately indifferent as a matter of law, defendant Sorel describes only her interaction with plaintiff on May 27, 2002. For the moment that will be the focus of the court's inquiry as well.

On May 27, 2002, plaintiff's fourth day of incarceration, at approximately 7:50 p.m., defendant Sorel gave plaintiff Effexor, an anti-depressant. *See* Doc. 55, attachment 38 thereto ("Sorel Stmt") at ¶ 17 (citation omitted); and Doc. 74, attachment 6 thereto ("Pl. Resp. to Sorel") at ¶ 17. Around that same time, Ms. Sorel "checked" on plaintiff and observed that "he was acting very strange, very bizarre[,]" so she called another defendant, Morteza S. Naghibi, the Jail physician. *See id.* at ¶ 18 (citing, *inter alia,* exh. E thereto at 82-83); Pl. Resp. to Sorel at 2, ¶ 18. At her deposition Ms. Sorel testified that during that telephone conversation she "advise[d]" the Dr. that plaintiff "was having DT's [sic] [delirium tremors][;]" he was "trembling[;]" and he was having "hallucinations[.]" *Id.* at ¶ 19 (citing exh. E at 62); Pl. Resp. to Sorel at 2, ¶ 19; Ms. Sorel further testified that at that point she "kn[e]w plaintiff was pretty incoherent." *Id.* at ¶ 18 (citing, exh. E at 82); Pl. Resp. to Sorel at 2, ¶ 18.

In response to defendant Sorel's inquiry, Dr. Naghibi ordered Librium, *id.* at ¶ 19 (citing exh. E at 62); Pl. Resp. to Sorel at 2, ¶ 19, which Sorel gave to him at 9:20 p.m. *Id.* at ¶ 20 (citing exh. G at 50); [9] and Pl. Resp. to Sorel at 3, ¶ 20 (citing, *inter alia,* exh. G at 50). Thus, within an hour and a half of defendant Sorel first noticing that plaintiff was having what she "believe[d] to be" AWS, the proof is uncontroverted: She contacted Dr. Naghibi; he ordered Librium and she administered it. *See id.* at ¶ 18 (citing exh. E at 47); Pl. Resp. to Sorel at 2, ¶ 18. Additionally, defendant Sorel "directed the ... Corrections Officers to put ... plaintiff on ... Frequent Supervised Visit [FSV]

status," so that a Corrections Officer would be "keeping a watchful eye" on plaintiff, "checking on him at least every 15 minutes, and reporting any difficulties to the Nursing staff." *Id.* at ¶ 21 (citations omitted); and Pl. Resp. to Sorel at 3, ¶ 21. Prescribing Librium and placing an inmate on FSV status were "standard" orders for AWS at the Jail. *See id.* (citing exh. E at 64); *see also* Pl. Resp. to Sorel at 3, ¶ 21. Based upon the foregoing facts, *all* of which plaintiff freely admits, defendant Sorel maintains that there is an absence of evidence to support a claim of deliberate indifference against her. Hence, she argues, she is entitled to summary judgment [as to the first and third [section 1983 based] causes of action.]

**\*10** Although defendant Sorel was the first nurse at the jail to recognize the possibility that plaintiff had AWS, and although she acted promptly once she came to that conclusion, plaintiff counters that nonetheless Sorel was deliberately indifferent. He posits that defendant Sorel was deliberately indifferent on May 27, 2002, because she "either was or could and should have been in possession of sufficient information to make or call for a significantly more aggressive response to [his] serious medical condition" than the response outlined above. Doc. 71 at 16, ¶ 58. In plaintiff's opinion, this "significantly more aggressive response[ ]" meant that he should have been hospitalized "to confirm [Sorel's] ... diagnosis of [AWS][.]" *Id.* Hospitalization was also mandated, in plaintiff's view, so that he could obtain "appropriate and necessary treatment and observation" and to "determine the source [of] and [to] treat his pain[ ]" on that date. *Id.* From plaintiff's perspective Sorel was also deliberately indifferent "on and after" May 27, 2006, by "fail[ing] ... to seek the transfer of Plaintiff to a hospital for appropriate treatment and to ensure [his] timely examination by [Dr.] Naghibi[.]" *See id.* at 16, ¶ 59. Plaintiff further raises the specter that Sorel was deliberately indifferent because on May 27, 2002, she did not "check" on plaintiff until approximately seven hours after her shift began. Doc. 74 at 3. During oral argument plaintiff added yet another theory of deliberate indifference-the fact that supposedly another inmate told Sorel that plaintiff was in pain, but she never responded.

On the face of it, these arguments are straightforward. The task of analyzing them was made unnecessarily arduous by two factors: (1) the manner in which plaintiff sought to meet his burden of production; and (2) the manner in which he presented his legal arguments.

As a vehicle for demonstrating a genuine issue of material fact, plaintiff's Response to Sorel's L.R. 7.1(a) Statement was practically useless. When cites were provided, more often than not they did not support a given proposition. For example, plaintiff asserts that on five different days defendants "Sorel and/or Mac Isaac were aware, or could and should have become aware[ ]" of certain conditions which plaintiff purportedly had. Pl. Resp. to Sorel at 3-4, ¶ 36. Plaintiff did not cite to the record to support any of these statements, however; and, as the Second Circuit has recognized, "a court is not required to consider what the parties fail to point out[.]" *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (internal quotation marks and citations omitted). Moreover, conclusory and speculative, unsupported statements such as that/this fall far short of the "affirmative and specific evidence showing that there is a genuine issue for trial[,]" which the Supreme Court has held the non-moving party must show to survive summary judgment. *See Toriola v. New York City Transit Authority,* No. 02 CIV. 5902, 2005 WL 550973, at \*4 (S.D.N.Y. March 9, 2005) (citing *Liberty Lobby,* 477 U.S. at 256-57).

**\*11** Omitting record cites was not the only way in which plaintiff's opposition papers were lacking. Through his attorney's affidavit, the plaintiff did provide a far more detailed recitation of the facts than is found in either his memorandum or his L.R. 7.1 Response, but that did not completely cure the defects just described. For one thing, as with his L.R. 7.1 Response, many times the cites in attorney Wilcox's affidavit did not support a given averment. To illustrate, plaintiff avers that defendant Sorel administered Effexor and Librium to him on May 28, 2002, at 2:00 p.m. and 7:47 p.m. *See* Doc. 71 at 6, ¶ 16. The cited "Medication Administration Records" does not support this "fact;" nor do any of the other cited documents. At best, all that can be shown from the cited documents is that on May 28, 2002 at "19:47 [7:47 p.m.]" there were "meds [medications] on [the] unit, [and] no refusals." Doc. 55, exh. G thereto at 1st unnumbered page after p. 57.

Plaintiff has not cited to any part of the voluminous record showing that it was defendant Sorel who was responsible for giving those medications to plaintiff and/or that she did so at those times on that date. This is but one example of many where a careful review of the cited documents reveals that they did not

support plaintiff's version of the facts as averred in his attorney's affidavit. Obviously, failing to accurately cite to the record significantly undermines a party's credibility. Compounding plaintiff's failure to properly and adequately identify those facts which he believes defeat Sorel's summary judgment motion is the lack of legal analysis in his opposing memorandum. It might have been possible to overlook the slipshod manner in which plaintiff submitted claimed factual disputes had his memorandum of law included legal arguments, which the Second Circuit has defined "as advancing one's contentions by *connecting the law* to the facts[,]" *Sioson,* 303 F.3d 458, 460 (2d Cir.2002) (emphasis added), but it did not. There is not one cite to the record in plaintiff's memorandum submitted in opposition to defendant Sorel's and Mac Isaac's summary judgment motion. Instead, plaintiff offers such pejorative and speculative statements as the following: "A mere cursory review of the Corrections Officer's entries in the jail logs pertaining to their observations of the Plaintiff and his dire condition would have snapped any conscientious medical person to attention and an immediate response." Doc. 74 at 3. Plainly such statements do not advance plaintiff's arguments in any way. In fact, they have the opposite effect.

Moreover, when plaintiff did include cites to case law, he did not include the "requisite combination of authorities and putative facts." *See id.* (footnote omitted). Thus, in the words of the *Sioson* court, plaintiff Burgess' memorandum is nothing more than "a doctrinal recapitulation masquerading as a legal argument." *Id.*

**\*12** Regarding plaintiff's claimed issues of fact, he attempts to create such issues in several ways. First, he claims that when Sorel spoke with Dr. Naghibi on May 27th, she "had no idea how long plaintiff had been suffering ["DTs"] and did not therefore convey that information to" the doctor. Pl. Resp. to Sorel at 3, ¶ 33 (citing Doc. 55, exh. E thereto at 85-87). Assuming that the cited portion of Ms. Sorel's deposition supports this statement, the same does not create a genuine issue of material fact so as to defeat Sorel's summary judgment motion. No such factual issue is created because as the undisputed facts set forth above show, within an hour and a half of first noticing that plaintiff was having what she "believe[d] to be" AWS, Sorel contacted the Jail physician, who ordered Librium, which she then administered. *See* Sorel Stmt at ¶ 18 (citing Doc. 55, exh. E thereto at

47; Pl. Resp. to Sorel at 2, ¶ 18. Those actions certainly do not evince "a mental state equivalent to criminal recklessness," which is the standard required to sustain a deliberate indifference claim. *See Young-Flynn,* 2005 WL 3544087, at *3.

Second, plaintiff cannot avoid summary judgment on the theory that Sorel "knew or should have known on May 27, 2002 at approximately 8:00 p.m. that [he] had a history of alcohol use and/or dependency." Pl. Resp. to Sorel at 3, ¶ 34 (citing Doc. 55, exh. C thereto; and Sorel Dep. at 37-40). In his Medical History Report, which Sorel filled out, plaintiff did report a "history of alcohol use," but *not* dependency. Pl. Resp. to Sorel at 3, ¶ 34 (citing Doc. 55, exh. C thereto; and Doc. 55, exh. E thereto at 37-40). In fact, the only reported detail of alcohol use was that plaintiff had a "6 pkg" of beer the day before his incarceration. *Id.* (citing Doc. 55, exh. C thereto at 1). Because Sorel filled out that report it is reasonable to infer that she was aware of plaintiff's reported alcohol use. Regardless, plaintiff has not shown how such awareness creates a genuine issue of material fact as to Sorel's alleged deliberate indifference. Indeed, Sorel's call to Dr. Naghibi because she believed plaintiff was suffering from AWS is consistent with her knowledge that plaintiff had a history of alcohol use.

Third, plaintiff claims that defendant[ ] Sorel ... w[as] aware, or could and should have become aware," of the following:

> that [p]laintiff: 1) was suffering pain: 2) had defecated and/or urinated on himself causing a significant and noticeable odor on th-1 Unit; 3) could not walk and lay on his cot in his cell, and; 4) was moaning in pain.

*Id.* at 3, ¶ 36. Insofar as the alleged pain is concerned, plaintiff claims that Sorel should have been aware of same because inmate Rios told her to see plaintiff about it. *Id.* at 3-4, ¶ 36 (citation omitted). Supposedly defendant Sorel did not respond to any of the foregoing, which from plaintiff's standpoint creates a genuine issue of material facts as to whether Sorel was deliberately indifferent. *See id.* at 4, ¶ 38. Assuming *arguendo* that the record

supports the forgoing assertions, [10] plaintiff still has not demonstrated an issue of fact that, if resolved in his favor, would show that the care rendered by defendant Sorel on May 27, 2002, rose to the level of a constitutional deprivation.

**\*13** All of the foregoing conditions, such as being in pain and unable to walk, are equally consistent with AWS as with a fractured pelvis. And, as discussed above, defendant Sorel did promptly respond to what she believed to be plaintiff's diagnosis at the time-AWS. The fact that she may have misdiagnosed plaintiff in terms of his fractured pelvis and/or rendered faulty judgment in connection therewith is, without more, at most malpractice which is *not* cognizable under section 1983. *See Hannah,* 2005 WL 2042074, at \*3.

Moreover, there is nothing in the record to show that on May 27, 2002, defendant Sorel knew or should have known that plaintiff had a fractured hip. As just stated, his symptoms could just as easily have been attributable to AWS as to a fractured pelvis. This is all the more so considering that there was nothing during plaintiff's "Initial Medical Screening," nor in his "Medical History Report," both of which Sorel filled out upon plaintiff's May 23, 2002 admission to Jail, indicating that he had any problems whatsoever with his hip.

At this "Initial Medical Screening," plaintiff did not show any "visible signs of trauma, illness, pain or bleeding that require[d] emergency care[.]" *See* Doc. 71, exh. B thereto. Asked directly whether he "ha[d] any medical condition that [the Jail] should know about[,]" plaintiff answered that he was taking "prilosec[.]" *Id.* He did not mention AWS and/or a fractured pelvis. In fact, at that time, plaintiff's most "recent[ ]" reported "treat[ment] by a doctor or hospitaliz[ation]" had been "[f]or stomach problems[;]" not for AWS or for a fractured hip. *See id.* Plaintiff signed this Screening form three times, including a certification that the information "supplied by" him was "true and complete to the best of [his] knowledge." *Id.* Likewise, on the "Medical History Report," which defendant Sorel also filled out upon plaintiff's incarceration, when specifically asked about "[p]ainful or [s]wollen [j]oints[,]" he answered, "NO ." Doc. 71, exh. C thereto at 1. Under these circumstances, defendant Sorel would have had no reason to doubt plaintiff or question him about his pelvis.

Fourth, plaintiff claims that inmate Rios told defendant Sorel that "[p]laintiff was in pain and asked" her to see plaintiff, but she "never" did, and this too creates a factual issue as to whether or not Sorel was deliberately indifferent. *See* Pl. Resp. to Sorel at 4, ¶ 37 (citations omitted). Plaintiff provides two cites to the record, but neither supports this proposition. *See id.* (citing, *inter alia,* Doc. 73, exh. E thereto at 20-22). Page 49 of the M-1 Unit Log does not mention any such communication between plaintiff and defendant Sorel, let alone that Sorel did not respond to same. Indeed, instead of ignoring plaintiff, that page shows, as noted earlier, that Sorel was going to contact Dr. Naghibi "for medication for [inmate] Burgess ['] D.T.s[.]" Doc. 55, exh. G thereto at 49.

**\*14** Even if the cited portions of Rios' deposition establish that he spoke to Sorel about plaintiff, [11] they do not establish that he told Sorel that plaintiff was in pain. The cited portion of Rios' testimony was far more ambiguous on that point. He testified that he told "the nurse in medication ... *to go check*" on "an inmate in room 15[,]" which is where plaintiff was housed. *Id.* (citing Doc. 73, exh. E thereto at 20; and 21) (emphasis added). The relevance of this testimony is further undermined by the lack of a time frame. Failing to check on an plaintiff for some indeterminate reason, at some unknown point during his nearly two week incarceration, does not present a fact issue which would preclude summary judgment on the issue of whether Sorel was deliberately indifferent.

As the foregoing discussion shows, plaintiff Burgess has not come forth with any evidence even tending to support an inference that defendant Sorel acted with a sufficiently culpable state of mind, either in treating or failing to treat his AWS and/or fractured pelvis, so as to sustain a claim of deliberate indifference against her. For example, plaintiff has not directed the court to any record evidence "describ[ing] a mental state *more blameworthy* than negligence[.]" *See Herndandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted) (emphasis added). Certainly there is nothing in defendant Sorel's actions or inaction on May 27, 2002, which "shock[s] the conscience or constitute[s] a barbarous act." *See Hannah,* 2005 WL 204204, at \*3 (internal quotation marks and citations omitted). In the absence of such proof, "there can be no genuine issue of material fact[;]" and hence, "summary judgment [in Sorel's favor] is appropriate." *See Fox v. Town of East Haven,* No. Civ. 302CV 1540WWE, 2006

WL 287208, at *2 (D.Conn. Jan. 6, 2006) (citing *Celotex*, 477 U.S. at 322-23).

As explained at the outset, as did defendant Sorel, the court has framed its analysis almost exclusively in terms of whether she was deliberately indifferent on May 27, 2002. However, because plaintiff's complaint and opposition papers can be read as asserting that she was also deliberately indifferent on other days, the court will expand its analysis accordingly.

Prior to May 27, 2002, defendant Sorel had seen plaintiff on May 23, 2002, his first day in jail, when Sorel did an "Initial Medical Screening." *See* Doc. 71, exh. B thereto. Several of plaintiff's responses to that screening are particularly noteworthy. Plaintiff denied "regular[ ] use" of alcohol, and he did not "appear to be under the influence of alcohol/drugs[;]" at that time. *Id.* Nor did plaintiff have "signs of [alcohol/drug] withdrawal[.]" *Id.* Turning to the issue of medication, when asked whether he was "carrying any ... or taking any ... prescribed by a doctor[,]" plaintiff answered that he was taking medication for "depression, anxiety[.]" *See id.* This response is consistent with Sorel's observation that plaintiff "appear[s] to have ... psychiatric problems[.]" *Id.*

**\*15** On the "Medical History Report," which Sorel evidently also filled out on May 23, 2002,[12] plaintiff reported a history of alcohol use, with his "last use" being a "6 pkg" of beer "yesterday," *i.e.* May 22, 2002- the day before his incarceration. *See* Doc. 71, exh. C thereto at 1. As on the Initial Medical Screening form, this report indicates that plaintiff was not then "under [the] influence [of] ... [a]lcohol[.]" *See id.* Moreover, he was "alert/oriented[.]" *Id.* However, also as with his Initial Screening, plaintiff did report that he had depression, but he did not have any "[p]ainful or [s]wollen [j]oints[.]" *See id.*

Plaintiff asserts that defendant Sorel saw him five more days after that initial screening. In particular, leaving aside May 27th, plaintiff claims that Sorel administered prescription medications to him on May 24 th, 28th, 29th, and 30th. *See* Doc. 71 at 6, ¶ 16. However, the cited parts of the record only establish that Sorel administered medications to plaintiff on two of those days-May 24th and 27th. *See id.* (citing Doc. 55, exh. I thereto at 1; Doc. 55, exh. G thereto at 49-50). Because those particular cites do not substantiate plaintiff's claim that defendant Sorel

gave him medications on May 28, 29, and 30, 2002, this court will proceed as have other courts within this Circuit when faced with a situation where the cited materials do not support a party's factual assertions, and disregard same. *See Holtz v. Rockefeller & Co., Inc.* 258 F.3d 62, 73-74 (2d Cir.2001) (and cases cited therein). This lack of proof is significant because without it there is no evidence that Sorel saw plaintiff on those days, and hence nothing to substantiate the theory that on those dates Sorel knew or should have known that plaintiff was in pain, etcetera.

In light of the foregoing, plaintiff has failed to come forth with evidence showing a genuine issue of material fact with respect to whether defendant Sorel was deliberately indifferent on May 27 or May 28-30, 2002. As such, defendant Sorel is entitled to summary judgment on the due process claims against her. The court will proceed with its analysis regarding plaintiff's claims of deliberate indifference by nurses Mac Isaac and Cicognani.

#### ii. Defendant MacIsaac

Defendant MacIsaac's first contact with plaintiff was sometime between 8:00 a.m. and 9:30 a.m on May 28, 2002, the day after he had been diagnosed with AWS. Doc. 55 at ¶ 24 (citing exh. F thereto at 61); Pl. Resp. at 3, ¶ 24. Sometime thereafter, but before 12:30 p.m. when she made her notes for the morning, MacIsaac also took plaintiff's vital signs, *i.e.* his blood pressure, pulse and respiration, and found them to be within normal limits. *Id.* at 62-65. According to defendant MacIsaac, the "purpose" of noting plaintiff's normal vital signs was to show that he was "responding to his [AWS] protocol [,]" *id.* at 65, a fact which plaintiff readily concedes. Pl. Response to MacIsaac at 3, ¶ 26.

**\*16** MacIsaac saw plaintiff again on May 31, 2002 at approximately 10:00 a.m. when she noted that he was complaining of pain to his left hip. *Id.* (citing Huttner Aff., exh. J thereto). She noted that plaintiff was "unable to bear weight." *Id.* At that time plaintiff "report[ed] he 'fell a few days prior to coming to the hospital[ ].' " *Id.* According to those May 31, 2002, progress notes, plaintiff "consented" to defendant MacIsaac "speaking" to a doctor." *Id.* Defendant MacIsaac noted, however that she "could not find" one. *Id.* Nonetheless, she explicitly stated that plaintiff was "to have x-ray of [left] hip/pelvis."

*Id.* Plaintiff was then sent for an x-ray at 3:18 p.m. on May 31st. *See* Huttner Aff., exh. G thereto at 75.

In his opposing memorandum, plaintiff's initial response is to make a bald, wholly uncorroborated assertion which apparently is intended to show that MacIsaac was deliberately indifferent. In particular, plaintiff contends: "Defendant ... MacIsaac observed [him] after he was suffering from a fractured hip, was face to face with him and again considering the jail log notations and complaints and reports of other inmates and the fact that he had to be transported in a wheelchair, completely failed to respond and provide Plaintiff any care or treatment or see that he received any care or treatment." Doc. 74 at 3. Clearly this statement, which does *not* include supporting cites to the record, is at odds with the facts outlined above, which are supported by the record. Accordingly this bald conclusory assertion is completely inadequate to withstand defendant MacIsaac's summary judgment motion on the issue of deliberate indifference.

Further, plaintiff's counter L.R. 7.1(a)(3) Statement is insufficient to create a genuine issue of material fact with respect to the alleged deliberate indifference by defendant MacIsaac. As previously discussed, the allegations in paragraph 36 of that Statement do not suffice to meet plaintiff's burden as the non-moving party on this summary judgment motion. As also explained above, to the extent plaintiff is relying upon the *entire* Rios deposition, the court will not take same into account given plaintiff's failure to parse out the relevant portions.

Based in part upon the May 31, 2002 note by defendant MacIsaac previously referenced in his counter L.R. 7.1(a)(3) Statement, plaintiff contends that even though MacIsaac noted that he had pain in his left hip at 10:00 a.m., she did not seek an x-ray from the jail doctor, and he did not leave the unit for an x-ray until 3:18 p .m., slightly more than five hours later. Even if the citations which plaintiff proffers supported that version of events, which they do not, at most defendant MacIsaac's inaction in this regard would amount to negligence which, as previously noted, is not actionable under section 1983. Furthermore, again, even assuming *arguendo* that MacIsaac did not get an x-ray for the doctor and plaintiff did not leave the unit for an x-ray for five hours, that delay, without more, does not "give rise to a reasonable inference that [defendant MacIsaac] knew of [a] serious medical need[ ] and intentionally disregarded it." *See Perez v.*

*Hawk,* 302 F.Supp.2d 9, 20 (E.D.N.Y.2004). There is no evidence whatsoever that MacIsaac intentionally delayed plaintiff's x-ray, much less that she did so as a form of punishment, or that the delay was due to anything more than administrative reasons. *Cf. Archer,* 733 F .3d at 16. For the aforementioned reasons, defendant Mac Isaac is entitled to summary judgment as to the due process claims against her.

### iii. Defendant Cicognami

**\*17** Defendant Cicognami contends that her interaction with plaintiff was limited to Sunday morning, May 26, 2002, [13] when she checked the results of his tuberculosis test by looking at the test site on his arm. Grogan Aff., exh. B at 53. After observing that plaintiff tested negative for tuberculosis, defendant Cicognami "medically cleared [him] to leave the isolation unit." Doc. 58 at 1; *see also* Grogan Aff., exh. B at 53. Plaintiff does not contend otherwise. Indeed, he testified that he "didn't" remember "meet[ing] with a nurse on Sunday morning," May 26, 2002. Doc. 55, attach. 2, exh. C at 70. He also acknowledged that he did not recall complaining of left hip pain to anyone in the Jail that morning. *Id.*

In her memorandum of law, defendant Cicognami contends that during her morning shift at the Jail no one "advised [her] of any facts that would lead her to have any concern for plaintiff's welfare or health." Doc. 58 at 2. She further claims that while checking plaintiff for tuberculosis, she "observed no irrational or erratic behaviors by [him]." *Id.* Nowhere in her memorandum of law or Supplemental Statement of Facts did defendant Cicognami cite to the voluminous record to support these conclusory statements.

Defendant Cicognami expressly adopted the L.R. 7.1 Statement of defendants MacIsaac and Sorel, [14] which she supplemented with her own such Statement. In her Supplemental Statement defendant Cicognami adds two facts which plaintiff admits. The first is that Cicognami is a LPN who began working with Adept at the Jail in October 1996. Doc. 58, attach. 5 at ¶ 1. The second admitted fact is that she worked the 8:00 a.m.-4:00 p.m. shift at the Jail on May 26, 2002. *Id.* at ¶ 2.

In his Memorandum of Law opposing Cicognami's motion for summary judgment, Plaintiff argues, without

citation to the record, that "by and before May 26, 2002," "Plaintiff was in a desperate and dire physical condition," and that for Nurse Cicognani "[t]o acknowledge observation of and contact with the Plaintiff at that time and not acknowledge his condition and to submit she had no reason to suspect any further interaction with the Plaintiff was necessary or advisable is simply not credible." Doc. 73 at 1. At oral argument, counsel for plaintiff elaborates on this argument to the extent he cites the May 26, 2002 entries of the medical unit log, which he alleges reflect plaintiff was "ranting and sweating" at the time Cicognani interacted with him. *See* Tr. at 27:21-29:23. The court's review of the medical unit log entries for May 26, 2002 reveals that at 9:48 a.m., it was noted that plaintiff was "ranting, sweating". *See* Doc. 55, Huttner Aff. Exh. G at 38. Thirty five minutes later, it was noted that plaintiff was "medically cleared". *See id.*

Upon its own further review of the record, the court notes Cicognani testified that she did not have any recollection specific to May 26, 2002 regarding whether she reviewed the medical unit log when she came on duty. *See* Doc. 58 at Exh. B, 37:19-22. Further, Cicognani testified that did not recall plaintiff "ranting and sweating" that day, only that she checked his arm to read the tuberculosis test. *Id.* at 49:18-20; 53:3-8. There is no evidence to indicate Cicognani was present and observed plaintiff while he was in a state of upset, thus no evidence that she consciously disregarded same. As such, Cicognani is entitled to summary judgment on plaintiff's due process claim against her.

### iv. Municipal Defendants

**\*18** As mentioned at the outset, plaintiff's first section 1983 cause of action is against *all* of the individual defendants. In moving for summary judgment on their behalf, except for the defendant doctor, attorney O'Connor did not distinguish between these defendants (Sheriff Keating, Undersheriff Walraed, Sheriff Department Colonel Loveridge and Sheriff Department Lieutenant Smith). Rather, it is the municipal defendants' position that they were not deliberately indifferent because the "deposition testimony of the Correction Officers and the nursing staff conclusively establish procedures at the jail during plaintiff's confinement reasonably calculated to address plaintiff's [AWS]." Doc. 63 at 9. These defendants provided no legal

analysis whatsoever as to how these claimed "procedures" demonstrate that they are entitled to summary judgment on the issue of deliberate indifference. They do raise a valid argument in their reply memorandum, however; and that is the seeming lack of evidence that any of the individual municipal defendants had the requisite culpable state of mind.

In any event, in his opposing memorandum, plaintiff baldly asserts that he has "established the defendants' deliberate indifference to plaintiff's serious medical condition." Doc. 72 at 2. Nowhere in that memorandum does he explain how any of the municipal defendants were deliberately indifferent, however. Instead, he recites a host of cases, but he does not apply the law to the facts of the present case. Thus, as the Second Circuit has so aptly put "[p]laintiff's brief is ... little more than a doctrinal recapitulation masquerading as a legal argument, tantamount to an invitation [for the court] to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for [plaintiff]." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 132 (2d Cir.2004). Therefore, plaintiff's memorandum does nothing to advance the argument that there are genuine issues of material fact precluding summary judgment on the issue of deliberate indifference.

As previously stated, at oral argument, plaintiff concedes that all municipal defendants are sued in their individual capacities only. Also at oral argument, plaintiff concedes that the only municipal defendants who had any personal involvement in the underlying events of this action are Hogan and Naghibi, and to a lesser extent, Loveridge, and that all municipal defendants, with the exception of Hogan and Naghibi, are liable as supervisory officials. *See* Tr. 32:15-35:3.

"[A] plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must show that the supervisor was personally involved in the alleged constitutional deprivation." *Baez v. Poole,* No. 04-CV-6316L, 2006 WL 3256858, at \*3 (W.D.N.Y. Nov. 9, 2006), *citing Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). Said personal involvement

> may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional

violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*19** *Id., quoting Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Regarding defendants Keating, Walraed and Smith, there is no evidence in the record which would indicate that they had any knowledge of the events at issue in this lawsuit at the time they occurred. As such, there is no basis for a finding of deliberate indifference on their behalf.

Regarding Loveridge, plaintiff states, again without pinpoint [15] citation to the record, that at some point during plaintiff's incarceration, he conducted a tour of the M-1 Unit. The court's review of the Unit log reveals that Loveridge was on the M-1 Unit for an inspection at 4:05 p.m. on May 29, 2002. *See* Doc. 55, Huttner Aff. exh. G at 61. Nothing in the log reveals that plaintiff was acting in an unremarkable manner during Loveridge's inspection. There being no evidence that Loveridge was personally involved in the events underlying this lawsuit, or that he was contemporaneously notified of same, no basis exists for a finding that he was deliberately indifferent.

Defendant Hogan's involvement was limited to a meeting with plaintiff on May 24, 2002, well before plaintiff was exhibiting symptoms of AWS. *See* Doc. 55, Huttner Aff.

exh. G at 22. As such, no evidence exists upon which Hogan may be found deliberately indifferent.

Finally, defendant Naghibi was not made aware of plaintiff's symptoms until Sorel notified him of same on May 27th. The evidence is uncontroverted that Naghibi ordered Librium, the standard treatment for AWS, and thereafter same was administered to plaintiff by Sorel. Plaintiff fails to identify any other evidence of Naghibi's involvement, much less any evidence which would support a finding of deliberate indifference on Naghibi's behalf.

As the aforementioned discussion shows, none of the municipal defendants may be found to have acted with deliberate indifference and as such, are entitled to summary judgment as to plaintiff's due process claims against them.

Moreover, because none of the non-municipal defendants are deliberately indifferent, necessarily the "failure to intercede" and policy or practice claims against the municipal defendants must fail, as plaintiff conceded during oral argument. *See* Tr. 48:4-22; 49:7-20.

### C. Supplemental State Law Claims
Because the court has dismissed all of plaintiff's federal civil rights claims, it declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3). Therefore, all of plaintiff's state law claims are hereby dismissed *without* prejudice. [16]

### V. Conclusion
For the aforementioned reasons, defendants' motions for summary judgment are hereby GRANTED, and all federal claims are dismissed with prejudice. Plaintiff's state law claims are dismissed without prejudice.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3729750

Footnotes

2006 WL 3729750

1    At oral argument, plaintiff's counsel admitted that the second supplemental claim is actually intended to be a claim for negligence, not breach of contract. *See* Doc. 87, Tr. at 59:20-60:8.

2    Obviously scarce judicial resources "are most efficiently used when the parties meet their adversarial duties in a tightly orchestrated and lucid manner[,]" *Kilmer* 212 F.R.D. at 69 (citations omitted), which most decidedly was *not* the case here.

3    To be sure, "there is a point when forbearance of a party's noncompliance with the Rules unfairly prejudices [its] adversaries." *Hudson,* 2004 WL 1006266, at *4 n. 9 (internal quotation marks and citations omitted). That point has not been reached here, however, especially given the fact that no party is wholly without fault in this regard.

4    Hereinafter references to plaintiff's first, second, third and fourth causes of action shall be read as referring to those brought pursuant to section 1983, as opposed to his [pendent] state law claims.

5    This "under color of state law" requirement "has consistently been treated as the same thing as the state action required under the Fourteenth Amendment." *Rendell-Baker v. Kohn,* 457 U.S. 830, 838 (1982) (internal quotation marks and citations omitted).

6    Some courts have stated that "[w]hether the Eighth Amendment or the Fourteenth Amendment applies is largely academic given that the same deliberate indifference to a serious medical need test is applied to both inmates and pretrial detainees alleging denial of adequate medical care." *Scott v. Delsignore,* No. 02-CV-029F, 2005 WL 425473, at *7 n. 5 (W.D.N.Y. Feb. 18, 2005) (citations omitted); *see also Davis v. Reilly,* 324 F.Supp.2d 361, 367 (E.D.N.Y.2004) (regardless of the "academic distinction," standard for analyzing pretrial detainee's due process claim is same as the standard under the Eighth Amendment). The distinction between a deliberate indifference analysis under those two amendments is not wholly academic given that, as will be more fully discussed herein, courts have applied different knowledge requirements depending upon whether or not the plaintiff is a pre-trial detainee.

7    Defendants are unwilling to concede that plaintiffs' fractured hip rose to the level of a serious medical condition. Tr. at 27. Given their concession that AWS constitutes such a condition, however, combined with the close relationship between the AWS and the fractured hip, it is possible to resolve the present motions without separately deciding whether plaintiff's fractured pelvis in and of itself was a serious medical condition.

8    In 1986 the Supreme Court decided three cases which clarified the standards to be employed in deciding Rule 56 motions for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

9    Plaintiff denies paragraph 20 of defendant Sorel's L.R. 7.1(a) Statement wherein she states, among other things, that plaintiff received his first dose of Librium at 9:20 p.m. *See* Pl. Resp. to Sorel at 3, ¶ 20. Both plaintiff and defendant Sorel cite to page 50 of the M-1 Unit Log which substantiates this fact however. Thus, there is no basis for plaintiff's denial of this uncontroverted proof.

10   Due to the lack of a time frame in the cited portions of Rios' deposition, it is not at all certain whether any of these conditions actually existed on May 27, 2002.

11   This assumption is doubtful because Rios testified that Rose was not the first name of the woman to whom he spoke; rather it was "only [the] name [the inmates] used to call her[.]" Doc. 73, exh. 73 thereto at 22. As defendant Sorel's attorney was quick to point out during oral argument, her first name is Rosemary-not Rose. Tr. at 17. Adding further confusion to the issue of the name of the woman to whom Rios purportedly spoke to regarding plaintiff's pain is the fact that originally Pauline Rose, another LPN, was named as a defendant in this action.

12   There is a discrepancy as to the date of this document. Page one gives the date as May 29, 2002, but page two indicates May 23, 2002, and May 23, 2004, in another place. *Compare* Doc. 71, exh. C thereto at 1, with Doc. 71, exh. C thereto at 2. The first is May 23, 2002, which is given in two separate places on that page two. *Id.,* exh. C thereto at 2. Obviously that 2004 date is wrong. As between May 23, 2002, and May 29, 2002, however, reading the Medical History Report as a whole and taking into account other parts of the record, it is reasonable to infer that Ms. Sorel questioned plaintiff and filled out this form on May 23, 2002. That is so because it is undisputed that plaintiff was first incarcerated on May 23, 2002. Therefore, the notation of plaintiff having had beer "yesterday," would make no sense if the date was May 29, 2002, because he was in jail the prior day (May 28, 2002) and presumably would not have had access to beer then.

13   Both in her memorandum of law and her "Supplemental Statement of Material Facts" defendant Cicognami misstates the date as "May 26, *2005.*" Doc. 58 at 1 (emphasis added); and Doc. 58, attachment 5 at ¶ 2 (emphasis added). At oral argument, counsel for Cicognami clarified that this is a typographical error, and that the correct date is May 26, 2002. *See* Tr. 49:21-50:4.

14   Grogan Aff. at ¶ 11.

15    Counsel for plaintiff, in response to the court's inquiry as to whether this assertion was included in his LR 7.1 statement, contends that the evidence is located in "the Unit 1 log." *See* Tr. 33:2-14. For the record, the court notes that this log contains 76 pages of handwritten notes.

16    Plaintiff is reminded that the limitations period for his state law claims was tolled while said claims were pending before this court, and for 30 days after dismissal. *See* § 1367(d).

---

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

2004 WL 1574649
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Virginia DAVIS, Plaintiff,
v.
Gwendolyn COLE–HOOVER,
M.D., et al., Defendants.

No. 03CV550.
|
June 14, 2004.

**Attorneys and Law Firms**

Alexander A. Reinert, Koob & Magoolaghan, New York, NY, for Plaintiff.

Gregory A. Mattacola, The Law Firm of Gregory A. Mattacola, Rome, NY, Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, Harold A. Kurland, Ward, Norris, Heller & Reidy, LLP, Rochester, NY, for Defendants.


Report & Recommendation

SCOTT, Magistrate J.

**\*1** This matter has been referred to the undersigned pursuant to 28 U . S.C. § 636(b)(1)(C) (Docket No. 7, Dec. 9, 2003). The instant matter before the court is defendants' (Docket Nos. 15, 23, 31) motion for summary judgment or to dismiss the Complaint and plaintiff's cross-motion (Docket No. 38) opposing summary judgment and for discovery under Federal Rule of Civil Procedure 56(f). [1] The Scheduling Orders for these motions had responses due by February 27, 2004, and replies by April 15, 2004 (Docket Nos. 30, 35, 44), later extended to April 30, 2004 (Docket No. 46; *see* Docket No. 45, Dr. Ching, et al., letter motion for extension of time to respond), and then by May 14, 2004 (Docket No. 55), when the motions were deemed submitted.


*BACKGROUND*

*Factual Allegations*

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), has a medical condition called hydrocephaly, which requires her to have a shunt to drain cerebrospinal fluid from her brain. She entered into DOCS custody in 1997 with her shunt intact. Within four years of incarceration, plaintiff alleges that she was rendered blind allegedly due to defendants' deliberate indifference to her medical needs. (Docket No. 1, Compl. ¶ 1, "Compl.") She was transferred from Bedford Hills to the Albion Correctional Facility ("Albion") in November 1999 (Docket No. 41, Pl. Aff. ¶ 4.)

In this action plaintiff sues various treating and prison officials and employees of the Albion Correctional Facility and medical personnel at Strong Memorial Hospital ("Strong") for their denial of treatment of her that allowed cerebrospinal fluid to back up in her brain, injuring her and causing her to lose her sight. (*See* Compl. ¶ 1.) Plaintiff sued certain medical staff at Albion (defendants Gwedolyn Cole–Hoover, M.D., Jon Miller, M.D., Ravi (originally alleged as "John or Jane" Sinha, M.D. (hereinafter "DOCS defendants")) along with Strong Memorial Hospital and Strong medical personnel Steven Ching, M.D., Webster Pilcher, M.D., Andrea Zynda–Weiss, M.D., David Rossi, R.P.A. and Donna Friedlander, R.P.A. (hereinafter "Strong defendants")), as well as two John Does later identified by plaintiff [2] and subject of her pending motion for leave to amend the Complaint, *see* Docket No. 28. She alleges, under 42 U.S.C. § 1983, deprivation of her civil rights due to the improper medical treatment she received while within defendants' custody or care. In particular, plaintiff alleges that defendants willfully and maliciously failed to provide adequate medical care to her, contrary to good and acceptable medical practice (Compl. ¶ 57). The first cause of action alleges deliberate indifference on the part of all defendants named; the second cause of action alleges defendants' deprivation of due process to plaintiff; the third cause of action alleges medical malpractice against Strong and the Strong defendants; the fourth cause of action alleges breach of contract by Strong; and the fifth cause of action alleges negligence on the part of Strong. (Com pl. ¶¶ 66–80.)

*Strong Hospital*

**\*2** Plaintiff alleges that Strong had contracted with DOCS for delivery of physician specialty consultation

services and delivery of off-site acute care hospital services for inmates at Albion and was responsible for delivery of medical services to plaintiff. (Compl.¶ 8.) Defendants vigorously deny the existence of a contractual relationship between Strong and DOCS (Docket Nos. 23, Parrinello Aff. ¶ 4; 25, Strong Statement of Facts ¶ 10; 26, original Parrinello Aff. ¶ 4; 24, Memo. of Law at 6–10). On January 19–20, 2001, plaintiff was admitted to Strong but was not evaluated for a shunt malfunction (Compl.¶¶ 39, 45–46), with the emergency department nurse noting plaintiff's complaints of headaches and decreased vision and that plaintiff had a history of past shunt revision (Compl.¶ 40). Defendants allegedly failed to provide medically adequate care to plaintiff, including (among other allegations) inadequate hiring and training of staff and gross negligence in supervision of staff. (Compl.¶ 57.) She alleges that Strong (with the other defendants) acted under color of state law to demonstrate deliberate indifference to her medical needs and to deprive her of life, liberty or property without due process of law (Compl.¶¶ 58–59). Strong, by contracting with DOCS, intended to render medical services to Albion inmates, including plaintiff, making plaintiff a third-party beneficiary to that contract (Compl.¶ 62) and owed a duty of care that Strong allegedly breached (Compl.¶ 63).

*Exhaustion of Administrative Relief*

Plaintiff contends that there was an informal resolution of disputes at her former facility, Bedford Hills, Docket No. 41, Pl. Aff. ¶ 3, and she used such an informal process at Albion, *id.* ¶ 6. Plaintiff alternatively argues that she was not aware of the grievance process at Albion, that she was never given a copy of the DOCS directive related to grievances, that grievance was not available for medical complaints such as her's, that she attempted to grieve there by filing a complaint that was dismissed by prison officials. (*Id.* ¶¶ 4–6.) Plaintiff began losing her sight in the end of 2000 and, after she filed a grievance, DOCS staff did not assist her in reading a response sent to her about it (*id.* ¶¶ 7, 8, 10.) The inmate assisting plaintiff read that response and said that the matter was "not grievable." (*Id.* ¶ 10.) After losing her eyesight, plaintiff was transferred back to Bedford Hills. In the move between facilities, plaintiff's legal papers (including her copy of the grievance) were lost. (*Id.* ¶ 16.)

DOCS defendants produced declarations from the grievance record keepers at Albion (Decls. of Linda Janish, Docket Nos. 22, 49), and within DOCS central

office (Docket No. 21), who state that their records do not contain a grievance filed by plaintiff. Ms. Janish states that grievances are not dismissed and there would be record of a filed grievance had it been allegedly dismissed. (Docket No. 49, Reply Decl. of Janish, ¶ 6.) If her grievance was dismissed, plaintiff's next resort was to appeal to the Inmate Grievance Program Supervisor, 7 N.Y.C.R.R. § 701.7(a)(5)(e)(iv). (*Id.* ¶¶ 11–12).

*Proceedings*

**\*3** Following the filing and service of the Complaint (and before any pretrial scheduling or discovery conferences), defendants separately moved either for summary judgment (Docket Nos. 15 (Dr. Ching, et al.,[3] hereinafter "Ching motion"), 31 (Dr. Cole–Hoover)) or to dismiss the Complaint or for summary judgment (Docket No. 23 (Strong)). There, the DOCS and Strong defendants and Dr. Cole–Hoover each argue that plaintiff's claims are barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997e, since she failed to exhaust her administrative remedies prior to commencing this action. The Strong defendants and Strong each argue alternatively that they are not state actors to be liable under 42 U.S.C. § 1983.

Plaintiff filed responses to each of these motions (Docket Nos. 40, 41, 42, 43, *see* Docket No. 37) and moved to deny summary judgment (and to compel discovery) based upon Rule 56(f) (Docket Nos. 38, 39). Replies were due April 30, 2004 (Docket No. 46, *see* Docket Nos. 30, 35, 44), filed as of that date (Docket Nos. 48–53). Plaintiff was granted an extension to file her reply to her cross-motion (Docket No. 55), which was filed on May 14, 2004 (Docket No. 57), and the matter was deemed submitted as of that date. Plaintiff filed supplemental materials she obtained through a Freedom of Information request. (Docket No. 58.) The Court considered these materials in rendering this Report & Recommendation.

*DISCUSSION*

I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003);

Fed.R.Civ.P. 56(c). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002).

## II. Ching and Cole–Hoover Motions—PLRA Exhaustion

**\*4** Dr. Cole–Hoover (Docket No. 31) and the other DOCS and Strong defendants (Docket No. 15) separately moved for summary judgment arguing (a) that plaintiff failed to exhaust her administrative remedies prior to commencing this civil rights action, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"); and (b) the non-DOCS employees are not state actors for liability under § 1983 (as is argued by Strong). The state action issue will be discussed below with Strong's motion.

### A. Prison Litigation Reform Act

The PLRA requires an inmate litigant to exhaust "such administrative remedies as are available" as a condition precedent to suing under 42 U.S.C. § 1983. 42 U.S.C. § 1997e(a). The PLRA "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d

12 (2002). "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 524–25. As one court noted "however vigorously and unsuccessfully an inmate seeks redress of grievances within the prison bureaucracy, he does not exhaust his remedies as required by § 1997e(a) unless he pursues the proper channels provided by state for remedying his situation." *Mendoza v. Goord,* 2002 WL 31654855, at \*3 (S.D.N.Y. Nov.21, 2002). The intent of the PLRA is to restrict inmate litigation where they had, but failed, to use all of their internal administrative remedies before commencing a federal civil rights action. *See Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001); *United States v. Al–Marri,* 239 F.Supp.2d 366, 367 (S.D.N.Y.2002) (purpose of exhaustion requirement is to filter out frivolous claims, and clarify the contours of controversies in litigated cases, citing *Porter, supra,* 534 U.S. at 524–25); *Blissett v. Casey,* 969 F.Supp. 118, 128 (N.D.N.Y.1997) (Congress's general purpose in enacting PLRA was to discourage filing of frivolous suits by inmates), *aff'd,* 147 F.3d 218 (2d Cir.1998), *cert. denied,* 527 U.S. 1034, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999).

Exhaustion, however, is an affirmative defense, *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999), and has been found in this Circuit not to be jurisdictional, *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). That defense is subject to countering defenses, such as estoppel. *See Ziemba v. Wezner,* No. 02–0340, 2004 WL 870476, (2d Cir. Apr.23, 2004) (per curiam) (adopting *Wright v. Hollingsworth,* 260 F.3d 357, 358 n. 2 (5th Cir.2001)).

Albion, like similar facilities in New York, each has a three-tier grievance procedure, called the Intake Grievance Program (or "IGP") that includes filing a grievance with the Inmate Grievance Resolution Committee; then an appeal to the superintendent; then an appeal to the Central Office Review Committee. 7 N.Y.C.R.R. § 701.7; *see Harris v. Totten,* 244 F.Supp.2d 229, 233 (S.D.N.Y.2003). The first step has the inmate filing an Inmate Grievance Complaint Form to the Grievance Clerk. 7 N.Y.C.R.R. § 701.7(a)(1). The Inmate Grievance Resolution Committee then reviews the grievance and attempts to resolve it informally and, if resolved to the satisfaction of the grievant inmate, the resolution shall be entered on the grievance. *Id.* §

701.7(a)(3). The second step is appeal to the facility's superintendent from the written response to the grievance by the Inmate Grievance Resolution Committee. *Id.* § 701.7(b)(1). The third step is an appeal of the superintendent's written decision to the Central Office Review Committee. *Id.* § 701.7(c)(1).

## B. Exhaustion through Informal Channels

**\*5** Plaintiff argues that at both Bedford Hills and Albion she informally resolved matters without using the grievance process and in fact was unaware of the grievance procedure. She argues that she informally complained about her headaches, failing eyesight, and the untreated shunt by writing a letter to the Superintendent (Docket No. 38, Pl. Atty. Aff. Ex. A, letter received Jan. 18, 2001. She alleges that her letter lead to an investigation and the Superintendent writing back to her telling her that she would be seen by a doctor to receive necessary treatment. (Docket No. 38, Pl. Atty. Aff. Ex. A, Memo. A. Andrews, Superintendent, to V. Davis, Jan. 29, 2001; Docket No. 40, Pl. Statement at 8, responding to defendant Cole–Hoover's Statement ¶ 5.) But she alleges that she still was not treated from January 20 through April 19, 2001 (Compl.¶ 48).

The United States Court of Appeals for the Second Circuit has appointed counsel in a number of pending appeals on PLRA exhaustion issues, asking the parties to address whether inmates who did not fully comply with Department of Correctional Services' grievance regulations have nevertheless exhausted their administrative remedies for PLRA purposes. *Cf. Davidson v. Pearson,* 71 Fed. Appx. 885 (2d Cir.2003) (slip opinion), citing four pending appeals, *Giano v. Goord,* No. 02–0105; *Johnson v. Reno,* No. 02–0145; *Hemphill v. State of N.Y.,* No. 02–0164; *Abney v. Dep't of Corrections,* No. 02–0241); *Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003) (per curiam) (collectively referred to as the "PLRA appeals.") These cases are scheduled for argument on May 27, 2004. But given the complexity of the issues posed in those appeals and their joint consideration, it may take that court months to render a decision.

Plaintiff's contention regarding her informal letter writing campaign is squarely one of the issues now before the Second Circuit in these PLRA appeals, although that court previously found that resolution of inmate grievances through informal channels can satisfy the exhaustion requirement. *Marvin v. Goord,* 255 F.3d 40,

43 (2d Cir.2001) (per curiam) (citing 7 N.Y.C.R.R. § 701.1); *Ortiz, supra,* 323 F.3d at 194; *see* 7 N.Y.C.R.R. § 701.1(a) (the Inmate Grievance Program "is intended to *supplement,* not replace, existing formal and informal channels of problem resolution," emphasis added). Other courts within the Second Circuit have construed letters like plaintiff's to be attempts to file grievances at that facility, but found that (absent following the other steps in the Inmate Grievance Program) those inmates failed to exhaust their complaints by mere letter writing. *See Harris, supra,* 244 F.Supp.2d at 233 (citing cases); *Mendoza v. Goord,* 2002 WL 31654855, at \*3 (S.D.N.Y. Nov.21, 2002) (inmate must pursue the proper channels in order to exhaust his administrative remedies). The Second Circuit has made this an open question. In *Davidson,* the inmate had attempted to file his grievance, including writing directly to the superintendent. 71 Fed. Appx. at 885. The Second Circuit remanded *Davidson* to this Court (Hon. William M. Skretny, U.S.D.J., No. 02CV88, from a decision of Hon. Charles Siragusa, U.S.D.J.) to consider whether the inmate satisfied the PLRA exhaustion requirement either by his informal attempts to exhaust or by his unsuccessful attempt to file a grievance. *Id.*[4]

**\*6** While plaintiff presents proof that she wrote to the Superintendent and got a favorable response from the Superintendent, she still did not receive treatment she sought for three months following the letter. She alleges that she continued to request medical attention during that time (Compl.¶ 48), but she does not document later instances of her complaints. In *Marvin, supra,* 255 F.3d at 43 n. 3, the inmate plaintiff succeeded in his informal request and the court held that he had likely exhausted that claim. Whether an inmate plaintiff exhausts only if the inmate prevails informally or if the inmate must somehow appeal the denial (or inaction on either the informal request or, as here, the apparent grant of relief) is a question that may be addressed by the Second Circuit in its pending appeals.[5] But because of the disposition of defendants' motions on other grounds (as discussed below), this Court need not resolve this question presently.[6]

## C. Failing to Assist Inmate File a Grievance
She also contends that no DOCS employee assisted her in the grievance process following her loss of sight. Plaintiff notes that the hearing impaired inmate gets

DOCS assistance while the sight impaired may not. (Docket No. 42, Pl. Memo. of Law at 12, citing Docket No. 22, Janish Decl., Ex. A, copy of Directive 4040, §§ III..G, V; 7 N.Y.C.R.R. § 701.7 note). Defendants argue that plaintiff could have received assistance from numerous DOCS employees or inmates upon her request. (Docket No. 49, Janish Reply Decl. ¶¶ 14–15.) Once the inmate's request for assistance is made known to the IGP office by any means, all necessary assistance would be promptly provided based upon the inmate's needs. (*Id.* ¶ 16.) Defendants conclude that, while plaintiff contacted the Superintendent and her counselor, she did not forward her grievance to the Inmate Grievance Program office, showing her noncompliance with the grievance procedure regulations. (*Id.*)

This contention may change with the Second Circuit's decision on the PLRA appeals as that court determines the means for alternative exhaustion. *But cf. Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (Court will not read futility or other exceptions into the statutory exhaustion requirement of PLRA where Congress has provided otherwise); *Marvin, supra,* 255 F.3d at 43 (quoting *Booth, supra* ). This Court need not resolve this issue now.

D. Being Informed Complaint Was Not Grievable
When plaintiff did file a grievance (through the assistance of another inmate), that inmate told her that her matter was "not grievable". (Docket No. 41, Pl. Aff. ¶ 10.) Plaintiff raises an issue of material fact that, regardless of the other issues currently in question due to the pending PLRA appeals, should preclude summary judgment. *See Preslar v. Dr. Tan,* No. 00CV6103, 2003WL553273, *3 (W.D.N.Y. Feb. 6, 2003) (Siragusa, J.) (allegation that medical complaint was not subject to grievance raised material issue of fact); *Lane v. Doan,* 287 F.Supp.2d 210, 212 (W.D.N.Y.2003) (Larimer, J.) (plaintiff is excused from exhausting administrative remedies where prisoner was informed that complaint was not subject to grievance procedure).

E. Total Exhaustion
**\*7** Defendants in the Ching motion also argue for dismissal of the entire case if one claim that should have been administratively exhausted is found not to have been exhausted. (Docket No. 16, Ching Memo. of Law, at 5–9.) Defendants are applying the "total exhaustion" doctrine,

arguing that, under PLRA, if one claim is not exhausted then (despite exhausting all other claims), the entire action should be dismissed. Courts nationally, including district courts within the Second Circuit, are divided on the issue of whether the PLRA requires total exhaustion or if only discrete, unexhausted claims are dismissed under the PLRA. *See Jennings v. Deperio,* W.D.N.Y. No. 00CV266, No. 69, Report and Recommendation, Feb. 10, 2004, at 9–11, 10 n. 4;[7] *Ashford v. Goord,* W.D.N.Y. No. 01CV18, No. 112, Order of Feb. 13, 2004, at 6–7. Some courts have accepted the total exhaustion doctrine and dismissed entire cases where at least one claim was not fully exhausted, arguing that the plain language of the PLRA bars any "action" being commenced without the plaintiff first exhausting his or her administrative remedies (including claims within an action that were exhausted). *See, e.g., Sanders v. Goord,* No. 98 Civ. 8501, 2002 U.S. Dist. LEXIS 13772 (S.D.N.Y. July 25, 2002). Other courts, including this one, *see Jennings, supra; Ashford, supra,* have dismissed only discrete claims that were not exhausted, leaving the complaint and the other, exhausted claims for adjudication. *See, e.g., Dimick v. Bafuffo,* 02 Civ. 2151, 2003 U.S. Dist. LEXIS 2865, at *13 (S.D.N.Y. July 28, 2003). In this latter instance, courts had either distinct defendants or claims that were easily severable, allowing the unexhausted claims to be separated from the exhausted claims. *See Jennings, supra,* at 10–11 (citing cases).

Here, plaintiff alleges five causes of action, all related to the failure of defendants to properly or promptly treat her defective shunt; two of causes are federal civil rights claims (the deliberate indifference and the deprivation of due process) governed by the PLRA exhaustion requirement. *See* 42 U.S.C. § 1997e(a) ("no action shall be brought with respect to prison conditions under section 1983 of this title, *or any other Federal law,* by a prisoner confined in any jail, prison, or other correctional facility ....," emphasis added); *Mitchell v. Brown & Williamson Tobacco Corp.,* 294 F.3d 1309, 1315 (11th Cir.2002) (state law claims unrelated to prison conditions removed to federal court on diversity held not governed by PLRA); *but cf. Hartsfield, supra,* 199 F.3d at 309 (state claims brought on diversity jurisdiction held to be brought "under federal law" and governed by PLRA). Both federal claims are intertwined, either deliberate indifference under the Eighth Amendment or deprivation of due process (denial of life, liberty or property) under the Fourteenth Amendment.

**\*8** Among the issues to be considered by the Second Circuit in the pending PLRA appeals is whether this total exhaustion doctrine (as argued by defendants here) is required under the PLRA. *Johnson v. Reno, supra; see Ortiz v. McBride, supra,* 323 F.3d at 195. Given the disposition recommended above to deny summary judgment to the Ching motion on other grounds (the issue of whether plaintiff was informed that her complaint was not grievable, Part II . D., *supra* ), the Court need not address the total exhaustion issue here or stay this motion pending the Second Circuit's resolution.

### F. In Summary

Therefore, the Ching motion for summary judgment (Docket No. 15) and the Cole–Hoover motion for the same relief (Docket No. 31) should be denied, namely on the issue of fact whether plaintiff was told that her medical complaint was not grievable and hindering her from otherwise grieving it. (*See* Part II.D., *supra.*)

### III. Strong Defendants, Strong and State Actor Requirement of § 1983

Strong Memorial Hospital moved to dismiss or for summary judgment (Docket No. 23), arguing that it was not alleged to be a state actor to be liable under 42 U.S.C. § 1983. The Strong defendants, in the Ching motion for summary judgment (Docket No. 15) discussed above, alternatively argue that Strong their employer was not a state actor for § 1983 liability. Their arguments will be considered together.

### A. Motion to Dismiss—Existence of a Policy

Strong has moved to dismiss the Complaint on the grounds that it states a claim for which relief cannot be granted. Strong argues there that it is not a "person" under § 1983 since plaintiff has not alleged that Strong (and not its personnel) executed a policy that violated plaintiff's rights.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court can not dismiss a complaint unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A Rule 12(b)(6) motion is addressed to the face of the pleading. In considering

such a motion, the Court must accept as true all of the well pleaded facts alleged in the Complaint. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. *New York State Teamsters Council Health and Hosp. Fund v. Centrus Pharmacy Solutions,* 235 F.Supp.2d 123 (N.D.N.Y.2002).

Strong argues that *Monell v. Department of Social Services of the City New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), applies to private entities to bar civil rights liability under a theory *respondeat superior* only, and for a § 1983 claim plaintiff must allege that the private entity (to be a "person" governed by § 1983) was implementing a policy to violate her constitutional rights. *Temple v. Albert,* 719 F.Supp. 265 (S.D.N.Y.1989); *McIlwain v. Prince William Hosp.,* 744 F.Supp. 986 (E.D.Va.1991). Plaintiff retorts that a single egregious incident by an employee of a private hospital that would imply grossly inadequate training or deliberate indifference can constitute a policy. See *Perez v. County of Westchester,* No. 96 Civ. 9487, 1997 WL 256932, at *2 (S.D.N.Y. May 17, 1997), *later decision,* 83 F.Supp.2d 435 (S.D.N.Y.) (granting summary judgment dismissing complaint), *aff'd mem.,* 242 F.3d 367 (2d Cir.2000). She contends that her time at Strong pointed to "systematic failing" of the hospital to protect her constitutional rights (Docket No. 43, Pl. Memo. of Law in Opp. at 4). Plaintiff alleged instances of deliberate indifference by Strong's employees (Compl.¶¶ 39–47, 49–52, 57–61), that they failed to properly coordinate her care by discharging her without considering a shunt malfunction as a cause for her maladies (Compl.¶ 51). Plaintiff infers from these allegations that Strong failed to adequately train and supervise its medical staff, hired unqualified medical staff, committed gross negligence in supervising those employees, and failed to remedy four months after her discharge the inadequate care that was delivered (Compl. ¶ 57; Docket No. 43, Pl. Memo. of Law in Opp. at 4).

**\*9** There is no heightened pleading required for § 1983 claims against municipalities or private institutions alleged to be state actors, *Leatherman v. Tarrant County Narcotics & Intelligence Coord. Unit,* 507 U.S. 163, 167, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and Federal Rule of Civil Procedure 8(a)(2) require a short and plain statement of the claim showing that the pleader,

*Perez, supra,* 83 F.Supp.2d at 438 (dismissing amended complaint for failing to allege policy or custom); *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993). One court has required the plaintiff to allege the nature of the purported policy or custom and facts demonstrating its existence. *Perez, supra,* 83 F.Supp.2d at 438. Furthermore, the alleged policy or custom must have directly caused plaintiff's constitutional injury. *See Coley v. Harmer,* No. 00CV373, 2001 WL 209905, at *2 (W.D.N.Y. Feb.26, 2001) (Elfvin, J.); *Conway v. Garvey,* No. 03 Civ. 7958(DC), 2003 WL 22510384, at *3–4 (S.D.N.Y. Nov.5, 2003).

Here, this Complaint is similar to the allegations in *Perez v. Westchester County,* where, after inviting plaintiff to amend the complaint to allege a policy or custom, plaintiff only alleged the conclusion of the existence of such a policy or custom. 83 F.Supp.2d at 438. In the Complaint here, [8] plaintiff alleges the same conclusory allegations of the existence of a policy or custom on Strong's part without elaborating on whether it was a policy or custom or the facts (aside from the employees' conduct) that show the existence of such a policy or custom. (*See* Compl. ¶ 57.) Standing alone, such a conclusory allegation is insufficient to state a claim for employer liability. *Id.; Dwares, supra,* 985 F.2d at 100. Such an allegation is not a plain statement of plaintiff's claim show that she is entitled to relief against Strong. *See Perez, supra,* 83 F.Supp.2d at 438.

Therefore, defendant Strong's Motion to Dismiss should be granted.

B. Summary Judgment—Strong as a State Actor
Alternatively, if dismissal is not warranted, Strong argues (as the Strong defendants also argue) that it is entitled to summary judgment because plaintiff has not shown Strong to be a state actor here. Strong contends that no contract exists between it and DOCS to make Strong a state actor (Docket No. 19). *See Nunez v. Horn,* 72 F.Supp.2d 24 (N.D.N.Y.1999) (granting summary judgment to physician dismissing inmate plaintiff's § 1983 claim since the doctor did not have a contractual relationship with DOCS and the treatment was provided outside of the facility). Plaintiff alleges that Strong has a contractual relationship with DOCS for specialty consultation and offsite hospital medical services (Compl.¶ 8), arguing that at least there is an issue of fact

or an area for inquiry in discovery (Docket Nos. 38, 43, Memo. of Law, at 9, 12–13).

In order to prevail on a cause of action under 42 U.S.C. § 1983, a plaintiff must show a violation of a constitution or federal law and that the alleged violation was committed by a person acting under color of State law. *West v. Atkins,* 487 U.S. 42, 48, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted); 42 U.S.C. § 1983.

1. Contractual Relationship between DOCS and Strong
*10 The question of whether Strong (and its affiliated medical personnel) is a state actor thus turns on the contractual relationship Strong had with DOCS. Defendants argue that *West* turned on whether or not the physician had a contract with the government to provide services in a state prison hospital to make him a state actor. 487 U.S. at 54; *see* Docket No. 51, Defs.' Reply Memo. at 4. Plaintiff, in her supplemental papers (Docket No. 58, Pl. Atty. Supp'al Affirm. ¶¶ 11–20, Exs. A, B, D), suggests an issue of fact here whether a contractual relationship exists between DOCS and Strong to make the latter a state actor, or at least there are issues for discovery. Determination of this point turns on plaintiff's lack of discovery on the existence of a contractual relationship. *See* Part V., *infra.*

2. Tests for State Action
Private hospitals and their employees generally are not state actors. *Qkunieff v. Rosenberg,* 996 F.Supp. 343, 356 (S.D.N.Y.1998), aff'd, 166 F.3d 507 (2d Cir.1999), *cert. denied,* 528 U.S. 1144, 120 S.Ct. 1002, 145 L.Ed.2d 945 (2000). Both Strong and the Strong defendants in their respective memoranda (Docket Nos. 16, Ching Memo. of Law at 11–12; 24, Strong Memo. of Law, at 7) articulated three tests to determine whether an exception to this rule exists so that a private party may be transformed to a state actor subject to liability under § 1983. The first test is the "close nexus/joint action" test, in which the plaintiff must show that there is sufficiently close nexus between the state and the challenged action of the private entity so that the action may be fairly treated as the action of the state itself. *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The second test is the "compulsion" test, which transforms a private decision to state action when the state has exercised coercive power or has provided such significant encouragement

either overt or covert so that the choice must be deemed to be that of the State. *Id.; Tewksbury v. Dowling,* 169 F.Supp.2d 103 (E.D.N.Y.2001). The third test is the "public function" test, where a private party exercises powers that are traditionally the exclusive prerogative of the State. *Tewksbury, supra,* 169 F.Supp.2d at 108 (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).

Applying the three tests for identifying a state actor, the Strong defendants establish that the close nexus and state compulsion tests do not show state action here, since the medical decisions of private doctors at issue here do not reflect government influence or inducement. *See Qkunieff, supra,* 996 F.Supp. at 356. As for the public function test, the Strong defendants argue that the issue also turns on whether Strong had a contract with DOCS. They point to *West, supra,* 487 U.S. at 56–57, and the fact that the Supreme Court relied upon the fact that Dr. West was a contract physician working within the prison facility to make him a state actor. Since plaintiff suggests that, at a minimum, discovery is needed to reveal whether a contract exists between Strong and DOCS, the determination of plaintiff's cross-motion for discovery and denial of defendants' motions on Rule 56(f) grounds would be dispositive of this point, *see* Part V., *infra.*

## IV. Supplemental Claims

**\*11** Plaintiff alleges three state law claims against Strong for medical malpractice (with Strong defendants), breach of contract, negligence. Strong and Ching in their separate motions ask that this Court not take supplemental jurisdiction over these claims. (Docket No. 24, Strong Memo. of Law, at 10–12; 16, Ching Memo. of Law at 17 .) 28 U.S.C. § 1367 grants this Court supplemental jurisdiction over state law claims, provided that the Court has original jurisdiction over the case (that is, at least one federal claim remains pending). When all original jurisdiction claims are dismissed, the Court may decline to exercise supplemental jurisdiction. *Id.* § 1367(c)(3); *see, e.g., Baines v. Masiello,* 288 F.Supp.2d 376, 395 (W.D.N.Y.2003) (Curtin, J.).

With dismissal of the federal claims against Strong, *see* Part III.A., *supra,* the Court should not exercise jurisdiction over the supplemental state law claims alleged solely against Strong in the fourth cause of action for breach of contract and the fifth cause of action for negligence, or the third cause of action for

medical malpractice only as against Strong. Since federal claims remain against the Strong defendants, the Court may exercise jurisdiction over those defendants on the remaining state law claim, the third cause of action for medical malpractice.

## V. Plaintiff's Need for Discovery Before Summary Judgment Can Be Granted

Plaintiff alternatively opposes the various dispositive motions, arguing that she needs discovery on material issues of fact before judgment can be rendered in this action (Docket No. 38). She argues that these motions occurred before even a Rule 16 scheduling conference has been held, much less any discovery undertaken. (Docket No. 38, Atty. Affirm. ¶ 5.) Plaintiff intends to seek discovery on the following areas she believes will lead to material issues of fact: discovery on plaintiff's January 2001 grievance that was returned as "not grievable"; discovery related to Superintendent Andrews' investigation upon receipt of plaintiff's January 2001 letter; discovery of materials provided to inmates regarding the Inmate Grievance Program that they receive upon arriving at Albion; discovery on the availability of assistance for sight-impaired inmates who wish to file grievances; discovery regarding security measures for inmate patients at Strong; discovery regarding the ability of the Strong defendants to communicate with inmate-patients during their incarceration; discovery on Strong's remuneration; discovery of the contractual arrangements and communication between Strong and DOCS, and Strong's policies regarding treating inmates; and discovery of the contractual arrangements between Strong and the Strong defendants. (*Id.,* Atty. Affirm. ¶ 7.)

A motion for summary judgment before discovery has even begun has been found by courts in some situations to be premature. *See Wait v. Beck's North Am., Inc.,* 241 F.Supp.2d 172, 176 (N.D.N.Y.2003); *Whiting v. Maiolini,* 821 F.2d 5, 7 (1st Cir.1991) (disfavoring summary judgment motions where "discovery has barely begun"). Rule 56(f) recognizes this by allowing the opponent to a summary judgment motion to respond by affidavit stating her inability to refute the allegations supporting the motion. The parties here agree that the relevant test in this Circuit for granting a Rule 56(f) responding motion (even if they disagree as to the burden this test places upon the opponent) is "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing '(1) what

facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." ' *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.2003) (quoting *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999)); *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994); *Antonio A. Alevizopoulos and Assocs., Inc. v. Comcast Int'l Holdings, Inc.,* 100 F.Supp.2d 178, 185 (S.D.N.Y.2000). Since no discovery has been conducted yet and, as an inmate, plaintiff has limited means to investigate these claims prior to these motions, she cannot state all the facts that support her opposition to defendants' motions. *See* Fed.R.Civ.P. 56(f). Three of the four elements have been met; the question then is whether the opponent can reasonably be expected to create a genuine issue of material fact. *Granito v. Tiska,* 181 F.Supp.2d 106, 112 (N.D.N.Y.2001).

**\*12** The areas of inquiry plaintiff identifies point to issues of fact (some discussed above on the merits of defendants' motions), namely the existence of a contractual arrangement between DOCS and Strong to make the latter a state actor (as well as the steps plaintiff took to administratively raise her complaints about her medical care). Given the disposition recommended above for denial of defendants' dispositive motions, plaintiff should be allowed (in the normal course of litigation) to conduct discovery on the above topics, and her motion to deny summary judgment under Rule 56(f) should be granted.

VI. Subsequent Proceedings

As a result of the above recommendations, defendant Strong would be dismissed from this action, the remaining defendants' precocious summary judgment motions ought to be denied, and plaintiff should have discovery to eventually contend with a dispositive motion. The Court must next consider plaintiff's motion for leave to amend the Complaint (Docket No. 28) to identify two John Doe defendants (Strong medical staff members) and to correct the identification of a third defendant (Dr. Ravi Sinha, who has appeared and moved with the DOCS defendants in the Ching motion, *cf.* Docket No. 17, Ching Defs.' Statement of Material Facts, ¶ 2, identifying Dr. Sinha). Claims remain as to both the DOCS and Strong defendants; thus, an amendment to properly identify defendants in either group may not be futile. The Court

will issue a separate Order giving a briefing schedule for that motion.

*CONCLUSION*

Based upon the above, it is recommended that plaintiff's motion for discovery under Federal Rule 56(f) (Docket No. 38) be granted; defendants' Ching, et al., motion (Docket No. 15) for summary judgment be denied; defendant Strong Memorial Hospital's motion to dismiss (Docket No. 23) be granted but for summary judgment (Docket No. 23) be denied; and defendant Dr. Cole–Hoover's motion for summary judgment (Docket No. 31) be denied.

Plaintiff's motion for leave to amend the Complaint (Docket No. 28) will be briefed pursuant to a separately filed Scheduling Order.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed.R.Civ.P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a).

FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

**\*13** The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of* *Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.*

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1574649

Footnotes

1    Plaintiff also moved for leave to amend the Complaint (Docket No. 28, Feb. 11, 2004) to name two defendants originally identified as John Does and to correct the identification of a third defendant, "Dr. John or Jane Sinha." That motion was held in abeyance pending the determination of these motions. Docket No. 30. A separate scheduling Order will issue for briefing on that motion.

2    Drs. James Cleland and Cathy Burkat, also alleged to be Strong medical staff members. That motion also correctly identifies the first name of Dr. Sinha.

3    Drs. Miller and Sinha of the DOCS defendants and Drs. Pilcher, Zynda–Weiss, Mr. Rossi and Ms. Friedlander of the Strong defendants join in the Ching motion.

4    This Court has not made a finding on this remanded issue, however.

5    Although the DOCS Inmate Grievance Program recognizes informal resolution methods, there is no clear way of knowing when such an informal method has been exhausted. Would exhaustion require the inmate to follow up her use of informal methods by using the Inmate Grievance Program, for example? Has the inmate exhausted if there is no appellate process or other review to informal action on her complaint? Informal processes lack the recording of the Inmate Grievance Program and depend ultimately upon the inmate or the recipient of the informal grievance to retain record of it. Such informal processes ultimately raises questions whether an inmate has exhausted all her administrative remedies, making summary judgment determinations on PLRA exhaustion into factual and credibility inquiries. The absence of a more formal administrative record when inmates claim to use informal means does little to "clarif[y] the contours of the controversy," *Porter, supra,* 534 U.S. at 525, once the matter is litigated.

6    The Ching defendants cite (Docket No. 48, Ching Reply Memo. at 9, Ex. A) this Court's Order of January 7, 2004, in *Rosario v. Kurtz,* No. 02CV134, Docket No. 38, which held (alternatively) that plaintiff's letter to the superintendent did not constitute exhaustion. *Id.* at 7. The focus of that case, however, was that plaintiff's attempt to have prison officials in a second facility recognize a favorable determination made at the first grievance step in his former facility. *Id.* at 5–7. There, the plaintiff had invoked the Inmate Grievance Program, but failed to commence a second grievance in his new facility when the medical treatment he sought was not provided by defendant (a doctor in the new facility).

7    *Compare Sanders, supra,* 2002 U.S. Dist. LEXIS 13772 (S.D.N.Y. July 25, 2002) (accepting total exhaustion, dismissing complaint), *with Dimick v. Bafuffo,* No. 02 Civ. 2151, 2003 U .S. Dist. LEXIS 2865, at *13 (S.D.N.Y. July 28, 2003) (rejecting total exhaustion, dismissing only unexhausted claims).

        Courts in the Second Circuit are not alone. Courts across the nation are split on whether total exhaustion is required before a prisoner can commence a federal civil rights action. *Compare, e.g., Hartsfield v. Vidor,* 199 F.3d 305, 310 (6th Cir.1999) (separates unexhausted claims and considers exhausted claims on merits); *Johnson v. True,* 125 F.Supp.2d 186 (W.D.Va.2000) (same); *Jenkins v. Toombs,* 32 F.Supp.2d 955 (W.D.Mich.1999) (same); *with, e.g., Smeltzer v. Hook,* 235 F.Supp.2d 736 (W.D.Mich.2002) (construing PLRA to require total exhaustion); *Riveria v. Whitman,* 161 F.Supp.2d 337 (D.N.J.2001) (same); *Thorp v. Kepoo,* 100 F.Supp.2d 1258, 1263 (D.Haw.2000) (same); *Ellison v. California Dep't of Corrections,* No. C 02–1393, 2003 U.S. Dist. LEXIS 8545 (N.D.Cal. May 19, 2003) (same).

8    Not remedied in plaintiff's proposed Amended Complaint, *see* Docket No. 28, Ex. C, proposed Am. Compl. ¶ 57.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 290480
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

John DOE, Plaintiff,

v.

Health Administrator Jorge TORRES,
Dr. M. Glover, Dr. Pradip M. Patel, Dr.
Kahanowicz, and Physician Assistant Patel,
and the United States of America, Defendants.

No. 05 Civ.3388 JSR GWG.
|
Feb. 8, 2006.

**Attorneys and Law Firms**

John Doe, pro se.

*REPORT AND RECOMMENDATION*

GORENSTEIN, Magistrate J.

**\*1** John Doe,[1] an inmate at a Bureau of Prisons ("BOP") facility proceeding *pro se,* seeks relief against various BOP employees and a doctor who worked under a contract with the BOP. Doe's claims are based on allegedly improper medical treatment he received. The defendants have moved to dismiss Doe's complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). For the following reasons, the motions should be granted in part and denied in part.

I. *BACKGROUND*

A. *Factual History*

The following facts are alleged by Doe in his complaint and are accepted as true for purpose of the current motions.

In late February 2004, while incarcerated at the Metropolitan Correctional Center in New York City ("MCC"), Doe injured his right knee playing basketball. *See* Redacted Complaint, dated Feb. 24, 2005 ("Compl.") (Docket # 2), ¶ IV. He reported the injury to a "recreation specialist," and the next day to his counselor and his

Unit Manager, who put him in touch with a physician's assistant, Gautam Patel. *Id.* Gautam Patel took him to see Dr. Glover, a staff physician at the MCC. Dr. Glover took an x-ray "which did not show anything," after which Doe told Dr. Glover that "it felt like I tore something." *Id.* On March 4, 2004, Dr. Glover filled out a diagnostic form and checked a box indicating that any further treatment requiring Doe's transportation outside the prison was "Medically Acceptable But Not Medically Necessary: for the convenience of the inmate." *See* Diagnostic Report of Dr. M. Glover, dated Mar. 4, 2004 ("3/4/04 Report") (reproduced as Ex. B to Compl.), at 1. On March 11, 2004, Dr. Glover examined Doe again, and this time checked a box indicating that further treatment was "Presently Medically Necessary: treatment that cannot reasonably be delayed without causing further serious deterioration, significant pain or discomfort." *See* Diagnostic Report of Dr. M. Glover, dated Mar. 11, 2004 ("3/11/04 Report") (reproduced as Ex. B to Compl.), at 2.

At some point following this second visit, Dr. Glover referred Doe to an orthopedist, Dr. Kahanowicz, *see* 3/11/04 Report at 2, who apparently is not a BOP employee. *See* Compl. ¶ IV; Professional Services Agreement, dated Dec. 15, 2003 ("Kahanowicz Contract") (reproduced as Ex. B to Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Complaint, dated July 8, 2005 ("Kahanowicz Mot. to Dismiss")). Dr. Kahanowicz examined Doe and told him to "just exercise" the knee and return in "a few weeks" for a follow-up. Compl. ¶ IV. After three follow-up visits to Dr. Kahanowicz, Doe's knee was still swollen, which led him to contact Dr. Pradip Patel. Dr. Patel told him to see Dr. Kahanowicz again, and that if he was still unsatisfied, Dr. Patel would give him a second opinion. *See* Compl ¶ IV. On March 25, 2004, Dr. Patel examined Doe and ordered a magnetic resonance imaging exam ("MRI") on Doe's right knee. *See* Diagnostic Report of Dr. P. Patel, dated Mar. 25, 2004 (reproduced as Ex. B to Compl.), at 3.

**\*2** On April 8, 2004, Doe underwent the MRI on his right knee. Compl. ¶ IV-A. Doe states that this procedure revealed a "small subchondral cyst in the femoral condyles, and small cystic area in the inferior patellar attachment" of the right knee. *Id.* (capitalization omitted). Dr. Patel's own notes of the procedure, recorded on May 13, 2004, read as follows: "Reveal bone bruise, mild arthritis [changes], no meniscal abnormalities." *See*

Diagnostic Report of Dr. P. Patel, dated May 13, 2004 (reproduced as Ex. B to Compl.), at 4.

On July 29, 2004, Doe was still experiencing pain and was referred to an orthopedic surgeon, Dr. Kaplan, who recommended arthroscopic surgery on his knee. *See* Compl. ¶ IV. Doe had the surgery on October 13, 2004. *See id.* After surgery, Doe was told he still had "loose chips" and that he might need more surgery. The surgeon also prescribed physical therapy, but did "not want to give to[o] much therapy." *Id.*

Doe characterizes his treatment prior to surgery as consisting of "X-ray MRI and Ace Bandage and 8 months and do exercise on weight machine which just irr [i]tate it more." Compl. ¶ IV-A.

### B. *Administrative Tort Claim*
In August 2004, Doe submitted an Administrative Tort Claim to the Office of the Regional Counsel of the BOP, seeking $25,000. *See* Claim for Damage, Injury, or Death [TRT-NER-2004-04547], dated Aug. 11, 2004 (reproduced as Ex. C to Declaration of Adam M. Johnson, dated Aug. 5, 2005 (Docket # 18) ("Johnson Decl.")). On February 11, 2005, the Northeast Regional Office of the BOP informed Doe it was declining to offer him a settlement regarding this claim. *See* Memorandum, dated Feb. 11, 2005 (annexed to Compl.).

### C. *The Instant Claims and Motions*
Doe brought this action using the form complaint for actions brought under 42 U.S.C. § 1983. He alleges that the defendants did not provide "proper medical treatment in the proper amount of time," and that there was "negligence" on the part of the BOP and its "employees." *See* Compl. ¶ V (capitalization omitted). He requests damages of $150,000. *Id.*

Defendants Torres, Dr. Glover, Dr. Patel, and Gautam Patel, who are federal employees represented by the United States Attorney's Office, have moved to dismiss under Fed.R.Civ.P. 12(b)(1) and (6). *See* Notice of Motion, dated Aug. 8, 2005 (Docket # 16). Dr. Kahanowicz, represented by private counsel, has moved to dismiss under Fed.R.Civ.P. 12(b)(6). *See* Notice of Motion, dated July 8, 2005 (Docket # 13).

### D. *The December 2, 2005 Order and Doe's Response*
Following review of the defendants' motions, it appeared to the Court that the complaint, liberally construed, sought to assert a claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 (the "FTCA"), inasmuch as Doe made claims of "negligence" and because he attached to his complaint the decision on his administrative claim under the FTCA. It was unclear, however, whether Doe intended to bring a complaint against the various federal employees in their individual capacities under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). Accordingly, the Court issued an order on December 2, 2005, outlining the legal standards for a *Bivens* action based on "deliberate indifference," *see, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), and directing Doe to send a letter or affidavit to the Court stating:

> **\*3** (1) whether Plaintiff wishes to pursue a claim against any defendant in his individual capacity on the ground that such defendant acted with "deliberate indifference" to Plaintiff's medical needs and, if so, (2) against which defendants Plaintiff wishes to pursue such a claim.

Order, dated Dec. 2, 2005 (Docket # 21), at 2. The Order added that Doe was "free to state any additional factual allegations he wishes with respect to this claim, though the Court is not requiring the plaintiff to do so at this time." *Id.*

In response, Doe submitted a document stating "that he does in fact intend to pursue a constitutional deliberate indifference claim against the defendants" on the ground that "the defendants either knew or should have known that their actions or lack thereof caused the injury and furthered additional injury through the defendants' deliberate indifference." Plaintiff's Response, dated Dec. 21, 2005 ("Pl.Resp."), at 1-2. The Court deems these allegations to supplement his original complaint. *See, e.g., Woods v. Goord,* 2002 WL 731691, at \*1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering *pro se* prisoner's factual allegations in briefs as supplementing his complaint); *Burgess v. Goord,* 1999 WL 33458, at \*1 n. 1 (S.D.N.Y.

**Doe v. Torres, Not Reported in F.Supp.2d (2006)**
Case 9:18-cv-00096-DNH-ML   Document 88   Filed 03/25/19   Page 55 of 132
2006 WL 290480

Jan. 26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum' ") (quoting *Gadson v. Goord,* 1997 WL 714878, at *1 n .2 (S.D.N.Y. Nov. 17, 1997)).

## II. *APPLICABLE STANDARDS*

With respect to a motion to dismiss for lack of subject matter jurisdiction, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. After construing all ambiguities and drawing all inferences in a plaintiff's favor, a district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Aurecchione v. Schoolman Transp. System, Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (internal citations and quotation marks omitted).

In resolving a motion to dismiss under Fed.R.Civ.P. 12(b) (6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 n. 1 (2002); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (footnote omitted). In making this evaluation, complaints drafted by *pro se* plaintiffs are held " 'to less stringent standards than formal pleadings drafted by lawyers,' " *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam)), and they "should be interpreted 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Although a court must construe *pro se* complaints liberally, especially in instances where a plaintiff alleges civil rights violations, *see, e.g., Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001), a *pro se* litigant is still obligated to comply with the relevant rules of procedural and substantive law. *See, e.g., Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

## III. *ANALYSIS*

### A. *Sovereign Immunity*

**\*4** The United States enjoys sovereign immunity from suit and thus cannot be sued without its consent. *See, e.g., United States v. Navajo Nation,* 537 U.S. 488, 502 (2003); *Coulthurst v. United States,* 214 F.3d 106, 108 (2d Cir.2000). Claims asserted against agencies of the United States government, such as the BOP, or federal officers in their official capacities are considered to be asserted against the United States and are also barred under the doctrine of sovereign immunity. *See, e.g., Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) (citing *FDIC v. Meyer,* 510 U.S. 471, 484-86 (1994)). Congress may waive the sovereign immunity of the United States but may do so only through unequivocal statutory language. *E.g., Lane v. Pena,* 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied.") (citations omitted). Congress may define the terms and conditions of such a waiver and "the terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586 (1941); *accord Meyer,* 510 U.S. at 475. Thus, if the United States has not waived its sovereign immunity, or if the conditions of such a waiver have not been met, the Court lacks subject matter jurisdiction over the claim. *See, e.g., Meyer,* 510 U.S. at 475; *Williams v. United States,* 947 F.2d 37, 39 (2d Cir.1991), *cert. denied,* 504 U.S. 942 (1992).

To the extent Doe's complaint relies on 42 U.S.C. § 1983, *see* Compl. at 1, it must be dismissed as there is no waiver of sovereign immunity effectuated by section 1983. *See, e.g., Harrison v. Potter,* 323 F.Supp.2d 593, 604 (S.D.N.Y.2004). To the extent Doe is alleging that the defendants have violated his constitutional rights under *Bivens,* 403 U.S. 388, *Bivens* too does not effectuate a waiver of sovereign immunity. *See Robinson,* 21 F.3d at 510. Thus, any *Bivens* claim must be dismissed with respect to the defendants in their official capacities. *See, e .g., Meyer,* 510 U.S. at 484-86; *Robinson,* 21 F.3d at 510; *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983).

While Doe does not explicitly assert that he is bringing a claim under the FTCA, we will assume the complaint raises such a claim as well, inasmuch as he has attached to his complaint the denial of his administrative claim under that statute. *See* Memorandum, dated Feb. 11, 2005

(annexed to Compl.. Accordingly, the remaining claims in this case are (1) Doe's claim under the FTCA; and (2) Doe's *Bivens* claim against the defendants in their individual capacities. We consider each in turn.

### B. *The FTCA Claim*

#### 1. *The Claims Relating to Conduct by the Federal Employees*

 **\*5** The FTCA states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. [2] The Government seeks dismissal of Doe's FTCA claim based on its argument that Doe has not alleged negligence by any of the federal employees-that is, employees other than Dr. Kahanowicz. It notes that the "only injury" Doe identifies in his complaint is "the condition identified by the April 8, 2004 MRI." *See* Memorandum of Law in Support of the Motion to Dismiss the Complaint, dated Aug. 8, 2005 (Docket # 19) ("Gov't Mem."), at 11. The Government thus contends that "the negligence at issue is the decision of Dr. Kahanowicz to prescribe physical therapy ... rather than immediately ordering surgery[.]" *Id.* The Government also asserts that Doe "does not allege that the Government Defendants caused the condition identified by the April 8, 2004 MRI." *Id.* Accordingly, the Government concludes that Doe's complaint fails to state a claim of negligence.

While it may eventually become clear that Doe cannot produce evidence demonstrating negligence on the part of the federal defendants, at this stage all Doe need do is give "fair notice of the basis" for his claims. *Swierkiewicz,* 534 U.S. at 514. The Court notes that Form 9 of the Appendix of Forms annexed to the Federal Rules of Civil Procedure, consisting of a sample complaint for negligence, offers virtually no detail on the manner in which the defendant committed negligence. Apart from supplying location and time, Form 9's sole factual allegation on liability is that the "defendant negligently drove a motor vehicle against plaintiff." Here, Doe has asserted that the defendants' medical treatment of him was "negligen[t]." *See* Compl. ¶ V. Because, pursuant to Fed.R.Civ.P. 84, Form 9 must be considered sufficient for stating a claim of negligence, Doe's mere statement that the defendants were negligent in their provision of medical treatment to him is sufficient to survive a motion to dismiss.

While a complaint containing additional-and legally unnecessary-detail could show an absence of negligence and thus support dismissal, *see generally Colodney v. Continuum Health Partners, Inc.,* 2004 WL 829158, at \*7 (S.D.N.Y. Apr. 15, 2004) (no claim for slander stated where the "facts contained in [plaintiff's] own pleading contradict[ed] any naked assertion that [the] statements about him were false"), the Court does not believe that such is the case here. For example, the exhibits Doe attached to his complaint demonstrate that while the diagnostic report of March 4, 2004-the apparent date of his first visit to Dr. Glover-stated that no additional consultation was required, and that further treatment outside the prison was not "medically necessary," *see* Compl. ¶ IV(A); 3/4/04 Report, a second report by Dr. Glover one week later stated that treatment for Doe "cannot be reasonably delayed without causing further serious deterioration, significant pain or discomfort." *See* 3/11/04 Report. Further, Doe alleges that when he saw Dr. Patel, Dr. Patel told him "all he can do is go by [Dr. Kahanowicz's] decision." *See* Compl. ¶ IV. Finally, the complaint, as supplemented by Doe's response to the Court's December 2, 2005 Order, states that all the defendants "should have known that their actions or lack thereof caused the injury and furthered additional injury." *See* Pl. Resp. at 2. Taking these allegations together, it is a fair inference that Doe is alleging that this conduct constituted negligence. The Court cannot say that these allegations show that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46.

#### 2. *The Claims Involving Conduct by Dr. Kahanowicz*
 **\*6** The Government argues that this Court lacks subject matter jurisdiction over Doe's FTCA claim to the extent it rests on any conduct by Dr. Kahanowicz because the United States is only liable under the FTCA for the negligent act or omission of any "employee" of the government. 28 U.S.C. § 1346(b). The Government asserts that "28 U.S.C. § 2671 clarifies that the term 'employee' specifically excludes 'any contractor with the United States.' " *See* Gov't Mem. at 10.

In fact, 28 U.S.C. § 2671 does not define the term "employee." It says only that the term "Federal agency" does not include a contractor. Nonetheless, in determining whether a person may be considered an "employee" for purposes of the FTCA, courts have held that an

Doe v. Torres, Not Reported in F.Supp.2d (2006)
Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 57 of 132
2006 WL 290480

"independent contractor" does not come within the FTCA. *See, e.g., Logue v. United States,* 412 U.S. 521, 527-28 (1973); *Leone v. United States,* 910 F.2d 46, 49 (2d Cir.1990). *Logue* held that "the critical factor" in making the determination of whether an individual is an independent contractor "is the authority of the principal to control the detailed physical performance of the contractor." 412 U.S. at 527-28. In *Leone,* the Second Circuit characterized the test as a determination of whether the individual's "day-to-day operations are supervised by the Federal Government." 910 F.3d at 50 (citing *United States v. Orleans,* 425 U.S. 807, 815 (1976)). *Leone* makes clear that the analysis is a fact-intensive one, requiring consideration of

> "the extent of control which, by agreement, the master [here, the federal agency] may exercise over the details of the work; whether or not the one employed is engaged in a distinct occupation or business; the kind of occupation, with reference to whether the work is usually done under the direction of the employer or by a specialist without supervision; the skill required in the particular occupation; whether the employer or the workman supplies the instrumentalities, tools and the place of work; and the method of payment, whether by time or by the job."

*Id.* at 50 (quoting 1 L. Jayson, *Handling Federal Tort Claims* § 203.01, at 8-58 (1990)).

The determination of this question is unsuited to the Government's motion to dismiss in Doe's case. While Dr. Kahanowicz has appended a copy of the contract between him and the BOP, and the BOP has made certain inferences based on that contract, *see, e .g.,* Gov't Mem. at 12 (Dr. Kahanowicz "had full autonomy in the performance of his work"), the Court declines to consider this evidence in the context of the Government's motion to dismiss. The Second Circuit has made clear that a court "may" consider materials outside the pleadings for purposes of a motion to dismiss for lack of subject matter jurisdiction, *see Makarova v. United States,* 201 F.3d 110,

113 (2d Cir.2000), but there is no requirement that a Court do so in every case. Such consideration would be inappropriate here because Doe has not been put on notice that he was required to contest the factual allegations regarding Dr. Kahanowicz's relationship with the BOP. Local Civil Rule 12.1 required the Government to "serve and file the notice required by Local Civil Rule 56.2 at the time" its motion to dismiss was served. Here, the Government served a notice, *see* Notice to Pro Se Litigants Opposing Motion for Summary Judgment, dated Aug. 8, 2005 (Docket # 17), but changed the version of the notice contained in Local Civil Rule 56.2 in a manner that rendered it confusing. The Government's version of this notice-unlike that contained in Local Civil Rule 56.2 itself-informed Doe that he must file affidavits or other papers in response to the Government's motion "as required by ... Local Rule 56.1." The Government's notice also attached the text of Local Civil Rule 56.1.[3]-also not an action required by Local Rule 56.2. These two references to Local Civil Rule 56.1 made the Government's notice confusing because the Government in fact had not submitted a statement pursuant to Local Rule 56.1(a) of material facts that were not dispute. Thus the Rule 56.2 notice, through its reference to Local Rule 56.1(b), informed Doe that he had to respond to a statement that the Government had never submitted.

**\*7** Accordingly, the Court will not make a determination regarding the status of Dr. Kahanowicz based on the current record. Obviously, the Government will be given the opportunity to move for summary judgment on this point in a manner that puts Doe on notice of his obligation to set forth the necessary evidence.

### C. The Bivens Claim Against the Federal Employees

#### 1. Failure to State a Claim

As noted previously, where an agent of the federal Government is alleged to have violated an individual's federal constitutional rights, *Bivens* permits that individual to bring an action for damages against the agent in his or her individual capacity.

To state a claim for deprivation of medical treatment in violation of the Eighth Amendment, a prisoner must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v.*

*Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995).

Under the subjective component, the prisoner must demonstrate that the defendants acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). The subjective element of the deliberate indifference test "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). Specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness." ') (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)), *cert. denied,* 125 S.Ct. 971 (2005).

The Government argues that Doe has not sufficiently alleged that the BOP employees were "deliberately indifferent" to Doe's medical needs. *See* Gov't Mem. at 15-18. But inasmuch as Doe has alleged that defendants "either knew or should have known that their actions or lack thereof" caused his injury and that they were "deliberate[ly] indifferen[t]" to his medical needs, *see* Pl. Resp. at 2, the complaint should not be dismissed on this ground given the liberal pleading standards contemplated under the Federal Rules.

Under the objective prong, the alleged medical need must be "sufficiently serious." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway,* 37 F.3d at 66) (internal quotation marks omitted). The Second Circuit has held that a "sufficiently serious" injury contemplates " 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway II,* 99 F.3d at 553); *accord Chance,* 143 F.3d at 702. Thus, a "sufficiently serious" injury exists "where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks omitted); *accord Harrison v.*

*Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *see also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (a serious injury occurs "if 'unnecessary and wanton infliction of pain' results, or where the denial of treatment causes an inmate to suffer a life-long handicap or permanent loss") (quoting *Harrison,* 219 F.3d at 136). In determining whether a serious medical need exists, the Second Circuit has noted several factors for courts to consider, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Chance,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)) (alteration in original).

**\*8** Doe's complaint does not make any allegations that would suggest that he has met the "serious harm" requirement. In fact, his complaint says nothing about *any* injury that was caused by the allegedly deliberately indifferent conduct of the defendants. While his complaint may be construed as asserting by implication that his knee injury was misdiagnosed initially and that he did not receive surgery that he required immediately, nothing in the complaint explains the consequence of these actions. Given the complete absence of allegations as to what was the effect of the purported improper treatment, the complaint should be dismissed for failure to allege this aspect of Doe's deliberate indifference claim.

Such dismissal should be granted, however, with leave to replead the claim in the event Doe is able to do so. *See, e.g., Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (it is "usual practice" to allow leave to replead upon granting motion to dismiss), *cert. denied,* 503 U.S. 960 (1992); *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990).

### 2. *Exhaustion*

The Government also argues that the complaint should be dismissed because Doe does "not allege or indicate" that he exhausted his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). *See* Gov't Mem. at 14. But given that the Second Circuit has squarely held that the exhaustion of administrative remedies is an affirmative defense, *see, e.g., Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004), there is no reason why Doe was required to plead the absence of this defense

in his complaint. *See generally Harris v. City of New York,* 186 F.3d 243, 251 (2d Cir.1999) (the "statute of limitations is an affirmative defense ... that [plaintiff's] pleading need not have anticipated").

The Government has also presented materials outside the pleadings in its effort to show that the plaintiff did not exhaust administrative remedies. *See* Gov't Mem. at 13-14. But to consider such materials, the Court would have to convert the Government's motion for failure to state a claim to one for summary judgment. *See* Fed.R.Civ.P. 12(b). Once again, the Court will not exercise its discretion to consider these materials because, for the same reasons given previously, *see* Section II.B.2 above, it is not clear that Doe understood that he was required to make a factual showing controverting the Government's factual assertion that he failed to exhaust his administrative remedies.

Accordingly, the Court will not dismiss Doe's complaint for failure to allege the exhaustion of administrative remedies at this stage of the proceedings. Again, the Government will be given the opportunity to move for summary judgment on this point.

### D. *The* Bivens *Claim Against Dr. Kahanowicz*

Dr. Kahanowicz contends that because he is "retained on a contractual basis" to examine inmates, he "cannot be considered a prison official" and therefore is not liable for violations alleged under 42 U.S.C. § 1983. *See* Kahanowicz Mot. to Dismiss ¶ IV(A). Since the filing of Dr. Kahanowicz's papers, however, it has been made clear that Doe is proceeding under *Bivens* rather than section 1983. Accordingly, the Court assumes that Dr. Kahanowicz would make the same arguments with respect to Doe's claim under *Bivens.*

**\*9** It is well-established that conduct "fairly attributable" to a government actor may be the basis for a claim of a violation of a federal right. *See Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937 (1982); *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 432-33 (2d Cir.1995) (citing *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 620 (1991)). With regard to doctors who treat prison inmates, the Supreme Court has held that it is "the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State" in a suit under 42 U.S.C. § 1983. *West v.. Atkins,* 487 U.S. 42, 55-56

(1988). "Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner. Contracting out prison medical care ... does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Id.* at 56. In *West,* an inmate injured his leg playing volleyball and was sent by a prison doctor to see a private orthopedist who had contracted with the state prison system to provide treatment to inmates. *See id.* at 43-44. The Court held that the orthopedist's "delivery of medical treatment to West was state action fairly attributable to the State, and that [he] therefore acted under color of state law for purposes of § 1983." *Id.* at 57.

While *West* arose from a section 1983 action, there is no reason to differentiate between a section 1983 claim and a *Bivens* claim for this purpose. Both apply to defendants acting under "color of law": section 1983 applies to those acting under color of state law and *Bivens* applies to those acting under color of federal law. *See, e.g., Commodari v. Long Island University,* 89 F.Supp.2d 353, 373 n. 10 (E.D.N.Y.2000) ("For the purposes of determining whether a private party acts under color of federal law, courts apply the same principles as in [sic] they do in determining whether a private party acts under color of state law in a § 1983 action.") (citations omitted); *accord Island Online, Inc. v. Network Solutions, Inc.,* 119 F.Supp.2d 289, 304 (E.D.N.Y.2000). Doe has made sufficient allegations at this stage of the proceedings to permit the conclusion that Dr. Kahanowicz's actions were attributable to the BOP. Nonetheless, because of his failure to meet the "serious harm" prong of a *Bivens* suit alleging "deliberate indifference," the claim against Dr. Kahanowicz must be dismissed with leave to replead. *See* Section III.C.1 above.

### Conclusion

For the foregoing reasons, the defendants' motion to dismiss Doe's *Bivens* action should be granted, with Doe being given leave to replead the claim if he is able to do so. The Government's motion to dismiss the FTCA claim should be denied. [4]

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**\*10**  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed S. Rakoff, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Rakoff. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 144-45 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 290480

---

Footnotes

1   The Court previously issued an order (Docket # 4) permitting plaintiff to proceed in this matter as "John Doe."

2   The Court has added to the caption the United States as a party defendant inasmuch as FTCA claims must be brought against the United States and the Government has made the certification required by 28 U.S.C. § 2679(d)(1) to include the United States as a party. *See* Certification of David N. Kelley, dated Aug. 8, 2005 (annexed to Docket # 16).

3   Actually, the Government quoted a superseded version of the Rule, which had been amended in March 2004.

4   Arguably, the complaint might be liberally construed as asserting a state common law tort claim against Dr. Kahanowicz. In the event this case proceeds with respect to any other claim, Dr. Kahanowicz should address whether the complaint should be so construed and should also set forth any defenses to such a claim, either by way of a supplemental answer or motion.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681 et seq. ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to
the record where those facts are established. A similar
obligation is imposed upon the non-movant who

> shall file a response to the [movant's]
> Statement of Material Facts. The non-

> movant's response shall mirror the
> movant's Statement of Material Facts
> by admitting and/or denying each of
> the movant's assertions in matching
> numbered paragraphs. Each denial
> shall set forth a specific citation to the
> record where the factual issue arises....
> *Any facts set forth in the [movant's]
> Statement of material Facts shall be
> deemed admitted unless specifically
> controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed
an eleven page, twenty-nine paragraph Statement of
Material Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of
law which failed to admit or deny the specific assertions
set forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here,
the opposing party has failed to comply with the Rule.
*See, e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-
Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999);
*Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185
F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v.
Stewart and Stevenson Operations, Inc.,* 1998 WL 903629,
at *1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL
743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien
& Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2
(N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

Elgamil v. Syracuse University, Not Reported in F.Supp.2d (2000)

2000 WL 1264122

## BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new

2000 WL 1264122

advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [3] as mentioned, Clawson, not Roopnarine, authored the exam question.

 **\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

## DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden

of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

### I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ––––, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

### A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment, [5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v.*

*New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,*

510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and

2000 WL 1264122

inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382,

at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment"). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

**B. Actual Knowledge / Deliberate Indifference**
Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to

occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced

the grading of her third research methods exam.[8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[9]

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

---

Footnotes

1    Amended January 1, 1999.

Elgamil v. Syracuse University, Not Reported in F.Supp.2d (2000)

2000 WL 1264122

2    Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

3    Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4    Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5    In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

    It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6    Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7    As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8    As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9    Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

**End of Document**                                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 69 of 132

Gentile v. Republic Tobacco Co., Not Reported in F.Supp. (1995)

1995 WL 743719

1995 WL 743719
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony GENTILE, Plaintiff,
v.
REPUBLIC TOBACCO COMPANY, Defendant.

No. 95-CV-1500 (RSP) (DNH).
|
Dec. 6, 1995.

**Attorneys and Law Firms**

Anthony Gentile, Binghamton, NY, pro se.

*DECISION and ORDER*

POOLER, District Judge.

*I. Background*

**\*1** Presently before this Court is an application to proceed in forma pauperis and a civil rights complaint. Plaintiff Anthony Gentile ("Gentile") has not paid the partial filing fee required to maintain this action.

Because Gentile's complaint is without arguable basis in law, I dismiss it pursuant to 28 U.S.C. § 1915(d) and Rule 5.4(a) of the Local Rules of Practice of this District as without arguable basis in law.

In his *pro se* complaint, Gentile claims that defendant Republic Tobacco Company ("Republic") manufactures a product called TOP tobacco, and that Republic has negligently failed to put any warning labels on such product regarding possible health hazards which may be caused by the use of such product. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether

the cause of action stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y. 1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir. 1983) (*per curiam*).

I have determined that Gentile's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). I therefore turn to the second inquiry. A court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir. 1990) (*per curiam*). In addition, the court should exercise extreme caution in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir. 1983). Nonetheless, the Court has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir. 1974), and to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

Gentile brought this action under 42 U.S.C. § 1983, which permits individuals to seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* No. 91-CV-612, 1994 WL 688306, \*3, 1994 U.S.Dist. LEXIS 17698, \*8-9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). However, parties may not be held liable under this section unless it can be established that they have acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir. 1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* No. 92-Civ-4288, 1992 WL 380914, \*1, 1992 U.S.Dist. LEXIS 18864, \*2-3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

**\*2** In the present case, Gentile has named Republic as the sole defendant herein. However, Gentile has not

Gentile v. Republic Tobacco Co., Not Reported in F.Supp. (1995)
Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 70 of 132
1995 WL 743719

alleged any nexus between the State of New York and the challenged actions of Republic. State action is an essential element of any § 1983 claim. *See Velaire v. City of Schenectady,* 862 F.Supp. 774, 776 (N.D.N.Y. 1994) (McAvoy, C.J.) (citation omitted).

Moreover, the Court notes that Gentile contends that Republic's failure to warn the public of possible health hazards was the result of negligence on the part of the defendant. Complaint at 2. However, it is well settled that mere negligence is not cognizable under § 1983. *See Stevens v. Pinkney,* No. 95-CV-1338, slip op. at 4 (N.D.N.Y. Oct. 25, 1995) (Scullin, J.) (citations omitted).

Because no arguable basis in law supports Gentile's complaint, I must dismiss it pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Rule 5.4(a) of the Local Rules of Practice of this District as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 743719

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 340014
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gregory JACKSON, Plaintiff,
v.
Mitchell BARDEN, M.D., personally, Sukhminder
Singh, M.D., personally, Ravinder Sidhu, M.D.,
personally, Michael Susco, M.D., personally,
and Saint Francis Hospital, Defendants.

12 Civ. 1069 (KPF)
|
Signed 01/08/2018

**Attorneys and Law Firms**

William Michael Brooks, Mental Disability Law Clinic,
Touro Law Center, Central Islip, NY, for Plaintiff.

Adam Joseph Sansolo, Barbara Kathryn Hathaway,
Steven Gabriel Morris, New York State Office of the
Attorney General, New York, NY, Carol Casteel Poles,
Ellen Anne Fischer, Janet Weintraub Blake, The Law
Firm of Steinberg & Symer, LLP, Poughkeepsie, NY,
Brian E. Lee, Ivone, Devine and Jensen, LLP, Lake
Success, NY, for Defendants.

REDACTED OPINION AND ORDER

KATHERINE POLK FAILLA, United States District
Judge

**\*1** Cognizant of the gravity of such an event, New York
law establishes detailed procedures for hospitalizing an
individual against his or her will. One such procedure,
codified in New York Mental Hygiene Law ("MHL") §
9.37, allows a hospital to "receive and care for" any person
who, "in the opinion of the director of community services
or the director's designee, has a mental illness for which
immediate inpatient care and treatment" is appropriate
and that is "likely to result in serious harm to" him or
herself or others.

On October 22, 2009, Plaintiff Gregory Jackson was
involuntarily hospitalized pursuant to MHL § 9.37 after
he displayed alarming behavior to, among many others,
numerous medical professionals from whom he received

treatment. In 2012, Plaintiff brought this action against
several physicians involved in his hospitalization and the
receiving hospital, seeking damages for alleged violations
of (i) the Fourth and Fourteenth Amendments to the
United States Constitution pursuant to 42 U.S.C. § 1983,
(ii) the Rehabilitation Act, 29 U.S.C. § 794, and (iii) New
York's common-law tort of medical malpractice.

After extensive discovery, as well as a lengthy delay
occasioned by the bankruptcy filing of the receiving
hospital, Defendants have moved for summary judgment
on all of Plaintiff's claims. Plaintiff opposes the motions
except as they pertain to his Rehabilitation Act claim,
which he now abandons. As set forth in the remainder
of this Opinion, all but one of the Defendants were not
acting on behalf of the State when making decisions about
Plaintiff's condition and treatment, and the remaining
Defendant is subject to qualified immunity for his
conduct. Accordingly, Plaintiff's federal claims fail, and
the Court declines to exercise supplemental jurisdiction
over Plaintiff's state-law claims. [1]

**BACKGROUND**

**A. Factual Background**

**\*2** The parties quibble over many of the factual details
underlying Plaintiff's background and hospitalization.
While none rises to the level of a genuine dispute of
material fact, the Court discusses both parties' accounts
when and to the extent they diverge.

**1. Plaintiff's Background**

The most significant source of information concerning
Plaintiff comes not from his sworn statements, but
from his "Core History," a document assembled by the
New York State Office of Mental Health ("OMH")
and available to certain healthcare professionals. As
discussed below, this document contains highly relevant
information regarding Plaintiff's psychiatric, criminal,
and personal histories.

**a. Plaintiff's Psychiatric History**

Plaintiff, now 55 years old, has an extensive history
of psychiatric illness [redacted]. (*See* Pl. 56.1 Opp. ¶¶
1, 15-16). [Redacted]. Despite these serious diagnoses,

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

Plaintiff has a history of failing to comply with medical treatment directives, including the taking of medication, leading to numerous inpatient hospitalizations. (*Id.* at ¶ 2).

Although his medical history precludes him from contesting the fact of these psychiatric hospitalizations, Plaintiff vigorously disputes certain ancillary details. For example, Plaintiff's medical records state that in 1987, Plaintiff assaulted a coworker, consequently lost his job, and was hospitalized at Prince George Hospital in Maryland for two weeks. (*See* Pl. 56.1 Opp. ¶ 17). Plaintiff acknowledges that he was involved in a shoving match at work, but insists that he neither lost his job nor was hospitalized after the incident. (*See id.*).

From April to May of 1989, Plaintiff was hospitalized for approximately two weeks at the Hudson River Psychiatric Center ("HRPC") "for [redacted] behavior." (Pl. 56.1 Opp. ¶ 19). In June 1990, Plaintiff was readmitted to HRPC for a similar length of time, in this instance for assaulting his wife and threatening his neighbors. (*See id.* at ¶ 20). Plaintiff admits that he kicked his wife but denies threatening his neighbors, stating that he "never threatened to cause harm," but only played music loudly over his neighbors' objections. (Pl. Aff. ¶ 57; *see also id.* at ¶ 55). Plaintiff's records indicate that upon admission, "he was [redacted]," and when asked about his interactions with his wife stated, "I tried to instill a little fear in her, that's all." (Pl. 56.1 Opp. ¶¶ 21-22). In connection with the instant motions, Plaintiff contends that this quote was taken out of context, and that he made this statement in relation to a "feigned suicide attempt" purported to invoke pity in his wife so that she would financially support him. (*Id.* at ¶ 22).

In February 1991, Plaintiff was again admitted at HRPC, this time for approximately three weeks. (*See* Pl. 56.1 Opp. ¶ 23). Plaintiff's medical history states that this hospitalization resulted after he assaulted his wife, but he denies this incident. (*Id.*).[2] Upon admission, Plaintiff was [redacted], but Plaintiff contests that he displayed any behavior warranting such treatment. (*See id.* at ¶ 24).

**\*3** In 1992, Plaintiff was admitted to HRPC from May 27 to July 22 "because of [redacted] behavior" after an altercation with his wife when she served him with a separation order. (Pl. 56.1 Opp. ¶ 25). Plaintiff contends such service never occurred, "and hence, [he] could not have been agitated in response to this action." (*Id.*).

Nevertheless, Plaintiff does not dispute that during his admission, he was [redacted]. (*See id.* at ¶¶ 26-27).

In May 2006, Plaintiff was hospitalized for one week "due to [redacted]." (Pl. 56.1 Opp. ¶ 28). Later that same year, from October 19 to December 29, Plaintiff was admitted to Defendant Saint Francis Hospital ("Saint Francis") in Poughkeepsie, New York [redacted]. (*Id.* at ¶ 30). Plaintiff was thereafter involuntarily transferred to HRPC for a period of time that the record does not specify. (*See id.* at ¶ 31).

### b. Plaintiff's Criminal History

Plaintiff's criminal history, as presented in his Core History, consists of six arrests and four convictions, spanning from 1984 to 2009. (*See* Pl. 56.1 Opp. ¶ 35).[3]

Several of Plaintiff's convictions involve forceful or destructive behavior. On January 19, 2008, Plaintiff was charged with burglary but later pled guilty to a lesser offense of criminal trespass. (Pl. 56.1 Opp. ¶¶ 36-37). On February 23, 2009, Plaintiff was charged with criminal mischief with intent to damage property after vandalizing the exterior of a building. (*See id.* at ¶ 32). The charges were dismissed in March 2009 upon a finding that Plaintiff was incapacitated [redacted]. (*See id.*; *see also* N.Y. Crim. Proc. Law § 730.40 (establishing procedure for finding incapacity to stand trial and remand to care of OMH)). On February 23, 2009, Plaintiff was also charged with criminal mischief and damaging another person's property in excess of $250. (*See* Pl. 56.1 Opp. ¶ 40). These charges were also dismissed in March 2009 after Plaintiff was found incapacitated. (*Id.* at ¶ 41).

Plaintiff's Core History also evinces, with varying degrees of detail, his participation in a number of crimes involving theft or fraud. In November 2000, Plaintiff was charged with criminal possession of stolen property, a charge to which he later pled guilty. (*See* Barden Decl., Ex. N, at 3). On December 10 and 19, 2002, Plaintiff was charged with carrying out a scheme to defraud, though his Core History does not provide the details of the scheme or the ultimate resolution of these charges. (*See id.*). In November 2003, Plaintiff was charged with criminal impersonation, to which he later pled guilty and for which he was sentenced to three years' probation. (*Id.*). And in April and October 2008, Plaintiff was charged with issuing bad checks; the

Jackson v. Barden, Not Reported in Fed. Supp. (2018)
2018 WL 340014

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 73 of 132

Core History does not indicate the resolution of these charges. (*Id.* at 4).

### c. Plaintiff's History of Substance Abuse

Plaintiff's Core History recites that in the late 1980s to early '90s, Plaintiff's drug and alcohol abuse, coupled with [redacted], resulted in "numerous admissions to HRPC." (Barden Decl., Ex. N, at 5). Plaintiff has also been [redacted] (Pl. 56.1 Opp. ¶ 33), and his Core History states that he "reports extensive use of crack cocaine and marijuana and has had 2 DWI's in his early 20's as a result of drinking" (Barden Decl., Ex. N, at 6). [4] After Plaintiff's week-long hospitalization in May 2006, he began outpatient treatment but did not consistently comply, leading to a relapse of crack cocaine use in August 2006. (*See* Pl. 56.1 Opp. ¶¶ 29, 34). According to Plaintiff, he last used cocaine in 2008. (*Id.* at ¶ 33).

### d. Plaintiff's [Redacted]

**\*4** [Redacted].

### 2. Events Preceding Plaintiff's October 2009 Involuntary Hospitalization

The events leading up to Plaintiff's involuntary hospitalization on October 22, 2009, involve numerous interactions with psychiatric support specialists, healthcare providers, and other professionals. Several of these individuals were affiliated with New York State and local governments. Of note, however, the hospital to which Plaintiff was admitted was private, as were its employees.

### a. Dutchess County's Involuntary Hospitalization Procedure

Defendant Mitchell Barden, M.D., was the initial medical professional who completed an MHL § 9.37 application to have Plaintiff evaluated for hospitalization. (*See* Barden 56.1 ¶¶ 102-03). In October 2009, Dr. Barden was an OMH psychiatrist employed at HRPC. (*See id.* at ¶ 3). In this capacity, Dr. Barden was the leader and decision-maker for the Dutchess County Mobile Crisis Team ("MCT"), a state-operated entity of healthcare

professionals dispatched to sites within the County to address psychiatric crises. (*See id.* at ¶¶ 3-6).

More specifically, after receiving a dispatch referral, Dr. Barden was responsible for determining whether an individual satisfied MHL § 9.37 by presenting sufficient danger to require hospitalization and further psychiatric evaluation. (*See* Barden Dep. 17:17-23). Upon such determination, police or other authorities would apprehend the individual and transport him or her to a hospital for psychiatric evaluation in accordance with MHL § 9.37. (*See id.* at 20:23-21:11). [5]

### b. The Dutchess County Psychiatric Helpline

The MCT dispatches its healthcare professionals based on referrals from a 24-hour Helpline operated by the Dutchess County Department of Mental Hygiene. (*See* Barden Dep. 20:15-21:11). The Helpline also provides counseling and a contact point for psychiatric emergency services. (Stern Dep. 8:12-21). At the time of Plaintiff's hospitalization, Helpline Clinical Unit Administrator John Stern was responsible for referring individuals for involuntary hospitalization evaluations. (*Id.* at 7:18-8:21).

Stern described Plaintiff as "a frequent caller to Helpline" (Stern Dep. 19:18), and Plaintiff does not dispute that he called "[m]any times" (Pl. Dep. 96:8). Indeed, Stern testified that Plaintiff called so often that it "significantly interfered with [Helpline's] operation." (Stern Dep. 20:12-14). According to Stern, Plaintiff would often express hostility toward Helpline staff, such as threatening lawsuits, causing Stern to be "frightened for [his] safety, and ... for the safety of the staff." (*Id.* at 66:23-67:5).

### c. Assertive Community Treatment

Assertive Community Treatment ("ACT") is an intensive, outpatient psychiatric program that treats patients who require frequent hospitalization and home visits. (*See* Barden Dep. 25:14-21; Stern Dep. 58:24-25). In June 2009, ACT admitted and began providing outpatient services to Plaintiff. (*See* Pl. Dep. 248:10-249:12). On October 14, 2009, however, Dr. Stacaynn Hahn, Director of ACT, completed a memo stating that Plaintiff "would be discharged from the ACT team immediately" because

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

he was not cooperating with treatment and was becoming [redacted]. (Barden Decl., Ex. O; *see* Barden Dep. 27:6-7, 28:13-14). This memo was then forwarded to Dr. Barden. (*See* Barden Dep. 27:4-22). Somewhat presciently, Dr. Barden received word from ACT during this time that he might one day need to dispatch the MCT to pick up Plaintiff because Plaintiff was [redacted]. (*See id.* at 26:19-27:3, 29:22-30:5).

### d. Plaintiff's Visit to the Dutchess County Executive's Office

**\*5** One week after his discharge from the ACT program, on October 22, 2009, Plaintiff visited the Dutchess County Executive's Office. Plaintiff concedes that during that entire month, he was suffering from [redacted]. (Pl. 56.1 Opp. ¶¶ 48-49). He further acknowledges that he did not sleep at all the preceding evening. (*Id.* at ¶ 47).

Accounts diverge as to the tenor and extent of Plaintiff's interactions with employees at the office. The first person Plaintiff encountered was Donna Lehnert, a budget assistant in the Dutchess County Budget Office, which shared office space with the Dutchess County Executive. (*See* Lehnert Dep. 6:23-7:13). Among other duties, Lehnert was responsible for greeting visitors of both offices, and her desk sat alone in a front entrance room. (*See id.* at 7:5-8, 8:1-7).

According to Lehnert, she received a phone call from Plaintiff on the morning of October 22 in which he requested to meet with the County Executive; when Lehnert informed Plaintiff that the County Executive was unavailable and asked if she could take a message, Plaintiff stated "he had something to show [the County Executive] ... regarding Mental Hygiene." (Lehnert Dep. 14:8-14). Within an hour of the call, Plaintiff arrived at the office and requested to schedule a meeting with the County Executive. (*Id.* at 14:15-18, 15:12-13). When Lehnert stated that the County Executive was unavailable, Plaintiff "got agitated and ... started walking and pacing and talking to himself" before having a seat and repeatedly opening, looking into, and closing a briefcase. (*Id.* at 15:14-22). Lehnert tried to obtain information from Plaintiff to schedule an appointment, but Plaintiff "got upset[,] ... started pacing[,] and [said] he wanted to wait for" the County Executive. (*Id.* at 17:25-18:6).

Plaintiff's behavior frightened Lehnert: "His behavior was threatening. ... He was talking to himself, he was pacing and he kept looking in a dark briefcase. It was scary. It's threatening." (Lehnert Dep. 21:21, 21:24-22:1). While Plaintiff was still in the office, Lehnert emailed a coworker to request security personnel. (*Id.* at 18:8-11). In the meantime, Plaintiff began reading pamphlets available in the office, continued opening and closing his briefcase, and began "mumbling to himself." (*Id.* at 18:17-24). After Lehnert sent a second email to her coworker, the coworker came to Lehnert's office, questioned Plaintiff, and left. (*See id.* at 19:4-18).

By the time security arrived, Plaintiff had exited. (*See* Lehnert Dep. 20:8-12). With Plaintiff gone, Lehnert called the Deputy Sheriff on duty in the building to inform him that she neither wanted Plaintiff to return to the office nor wanted to be alone. (*Id.* at 23:22-24:7). Lehnert then called the Helpline to inform John Stern that Plaintiff had visited the office; Lehnert also asked Stern whether Plaintiff was violent. (*See id.* at 25:17-26:2). [6]

At approximately 9:45 a.m., Stern called Dr. Barden and warned him that the MCT might need to evaluate Plaintiff for hospitalization. (*See* Barden Dep. 31:8-17). During the call, Stern indicated that Plaintiff

> was harassing [someone] at the County Executive's office, that he had been there earlier that day and had to be escorted out, that in the past he had often frequented that office and had to be escorted out by security, that he was refusing medication and treatment, that he was hostile towards Mr. Stern and [Helpline] staff, [redacted], and ... that [he] was making threats towards the Helpline staff.

**\*6** (*Id.* at 31:21-32:8). Stern also informed Dr. Barden that in the past, when Plaintiff "refused medication[, he] had a history of becoming [redacted], and that at [that] time [Plaintiff] was refusing all treatment and medication." (*Id.* at 32:16-20).

Later that day, Stern completed a Mobile Team Referral form, requesting the MCT to evaluate Plaintiff. (*See* Stern Dep. 39:21-40:3; Barden Decl., Ex. P). The reason for referral, as Stern handwrote in the form, was that [redacted]. (Stern Dep. 40:17-20; *see* Barden Decl., Ex. P). The form instructed the MCT to "[e]valuate [Plaintiff] for hospitalization." (Stern Dep. 40:20-21; *see* Barden Decl., Ex. P).

Plaintiff tells a different story. According to him, on the morning of October 22, he never called the County Executive's Office, but merely visited to make an appointment with and obtain the name and phone number of someone who could help him obtain records from HRPC to support an ongoing lawsuit against the psychiatric center. (*See* Pl. Aff. ¶¶ 23-24; Pl. Dep. 66:14-67:2). While he was at the office, the County Executive entered Lehnert's office and asked Plaintiff to present a letter from HRPC denying him access to the records he sought. (Pl. Aff. ¶ 26). Plaintiff responded that he only wanted the name and number of someone who could help him, and he promptly left after receiving that information and sitting in the office to rest for a short time. (*See id.* at ¶¶ 26-29). In further contrast to Lehnert's testimony and Stern's report, Plaintiff states that he only opened his briefcase once to store a brochure from the office, and he denies pacing or threatening anyone while he was there. (*Id.* at ¶¶ 28-29).

#### e. Plaintiff's Interaction with Dr. Barden

After receiving the referral from Stern, Dr. Barden reviewed Plaintiff's Core History and, based on this review along with the information received from Stern and ACT members, determined that Plaintiff was at "a very high risk of being [redacted] towards others." (Barden Dep. 38:3-14; *see id.* at 26:19-27:14). Before Dr. Barden or the MCT could examine Plaintiff per the referral form, however, Plaintiff unexpectedly appeared at Dr. Barden's office at around 11:00 a.m. (*See* Pl. 56.1 Opp. ¶ 89). Plaintiff has explained that he went to Dr. Barden's office at the direction of the Director of Community Services, who informed Plaintiff that Dr. Barden was a psychiatrist who could administer prescription antipsychotic medication. (Pl. Aff. ¶ 31).

Here again, the parties provide differing accounts of events. According to Plaintiff, his interaction with Dr.

Barden lasted less than a minute. (*See, e.g.*, Pl. Aff. ¶ 33; Pl. Dep. 70:14-16 ("I saw him for about 24 seconds and I left[.]")). Plaintiff explained that he eschewed Dr. Barden's professional services because the doctor looked unprofessional. (Pl. Aff. ¶ 32). Plaintiff further describes their encounter as follows:

> I walked in and asked "are you Dr. Barden?" Dr. Barden replied "yes." I then stated "I will let you know if I want to be treated by you." Dr. Barden said "wait." I replied "I'm leaving." Dr. Barden again said "wait." I then said "I've spoken" and left his office.

(Pl. Aff. ¶ 33).

Under Dr. Barden's account, the two met for approximately ten minutes. (Barden Dep. 44:2-5). After he met Plaintiff in the waiting room and took him to a conference room for an evaluation, Plaintiff began commenting about Dr. Barden's eyes, saying they "looked evil" and "infectious," and "that the devil was present in [Dr. Barden's] eyes." (*Id.* at 39:15-40:5). Dr. Barden responded that he was blind in one eye and had a cadaveric corneal graft that was not infectious. (*Id.* at 40:5-8). Plaintiff denies mentioning Dr. Barden's eyes during their meeting. (*See* Pl. Aff. ¶ 34).[7]

**\*7** Dr. Barden recalls Plaintiff stating that he was facing harassment from government agencies and healthcare providers, such as HRPC, ACT, Saint Francis, and Helpline, along with individuals associated with those entities, including John Stern and Stacyann Hahn. (*See* Barden Dep. 40:20-41:6). This alleged harassment consisted of statements to Plaintiff that [redacted], and Plaintiff feared that this might lead to further hospitalization. (*See id.* at 41:11-19). Dr. Barden then asked Plaintiff about his threats to the Helpline staff and whether [redacted], to which Plaintiff impliedly responded that [redacted]. (*See id.* at 41:21-42:2). Dr. Barden was unable to evaluate Plaintiff further because Plaintiff abruptly departed. (*Id.* at 42:9-12).

#### f. Dr. Barden's Application for Involuntary Hospitalization

After his interaction with Plaintiff, Dr. Barden concluded that Plaintiff was "extremely dangerous to others"; indeed, Dr. Barden feared for his own safety, especially

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

given Plaintiff's vociferous opposition to even the possibility of hospitalization. (Barden Dep. 43:8-24). Dr. Barden estimates that his entire time spent determining whether Plaintiff required hospitalization—consisting of reading Plaintiff's medical history, speaking with Stern, and preparing the case for other MCT members—spanned approximately 45 minutes. (*Id.* at 44:9-47:20). Based on these sources as well as his interaction with Plaintiff, Dr. Barden completed an [MHL § 9.37](#) Application for Involuntary Admission to Saint Francis, finding that Plaintiff presented "a substantial risk of physical harm to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." (Barden Decl., Ex. Q; *see* Barden Dep. 58:11-20). [8]

In the application, Dr. Barden described Plaintiff's behavior as follows: "Patient is [redacted]. Patient has been harassing the County Executive and the head of HRPC and others. His [insight and] judgments are poor." (Barden Dep. 58:25-59:5; *see* Barden Decl., Ex. Q). During his deposition, Dr. Barden added additional reasons for completing the application: Plaintiff "made threats to harm staff at County Helpline[,] ... denies having mental illness[,] and has in the past become violent when not taking medication." (Barden Dep. 59:6-20). Furthermore, Dr. Barden testified that Plaintiff's Core History revealed a pattern of behavior that posed a danger to Plaintiff's self and others, including [redacted]. (*See, e.g.*, *id.* at 68:2-69:9).

### 3. Plaintiff's Hospitalization at Saint Francis

After Dr. Barden submitted his application, authorities apprehended Plaintiff at his apartment and transported him to Saint Francis, a private Catholic community hospital. (*See* Pl. 56.1 Opp. ¶ 107; Pl. Dep. 132:24-133:3; Sidhu Decl. ¶ 4). Again, the parties provide divergent tales of what occurred following Plaintiff's arrival at Saint Francis.

### a. Dr. Sidhu's Initial Evaluation

On October 22, 2009, Defendant Ravinder Sidhu, M.D., was on duty at Saint Francis as an emergency medicine physician; Dr. Sidhu was not a municipal employee and did not hold public office. (Sidhu Decl. ¶ 4). In the context of receiving a patient for psychiatric admission,

Dr. Sidhu was responsible for evaluating the patient to determine whether the reason for the behavior underlying the patient's admission was psychiatric as opposed to medical. (*See* Sidhu Dep. 87:11-88:11).

After Plaintiff arrived at Saint Francis, at 1:00 p.m., a registered nurse began triaging Plaintiff but was unable to complete her evaluation because Plaintiff was [redacted]. (Sidhu Decl. ¶ 6; *see* Fischer Decl., Ex. N, at 18-19). Approximately ten minutes later, the nurse summoned Dr. Sidhu for assistance. (*See* Sidhu Decl. ¶ 7; Sidhu Dep. 34:18-22). Dr. Sidhu then evaluated Plaintiff and found him to be [redacted] such that he was "physically intimidating and threatening." (Sidhu Decl. ¶ 8). Dr. Sidhu therefore spent 20 minutes attempting to calm Plaintiff through verbal de-escalation, offering oral medication, and a time-out period, all of which Plaintiff refused. (*See* Fischer Decl., Ex. N, at 34; Sidhu Dep. 51:5-13).

**\*8** After exhausting these less intrusive techniques, Dr. Sidhu directed the staff to [redacted] in order to calm Plaintiff and prevent him from injuring himself or others. (*See* Sidhu Decl. ¶ 14; Sidhu Dep. 57:2-58:23). Despite Dr. Sidhu's efforts to pacify Plaintiff, he remained "combative and restless" for approximately one hour after their administration. (Sidhu Decl. ¶ 15; *see* Fischer Decl., Ex. N, at 46). Once these behaviors subsided, Dr. Sidhu [redacted]. (*See* Sidhu Decl. ¶ 16; Fischer Decl., Ex. N, at 34). Dr. Sidhu later testified that his decision to order Plaintiff's restraint and medication was "based only on his condition and conduct in the Emergency Department at [Saint Francis]." (Sidhu Decl. ¶ 17). And although Dr. Sidhu was aware of Dr. Barden's determination that Plaintiff was mentally ill and dangerous, Dr. Sidhu "did not rely solely upon [that] information" in arriving at his decision. (*Id.* at ¶ 18). Ultimately, Dr. Sidhu cleared Plaintiff to receive psychiatric treatment at Saint Francis. (*See* Sidhu Dep. 88:14-17).

Plaintiff's version of events casts Dr. Sidhu as much less methodical. According to Plaintiff, he initially met with a nurse at Saint Francis who summoned Dr. Sidhu; the nurse then returned with a needle in hand along with the doctor and two security guards. (*See* Pl. Aff. ¶ 38). As opposed to Dr. Sidhu's claimed efforts to calm Plaintiff, Plaintiff contends his sole interaction with Dr. Sidhu was the latter saying something Plaintiff found confusing, to which Plaintiff responded, "you don't have to thought

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 77 of 132

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

police me." (*Id.*). Dr. Sidhu then "stuck his thumb up in the air and said to the nurse and security staff that they could give [Plaintiff] the injection." (*Id.*). The nurse and security guards then restrained and medicated Plaintiff. (*See id.* at ¶ 40).[9]

### b. Dr. Singh's Psychiatric Evaluation

Plaintiff's next relevant encounter with Saint Francis personnel was with Defendant Sukhminder Singh, M.D., who worked as a staff psychiatrist. (*See* Singh Dep. 10:5-8). At 4:19 p.m., Dr. Singh performed a psychiatric evaluation of Plaintiff to evaluate the need for Plaintiff's immediate hospitalization. (*See id.* at 49:25-50:9; Fischer Decl., Ex. N, at 11-12). Dr. Singh's evaluation notes reflect his assessments of Plaintiff's immediate, personal, and past medical histories, including [redacted]. (Fischer Decl., Ex. N, at 11). Dr. Singh also reported that Plaintiff was [redacted]. (*Id.*). Concluding his evaluation, Dr. Singh diagnosed Plaintiff with [redacted] and ordered his involuntary admission to the care of Defendant Michael Susco, M.D., thereby confirming Dr. Barden's initial MHL § 9.37 determination. (*Id.* at 11-12; *see* Saint Francis 56.1 ¶ 238). Dr. Singh estimated that his meeting with Plaintiff lasted approximately 45 minutes. (*See* Singh Dep. 68:18-21).

In stark contrast, Plaintiff claims he never met with Dr. Singh on October 22, 2009. (*See* Pl. Dep. 200:25-201:4). Instead, Plaintiff asserts he only saw Dr. Singh from afar in another office at Saint Francis, and that Plaintiff recognized Dr. Singh from previous interactions at HRPC, where Plaintiff had been a patient and Dr. Singh had been an employee. (*See id.* at 200:1-201:8; Pl. Aff. ¶ 45; Singh Dep. 7:13-25).

### c. Dr. Susco's Psychological Evaluation

In 2009, Defendant Michael Susco, M.D., worked at Saint Francis as the Director of Behavioral Health Services and an attending psychiatric physician. (*See* Susco Dep. 5:19-23). On October 22, 2009, Dr. Susco became Plaintiff's treating physician in order to determine, within 72 hours of admission, whether Saint Francis should continue to retain Plaintiff. (Susco Decl. ¶ 4). On that same date, Dr. Susco learned of the events culminating in Dr. Barden's MHL § 9.37 application. (*See* Susco Decl.

¶ 7). Dr. Susco was also familiar with Plaintiff—and, by extension, with Plaintiff's pattern of [redacted]. (*Id.* at ¶ 6).

**\*9** During the two days following Plaintiff's admission at Saint Francis, Dr. Susco observed and interacted with Plaintiff. (Susco Decl. ¶¶ 28-29). Dr. Susco noted that during this time, Plaintiff was "[redacted], pacing, dismissive of attempts to ask him questions, [redacted], [and] refusing vital signs by the technicians," and, further, that Plaintiff "isolated himself from the other patients in a manner as if he thought he was superior to them." (*Id.* at ¶ 29). Dr. Susco later learned that Plaintiff required [redacted] upon his admission to Saint Francis. (*See id.* at ¶ 8).

The day following Plaintiff's admission to Saint Francis, a social worker completed a psychological assessment of Plaintiff. (*See* Fischer Decl., Ex. N, at 33). The assessment notes that Plaintiff [redacted]. (Saint Francis 56.1 ¶ 246). On that same date, a nurse noted that Plaintiff "frequently required redirection away from the nurse's station[ ] due to [redacted] ... [and was [redacted]," and refused [redacted]. (*Id.* at ¶ 249). An occupational therapist also noted that Plaintiff [redacted]. (*Id.* at ¶ 250). That evening, Plaintiff "remained [redacted]," while he continued to "den[y] psychiatric problems." (*Id.* at ¶ 251).

On October 24, 2009, Plaintiff continued to [redacted]. (St. Francis 56.1 ¶ 252). Plaintiff's notation charts indicate that he [redacted] from October 22 through October 26. (*See* Fischer Decl., Ex. N, at 108). In addition, Plaintiff refused to allow Saint Francis staff members to assess his vital signs from October 23 until the evening of October 26. (*Id.* at 87-89).

Also on October 24, Dr. Susco met with Plaintiff to determine whether he required further hospitalization and reviewed Plaintiff's admission records in preparation for that meeting. (*See* Susco Decl. ¶¶ 31, 32). During his evaluation, Dr. Susco noted Plaintiff's [redacted]. (*Id.* at ¶ 33). Dr. Susco also observed that Plaintiff [redacted]. (*Id.*). Based on this interaction, a review of Plaintiff's medical history, observations of Plaintiff, and his professional psychiatric judgment, Dr. Susco found that Plaintiff [redacted] "posed a substantial threat of harm to self or others" and required further involuntary hospitalization. (*Id.* at ¶ 32; *see id.* at ¶ 36).

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 78 of 132

Given his assessment, Dr. Susco completed a form pursuant to MHL § 9.37, certifying his decision that Plaintiff required further hospitalization. (*See* Saint Francis 56.1 ¶ 265). The certification form noted that pertinent factors underlying Dr. Susco's decision consisted of "[redacted]." (*Id.* at ¶ 266). Dr. Susco also diagnosed Plaintiff [redacted] and noted Plaintiff's tendency to harm others. (*See id.* at ¶ 269).

Plaintiff characterizes his interaction with Dr. Susco in much different terms. Although Plaintiff admits to meeting with Dr. Susco on October 24, he asserts that during their meeting, "Dr. Susco did not conduct a psychiatric evaluation of me in which he asked me how I was feeling, what my medications were[,] and what brought me to the hospital." (Pl. Aff. ¶ 48). Instead, the meeting lasted "no more than five minutes," during which Plaintiff "simply asked for [his] immediate discharge and Dr. Susco said no." (*Id.*)

In any event, on November 5, 2009, Dr. Susco determined that Plaintiff's condition improved enough to warrant his discharge and referral to outpatient treatment. (*See* Susco Decl. ¶ 38; Pl. Aff. ¶ 51). According to Dr. Susco, by that date, Plaintiff was more compliant with treatment, less symptomatic, showed stable vital signs, and took better care of himself. (*See* Susco Decl. ¶ 38).

### B. Procedural Background

**\*10** Plaintiff filed the initial complaint in this action on February 10, 2012. (Dkt. #2). It named as defendants Drs. Barden, Singh, Susco, and Sidhu, as well as Saint Francis and a John Doe Defendant, and it contained claims under federal law for (i) violations of the Fourth and Fourteenth Amendments against Defendants Barden, Susco, Sidhu, and Doe; and (ii) a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against Defendant Saint Francis. (*Id.* at 14-17). It also contained pendent claims under state law for medical malpractice against all Defendants but Dr. Susco. (*Id.* at 17).

On October 19, 2012, Plaintiff amended his complaint to remove John Doe as a Defendant and to add claims against Dr. Singh for (i) violations of the Fourth and Fourteenth Amendments, and (ii) medical malpractice. (Dkt. #28, at 14-18).

On November 2, 2016, the parties stipulated to a dismissal of the medical malpractice claim against Dr. Singh. (Dkt.

#118). On November 17, 2016, Defendants Saint Francis, Dr. Sidhu, and Dr. Susco jointly moved for summary judgment on Plaintiff's remaining claims. (Dkt. #122). Also on November 17, Dr. Barden and Dr. Singh filed separate motions for summary judgment. (Dkt. #125, 128). On January 11, 2017, Plaintiff opposed Defendants' motions for summary judgment. (Dkt. #142-47). In Plaintiff's opposition papers, he conceded that Second Circuit precedent, published after he filed the Amended Complaint, forecloses his Rehabilitation Act claim. (*See* Dkt. #144, at 1) (citing *McGugan* v. *Aldana-Bernier*, 752 F.3d 224, 231-34 (2d Cir. 2014)). [10] Defendants thereafter replied to Plaintiff's opposition papers, and summary judgment briefing closed on March 17, 2017, when the Court denied Plaintiff's request to file a sur-reply. (Dkt. #163).

On September 22, 2017, the Court filed an unredacted copy of this Opinion under seal. On that same day, the Court provided the parties with a copy of the unredacted Opinion and allowed the parties to propose redactions. Pursuant to the Court's directions, the parties will file their materials publicly by October 23, 2017, with certain limited categories of information redacted in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). The Court will then file the redacted Opinion publicly. The Court now considers the pending motions for summary judgment.

### DISCUSSION

### A. Summary Judgment Under Fed. R. Civ. P. 56

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). [11] A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

**\*11** While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 79 of 132

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

fact,' " *ICC Chem. Corp.* v. *Nordic Tankers Trading al s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita,* 475 U.S. at 587; *Wyler* v. *United States,* 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

**B. Analysis**

**1. Plaintiff's Constitutional Claims Fail**
Plaintiff sources his constitutional claims to the Fourth Amendment's prohibition on unreasonable seizures and the Fourteenth Amendment's right to due process. [12] By virtue of his involuntary hospitalization, Plaintiff was, no doubt, "seized" within the meaning of the Fourth Amendment, *see Glass* v. *Mayas*, 984 F.2d 55, 58 (2d Cir. 1993), and he had a right to be free from unwelcome medical treatment, *see Green* v. *City of N.Y.*, 465 F.3d 65, 84-85 (2d Cir. 2006) (quoting *Cruzan* v. *Dir., Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1990)). Nevertheless,

as the Court explains below, Drs. Singh, Susco, and Sidhu, and Saint Francis (collectively, the "Saint Francis Defendants") cannot be considered state actors, while Dr. Barden, a conceded state actor, is entitled to qualified immunity from Plaintiff's constitutional claims.

**a. The New York Mental Hygiene Law**

 **\*12** At issue is Section 9.37 of New York's Mental Hygiene Law, which provides in relevant part:

(a) The director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.

The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission. Within seventy-two hours, excluding Sunday and holidays, after such admission, if such patient is to be retained for care and treatment beyond such time and he or she does not agree to remain in such hospital as a voluntary patient, the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital. From the time of his or her admission under this section the retention of such patient for care and treatment shall be subject to the provisions for notice, hearing, review, and judicial approval of continued retention or transfer and continued retention provided by this article for the admission and retention of involuntary patients, provided that, for the purposes of such provisions, the date of admission of the patient shall be deemed to be the date when the patient was first received in the hospital under this section.

(b) The application for admission of a patient pursuant to this section shall be based upon a personal examination by a director of community services or his designee. It shall be in writing and shall be filed with the director of such hospital at the time of the patient's reception, together with a statement in a form

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 80 of 132

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

prescribed by the commissioner giving such information as he may deem appropriate.

\* \* \*

(d) After signing the application, the director of community services or the director's designee shall be authorized and empowered to take into custody, detain, transport, and provide temporary care for any such person. Upon the written request of such director or the director's designee it shall be the duty of peace officers, when acting pursuant to their special duties, or police officers who are members of the state police or of an authorized police department or force or of a sheriff's department to take into custody and transport any such person as requested and directed by such director or designee. Upon the written request of such director or designee, an ambulance service, as defined in subdivision two of section three thousand one of the public health law, is authorized to transport any such person.

MHL § 9.37. In this setting, "likely to result in serious harm"

> means (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

**\*13** *Id.* § 9.01. [13]

### b. The Elements of a Section 1983 Claim

Section 1983 provides a remedy when a state actor deprives a plaintiff of federally protected rights, including rights provided by the Fourth and Fourteenth Amendments. *See* 42 U.S.C. § 1983; *see also City of Okla.*

*City* v. *Tuttle*, 471 U.S. 808, 816 (1985) ("By its terms, of course, [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992).

"A § 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also West* v. *Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 155-56 (1978). Even where these two elements are satisfied, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Mullenix* v. *Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009)).

### c. The Saint Francis Defendants Were Not State Actors

#### i. Applicable Law

Because constitutional protections constrain only government actors, a plaintiff pursuing a § 1983 claim must show in the first instance that the alleged constitutional violation constitutes state action. *See Fabrikant* v. *French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Flagg* v. *Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 186 (2d Cir. 2005); *Tancredi* v. *Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003)). That said, private parties may engage in state action if their behavior is "fairly treated as that of the State itself." *Brentwood Acad.* v. *Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson* v. *Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Such private conduct becomes state action if (i) "the State compelled the conduct [the 'compulsion test']," (ii) "there is a sufficiently close nexus between the State and the private conduct [the 'close nexus test' or 'joint action test']," or (iii) "the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the 'public function test']." *McGugan* v. *Aldana-Bernier*, 752 F.3d 224, 229 (2d

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 81 of 132

Cir. 2014) (alterations in original) (quoting *Hogan* v. *A.O. Fox Mem'l Hosp.,* 346 Fed.Appx. 627, 629 (2d Cir. 2009) (summary order)).

**\*14** While considering the issue of state action in the context of involuntary hospitalization, this Court does not write on a blank slate. In *Doe* v. *Rosenberg*, the Second Circuit upheld the reasoning behind a district court's summary judgment award against a § 1983 plaintiff who alleged constitutional violations at the hands of her private physician and a private hospital and several of its employees. *See* 166 F.3d 507 (2d Cir. 1999) (per curiam). The district court had concluded that the plaintiff failed to establish state action under any of the three tests outlined above. *First*, the plaintiff failed to satisfy the compulsion test because the statute under which she was hospitalized, MHL § 9.27, "by its terms is permissive, not mandatory," given its provision that a "director of a hospital *may*" hospitalize a patient under certain conditions, thus providing discretion to an evaluating physician. *Doe* v. *Rosenberg*, 996 F. Supp. 343, 349-50 (S.D.N.Y. 1998) (quoting MHL § 9.27), *aff'd,* 166 F.3d 507. *Second*, the private hospital's contract with OMH allowing it to operate a psychiatric practice, and its OMH license to serve as a primary psychiatric emergency care provider, were insufficient to satisfy the close-nexus test because "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State ... [n]or does the fact that the regulation is extensive and detailed[.]" *Id.* at 352 (quoting *Jackson*, 419 U.S. at 350). *Third* and finally, the hospitalization authority that the MHL bestows on hospitals and physicians is not the sort of power traditionally reserved for the State because "[t]he responsibility for invalid commitment lies with the physician as a private individual," and thus fails to satisfy the public-function test. *Id.* at 353.

More recently, in *McGugan* v. *Aldana-Bernier*, the Second Circuit affirmed the dismissal of a § 1983 claim alleging constitutional violations in the form of forced medication and hospitalization both while and after police transported the plaintiff to a private hospital that received federal funds and was licensed by OMH to provide psychiatric treatment. 752 F.3d at 227-28. After the plaintiff was hospitalized, two doctors had separately certified her as suffering from a mental illness likely to result in substantial harm to herself or others and determined to hospitalize her further pursuant to MHL § 9.39, which pertains to emergency admission of patients

for immediate observation, care, and treatment. *Id.* at 228. Finding no meaningful differentiation from *Rosenberg*, the Court ruled that these doctors were not state actors, because although "the state endowed [the doctors] with the authority to involuntarily hospitalize (and medicate) the plaintiff, ... it did not compel them to do so." *Id.* at 229.

So too here. While Plaintiff portrays the physicians at Saint Francis as summarily confirming Dr. Barden's initial application, his unsupported assertions are plainly insufficient to create a genuine dispute of material fact. *See Goenaga* v. *March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995) ("[T]he plaintiff cannot meet this burden through reliance on unsupported assertions. Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party ... must come forward with evidence that would be sufficient to support a jury verdict in his favor."). More fundamentally, the record makes clear that the Saint Francis Defendants fail to qualify as state actors under any of the three tests set forth by the Supreme Court.

### ii. Plaintiff Cannot Satisfy the Compulsion Test

Under the compulsion test, private behavior becomes state action if "it results from the State's exercise of 'coercive power,' " or "the State provides 'significant encouragement, either overt or covert.' " *Brentwood Acad.*, 531 U.S. at 296 (quoting *Blum* v. *Yaretski*, 457 U.S. 991, 1004 (1982)); *see also Doe* v. *Harrison*, 254 F. Supp. 2d 338, 342 (S.D.N.Y. 2003). MHL § 9.37 does not require a physician responding to an application thereunder to hospitalize the patient subject to the referral; rather, it provides that "an examining physician ... *may* receive and care for" such individual. MHL § 9.37 (emphasis added); *cf. Rosenberg*, 996 F. Supp. at 349-50 (finding no State compulsion under § 9.27 because the provision stated that hospital director "may" hospitalize patient under certain conditions). Drs. Singh and Susco thus certified Plaintiff's need for further hospitalization independent of any state power, and although MHL § 9.37 required them to evaluate Plaintiff after Dr. Barden's application, it did not preordain the outcome of their evaluations. *See Blum*, 457 U.S. at 1006-07 ("We cannot say that the State, by requiring completion of a form, is responsible for the physician's decision.").

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 82 of 132

Jackson v. Barden, Not Reported in Fed. Supp. (2018)
2018 WL 340014

**\*15** Dr. Sidhu, who conducted a preliminary evaluation of Plaintiff to determine whether his underlying behavior was psychiatric or medical—an assessment independent of MHL § 9.37's requirements—was even further removed from the power of the State. Indeed, he was operating wholly at the directive of Saint Francis's policies rather than those of the State. *See Sybalski* v. *Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257-58 (2d Cir. 2008) (state action requires more than "state involvement in *'some activity* of the institution alleged to have inflicted injury upon a plaintiff,' " and instead requires "that the state was involved 'with the *activity that caused the injury'* giving rise to the action.") (emphases in original) (quoting *Schlein* v. *Milford Hosp., Inc.,* 561 F.2d 427, 428 (2d Cir. 1977) (per curiam)). The State therefore did not compel any of the Saint Francis Defendants' decisions.

### iii. Plaintiff Cannot Satisfy the Close-Nexus or Joint-Action Test

Plaintiff's state-action arguments focus on the close-nexus or joint-action test. A plaintiff satisfies this test by establishing "a sufficiently close nexus between the State and the challenged action of the [private] regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Rosenberg*, 996 F. Supp. at 349 (alteration in original) (quoting *Blum*, 457 U.S. at 1004). To meet this standard, the State must "so far insinuate[ ] itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Turturro* v. *Cont'l Airlines*, 334 F. Supp. 2d 383, 396 (S.D.N.Y 2004) (quoting *Rosenberg*, 334 F. Supp. at 352). The Supreme Court views this test as assurance that courts will hold private parties to constitutional standards only if "the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004.

In *Blum* v. *Yaretsky*, the Supreme Court held that private physicians and nursing home administrators who transferred or discharged elderly Medicaid recipients to lower levels of care were *not* state actors, despite the fact that the State responded to such decisions by adjusting the recipients' benefits. 457 U.S. at 1005. The Court reasoned that although regulations required the physicians to complete certain forms to obtain benefits and required the nursing homes to place patients at an appropriate level of care, "[t]hese regulations [did] not require the nursing homes to rely on the forms in making

discharge or transfer decisions, nor [did] they demonstrate that the State [was] responsible for the decision to transfer particular patients." *Id.* at 1006-08. Indeed, "[t]hose decisions ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008.

Plaintiff argues that under MHL § 9.37, the physicians at Saint Francis could not have hospitalized him absent the certification of Dr. Barden—clearly a state actor—and thus the private physicians' subsequent determinations became those of the State. (*See* Pl. Opp. 21-22). In Plaintiff's view, any private physician confirming a hospitalization under MHL § 9.37 becomes a state actor by virtue of the requisite initial application by the director of community services. This argument paints with too broad a brush, and, indeed, runs afoul of the fact-intensive analysis required in determining when private conduct crosses over into state action. *See Burton* v. *Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."); *Int'l Soc. For Krishna Consciousness, Inc.* v. *Air Can.*, 727 F.2d 253, 255 (2d Cir. 1984). Moreover, although MHL § 9.37 by its terms involves state actors, the ultimate determination of whether to hospitalize a patient falls on the medical judgments of private physicians applying standards that the State has no part in instituting. *See Turturro*, 334 F. Supp. 2d at 395-96.

**\*16** Plaintiff next seeks refuge in several recent district court cases that have found state action on the part of private physicians who acted merely as "rubber stamps" to state actors' hospitalization determinations pursuant to MHL § 9.37. (*See* Pl. Opp. 22-23). To discuss these cases, however, is to distinguish them from the instant case. In *Tewksbury* v. *Dowling*, 169 F. Supp. 2d 103 (E.D.N.Y. 2001), for instance, the district court, ruling on the defendant physicians' summary judgment motion, held that private physicians employed by a private hospital "jointly participated with state officials" by hospitalizing the plaintiff under MHL § 9.37 based solely on a phone call communicating the state officials' determination that the plaintiff required hospitalization. *Id.* at 110. Other private physicians also certified the plaintiff for further hospitalization in reliance on information obtained from state officials. *Id.* The court cautioned, however, that "if the decision to commit [the plaintiff] was based purely on

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

their own independent medical judgment," the physicians would not have been state actors. *Id.* at 109.

The court in *Bryant* v. *Steele*, 93 F. Supp. 3d 80 (E.D.N.Y. 2015), reached a similar conclusion. There, the district court upheld the sufficiency of a complaint alleging that after a state actor submitted an MHL § 9.37 application to a private hospital, the hospital confirmed the plaintiff's need for hospitalization "without conducting an independent medical examination." *Id.* at 90. The court also relied on *Tewksbury* to point out that the private physicians could not have hospitalized the plaintiff under MHL § 9.37 without an initial application from a state actor. *See id.* at 92 (quoting *Tewksbury*, 169 F. Supp. 2d at 110).

Plaintiff here has failed to establish that Dr. Barden was "so far insinuated" with the Saint Francis Defendants that their determinations were interdependent. *Turturro*, 334 F. Supp. 2d at 396. To begin, Dr. Sidhu testified that although he was aware of Dr. Barden's determination, his decision to restrain and medicate Plaintiff was "based only on [Plaintiff's] condition and conduct" at Saint Francis. (Sidhu Decl. ¶¶ 16-17). And medical records that he and a treating nurse completed on October 22 corroborate Dr. Sidhu's characterization of Plaintiff's condition. (*See* Fischer Decl., Ex. N, at 18-19, 34, 46). But more importantly, as discussed above, Dr. Sidhu played no role in the hospitalization procedure that MHL § 9.37 establishes.

The record belies Plaintiff's bald assertion that he never received a face-to-face evaluation from Dr. Singh and fails to create a triable issue of material fact as to Dr. Singh's independent medical evaluation. Aside from Dr. Singh's testimony that he evaluated Plaintiff for approximately 45 minutes, his evaluation notes contain statements such as "patient denies," "patient states," and "[patient] reports," indicating a live interaction with Plaintiff, and it also includes information not otherwise available in Plaintiff's medical records. (*See* Fischer Decl., Ex. N, at 11; *see, e.g.*, *id.* ("[Plaintiff] reports that right now he is also attending college on-line.")). Moreover, his notes indicate a time of dictation at 4:19 p.m. (*see id.* at 12; Singh Reply Decl., ¶ 11), and a nurse's note states that Dr. Singh evaluated Plaintiff at approximately 3:30 p.m. on October 22 (*see* Fischer Decl., Ex. N, at 17; Slocum Decl.), which coincides with Dr. Singh's estimated 45-minute evaluation.

As to Dr. Susco, Plaintiff does not deny meeting with him on October 24, 2009, and receiving a psychiatric evaluation at the time, but instead complains about the subject matter of that meeting. (*See* Pl. Aff. ¶ 48). Although Dr. Susco performed this evaluation two days after Plaintiff's initial admission to Saint Francis, this is exactly the procedure that MHL § 9.37 contemplates. *See* MHL § 9.37(a). Furthermore, Plaintiff does not deny and presents no evidence contradicting Dr. Susco's observations of and interactions with Plaintiff during the two preceding days.

**\*17** Thus, while treating and evaluating Plaintiff, the Saint Francis Defendants primarily utilized independent medical judgment, thereby separating themselves from the preceding state action on the part of Dr. Barden. *See Blum*, 457 U.S. at 1006-08; *cf. Bryant*, 93 F. Supp. 3d at 90-91 (holding plaintiff sufficiently pled state action by alleging that private physicians admitted plaintiff "upon the assessment of ... a state actor[ ] without conducting an independent medical examination"); *Tewksbury*, 169 F. Supp. 2d at 109 (finding state action where plaintiff was admitted to private hospital after government referral "without any independent examination"). To be sure, the Saint Francis Defendants readily admit their cognizance of the events leading up to Plaintiff's hospitalization as well as Dr. Barden's evaluation. But "mere '[c]ommunications,' even regular ones, 'between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor.' " *Bryant*, 93 F. Supp. 3d at 91 (quoting *Fisk* v. *Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005)).

Lastly, Plaintiff argues that Saint Francis acted on the State's behalf because "the [S]tate has outsourced its commitment authority to [Saint] Francis as it was the only provider of inpatient psychiatric services in Dutchess County." (Pl. Opp. 24). In raising this argument, Plaintiff relies on *Rhee* v. *Good Samaritan Hospital*, where the district court refused to dismiss a § 1983 claim based on the plaintiff's hospitalization, reasoning in part that under *West* v. *Atkins*, 487 U.S. 42 (1988), the plaintiff's allegation that a state-affiliated hospital " 'outsourced' its commitment decisions to [a private hospital]," could suffice for state action depending on the contractual relationship between the State and the hospital. *See* No. 12 Civ. 8508 (NSR), 2015 WL 1501460, at \*6-7 (S.D.N.Y. Mar. 30, 2015). [14]

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 84 of 132

2018 WL 340014

Plaintiff can point to no similar contractual relationship between the State and Saint Francis or any of its physicians. Undeterred, Plaintiff argues the State has delegated its commitment authority to Saint Francis by virtue of the hospital's position as the only provider of inpatient psychiatric services in Dutchess County. Even so, Plaintiff has brought forth no facts that so much as hint that the State had anything to do with this position. *Cf. West*, 487 U.S. at 55 ("Under state law, the only medical care [plaintiff] could receive ... was that provided by the State."); *Rhee*, 2015 WL 1501460, at *6-7. Plaintiff thus fails to raise a genuine dispute of fact that the State was in any way responsible for the decisions of Plaintiff's treating physicians. *See Schlein*, 561 F.2d at 429 ("Even assuming ... that the Hospital occupies a monopoly position in the [relevant geographical] area ... such status is not determinative of state action." (citing *Jackson*, 419 U.S at 351-52)).

#### iv. Plaintiff Cannot Satisfy the Public-Function Test

Although Plaintiff does not expressly invoke the public-function test, the Court nevertheless addresses it for completeness. Under this test, a private party becomes a state actor "where the State delegates its responsibilities to [the] private part[y] and then attempts to escape liability for constitutional violations caused by private parties acting pursuant to the delegation." *Rosenberg*, 996 F. Supp. at 353 (citing *Rockwell* v. *Cape Cod Hosp.*, 26 F.3d 254, 258 (1st Cir. 1994)). The analysis thus turns on whether the private party's alleged constitutional violation occurred while exercising authority that is "traditionally the exclusive prerogative of the State." *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 842 (1982) (emphasis removed) (quoting *Jackson*, 419 U.S. at 353). The Second Circuit has recognized that private hospitals, though "clearly 'affected with a public interest,' ... have not been 'traditionally associated with sovereignty,' and have long been relegated to the private domain, rather than treated as 'traditionally the exclusive prerogative of the State.' " *Schlein*, 561 F.2d at 429 (quoting *Jackson*, 419 U.S. at 353). Thus, in the absence of any evidence to the contrary, the Court shall assume the same in the more specific context of involuntary hospitalizations. *See Turturro*, 334 F. Supp. 2d at 396-97.

**\*18** In sum, Plaintiff has failed to establish that Dr. Singh, Dr. Sidhu, Dr. Susco, or Saint Francis acted at the behest of the State in a sense that would render them subject to constitutional scrutiny. The Court therefore dismisses with prejudice Plaintiff's Second, Third, Fourth, and Seventh Causes of Action.

#### d. Dr. Barden Is Entitled to Qualified Immunity

Dr. Barden does not dispute that he is a state actor, but argues instead that he did not violate any of Plaintiff's constitutional rights and, alternatively, that he is subject to qualified immunity. (Barden Br. 11-23). While Dr. Barden's arguments opposing Plaintiff's claims of Fourth and Fourteenth Amendment violations have considerable traction, his qualified immunity arguments are plainly correct and require summary judgment in his favor.

#### i. The Defense of Qualified Immunity

"The defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Kerman* v. *City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004) (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011). Thus, "[w]hether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts." *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Harlow*, 457 U.S. at 819). "And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.' " *Id.* (alteration in original) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 639 (1987)). At base, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

As noted, defendants are entitled to qualified immunity "if they can establish either that [i] 'a constitutional right was [not] violated' or [ii] 'the right was [not] clearly established.' " *Royal Crown Day Care LLC* v. *Dep't of Health and Mental Hygiene of City of N.Y.*, 746 F.3d 538, 543 (2d Cir. 2014) (second and fourth alterations in original) (quoting *Bailey* v. *Pataki*, 708 F.3d 391, 404

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 85 of 132

2018 WL 340014

(2d Cir. 2013)). Courts undertaking this analysis "have discretion to decide the order in which to engage these two prongs," but they "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan* v. *Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations omitted).

### ii. The Right Plaintiff Asserts Was Not Clearly Established

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle* v. *Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012)). Because the rights allegedly violated may appear abstract, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Ziglar*, 137 S. Ct. at 1866 (emphasis and alteration in original) (internal quotation marks omitted) (quoting *Mullenix*, 136 S. Ct. at 308). "It is not necessary, of course, that 'the very action in question has previously been held unlawful.' " *Id.* (quoting *Anderson*, 483 U.S. at 640). "But 'in the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent.' " *Id.* at 1867 (quoting *Anderson*, 483 U.S. at 640).

**\*19** Put somewhat differently, a constitutional right is clearly established if (i) it is "defined with reasonable clarity," (ii) "the Supreme Court or the Second Circuit has confirmed the existence of the right," and (iii) "a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Bailey*, 709 F.3d at 404-05 (citing *Luna* v. *Pico*, 356 F.3d 481, 490 (2d Cir. 2004)). A court's definition of the purported right "must be 'particularized' in the sense that '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.' " *Golodner* v. *Berliner*, 770 F.3d 196, 206 (2d Cir. 2014) (first alteration in original) (quoting *Anderson*, 483 U.S. at 640). A court must walk a middle course in defining the right at issue: Outline rights too broadly and plaintiffs would be able to subvert qualified immunity merely by alleging violations of exaggeratedly abstract rights; construe rights too narrowly and government actors would never encounter the same right twice, thus enjoying almost boundless

immunity. *See LaBounty* v. *Coughlin*, 137 F.3d 68, 73-74 (2d Cir. 1998) (quoting *Anderson*, 483 U.S. at 639).

The Supreme Court and the Second Circuit have clearly established that the State may not involuntarily hospitalize an individual consistent with the Fourth or Fourteenth Amendment absent a showing that the individual poses a danger to himself or others. *See O'Connor* v. *Donaldson*, 422 U.S. 563, 576 (1975) (applying Fourteenth Amendment to involuntary commitment); *Glass* v. *Mayas*, 984 F.2d 55, 57-58 (2d Cir. 1993) ("Because we have already concluded that the defendants were objectively reasonable in finding [plaintiff] dangerous in the due process context, it follows that they were objectively reasonable in making the same determination in the Fourth Amendment context."). In both of these contexts, however, Plaintiff argues he was entitled to a more robust right to be free from involuntary hospitalization "in the absence of recent homicidal or other violent behavior." (Pl. Opp. 17 (discussing Fourth Amendment); *see id.* at 19 (arguing Dr. Barden violated Fourteenth Amendment in failing to find "*present* homicidal or other violent behavior" before applying for hospitalization (emphasis added))). This is not the law.

As an initial matter, Plaintiff derives this purported right from a faulty reading of the Mental Hygiene Law. To be sure, MHL § 9.37 requires that a patient subject to hospitalization have a mental illness that "is likely to result in serious harm to himself or others," and MHL § 9.01 defines "likely to result in serious harm" to include "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." But Plaintiff ascribes undue significance to the verb "are" in arguing that Dr. Barden could only consider recent events—none of which, Plaintiff contends, evidenced homicidal or violent behavior. (*See* Pl. Opp. 13-15). Nothing in law or logic requires medical professionals to put out of their minds all knowledge of a patient's past behavior, no matter how serious, in determining that patient's present danger to himself or others. Rather, medical professionals must be permitted to consider that behavior when evaluating more recent conduct, in order to contextualize the latter and, in so doing, arrive at a more accurate assessment of the patient's dangerousness *vel non.*[15]

**\*20** The Court has found no authority supporting Plaintiff's foreshortened construction of the statute. To the contrary, the Second Circuit has held that New York's civil commitment scheme does not offend due process even if it requires a showing of dangerousness that does not include an "overt act" evincing a present risk of physical harm. *See Project Release* v. *Prevost*, 722 F.2d 960, 973-74 (1983) ("[T]he New York State civil commitment scheme, considered as a whole and as interpreted ... to include a showing of dangerousness, meets minimum due process standards without the addition of an overt act requirement."). Plaintiff's failure to point to any precedent suggesting the existence of the right he now claims is both unsurprising and fatal to his argument. *See Bailey*, 709 F.3d at 404-05 (citing *Luna*, 356 F.3d at 490).

Plaintiff did not enjoy as expansive a right as he contends; at the very least, the right Plaintiff now claims was not clearly established at the time of his October 2009 commitment. Nevertheless, Plaintiff *did* enjoy a clearly-established right not to be hospitalized absent a showing of dangerousness. The Court shall therefore consider whether Dr. Barden reasonably believed that Plaintiff was dangerous when he interacted with Plaintiff based on the information he possessed at that time. *See Glass*, 984 F.2d at 57. [16]

### iii. Dr. Barden Acted Reasonably

A government official's decisions "must be viewed as objectively reasonable unless 'no [official] of reasonable competence could have made the same choice in similar circumstances.' " *Green*, 465 F.3d at 92 (quoting *Lennon* v. *Miller*, 66 F.3d 612, 420-21 (2d Cir. 1995)). Where the facts that are relevant to qualified immunity are not in dispute, the issue of whether a government official acted reasonably is ripe for summary judgment. *See Tierney* v. *Davidson*, 133 F.3d 189, 194-95 (2d Cir. 1998) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 227 (1991); *Lennon*, 66 F.3d at 422; *Warren* v. *Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)).

In *Glass* v. *Maya*, the Second Circuit considered whether a physician was immune from Fourth and Fourteenth Amendment claims arising from the physician's forcible hospitalization of the plaintiff. *See* 984 F.3d at 57-58. The court ruled that the physician acted reasonably and was thus entitled to qualified immunity because the

physician received reports that the plaintiff threatened another individual with a gun; exhibited "strange behavior"; was described by those who examined him as "hostile, guarded, angry, suspicious, uncooperative, and paranoid"; and "had an extensive psychiatric history, which included a history of violent behavior," multiple psychiatric hospitalizations, "and a family history of mental illness." *Id.* at 57. Additionally, the plaintiff was "hostile and uncooperative" during every examination he received throughout the admission process. *Id.*

**\*21** Here, the undisputed facts establish that Dr. Barden acted reasonably in applying for Plaintiff's hospitalization. Before meeting with Plaintiff, Dr. Barden received reports from Stern and ACT team members regarding Plaintiff's hostile and threatening behavior. (*See* Barden Dep. 26:19-27:14). Further, he received word that Plaintiff was not cooperating with treatment and that Plaintiff typically became [redacted]. (*Id.* at 32:16-20). Dr. Barden also reviewed Plaintiff's psychiatric history, which contains numerous accounts of [redacted], regardless of Plaintiff's controversion of certain peripheral facts during this litigation. (*Id.* at 44:9-47:20). In addition, Dr. Barden was aware of Plaintiff's criminal history, including charges of burglary and criminal mischief. (*Id.*). Regardless of current disputes regarding the veracity of this information, it was before Dr. Barden without such disputes at the time of his assessment, and he reasonably relied on it in making his determination. *See Castro* v. *United States*, 34 F.3d 106, 112 (2d Cir. 1994) ("Officials are 'entitled to qualified immunity [when] their decision was *reasonable*, even if mistaken.' " (alteration in original) (quoting *Hunter*, 502 U.S. at 229)).

Plaintiff argues that Dr. Barden failed to conduct a formal psychiatric evaluation of Plaintiff, thus rendering his hospitalization objectively unreasonable. (*See* Pl. Opp. 18). But this argument overlooks Dr. Barden's thwarted attempt to evaluate Plaintiff in a more formal setting than that of their interaction after Plaintiff's unexpected arrival at Dr. Barden's office. This interaction occurred immediately after Dr. Barden received (i) a referral from John Stern and (ii) a plethora of information regarding Plaintiff's psychiatric condition, rendering it a perfect opportunity for Dr. Barden to evaluate Plaintiff. And even taking Plaintiff's account of their interaction as true, viewed against the informational backdrop before which Dr. Barden was then operating, Plaintiff's abrupt arrival and departure would have itself been bizarre and

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 87 of 132

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

alarming, and Dr. Barden thus did not act unreasonably in fearing for the safety of Plaintiff, himself, and others.

The constitutional claims against Dr. Barden fail as a matter of law because it is not at all clear that he violated Plaintiff's rights under the Fourth and Fourteenth Amendments and, at the very least, he is entitled to qualified immunity. The Court thus dismisses with prejudice Plaintiff's First and Fifth Causes of Action.

### 2. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Remaining Claims

Having dismissed Plaintiff's federal constitutional claims, his only remaining claims, contained in the Eighth and Ninth Counts of the First Amended Complaint, allege medical malpractice under state law against Drs. Barden, Susco, and Singh, and Saint Francis. The Court declines to exercise supplemental jurisdiction over these claims.

A district court has discretion to "decline to exercise supplemental jurisdiction" after "dismiss[ing] all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see Klein & Co. Futures, Inc.* v. *Bd. of Trade of City of N.Y.*, 464 F.3d 255, 263 (2d Cir. 2006) ("[T]he decision to retain jurisdiction is discretionary and not a litigant's right[.]"). In making this determination, courts "balance[ ] the traditional 'values of judicial economy, convenience, fairness, and comity.' " *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)). In general, "if the federal claims are dismissed before trial, ... the state claims should be dismissed as well." *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966). Moreover, "[a]lthough the exercise of supplemental jurisdiction is discretionary, the ordinary case 'will point toward declining jurisdiction over the remaining state-law claims.' " *Jordan* v. *Chase Manhattan Bank*, 91 F. Supp. 3d 491, 511 (S.D.N.Y. 2015) (quoting *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998)).

Here, all factors weigh in favor of declining supplemental jurisdiction over Plaintiff's state-law claims. First,

considering judicial economy, although this case has been ongoing since 2012, Plaintiff's remaining claims involve four defendants and complex factual issues that may not prove amenable to resolution by way of summary judgment. *Cf. Chenensky* v. *N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 393 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over state-law claims in five-year-old case). Second, refiling in state court will present only a minor inconvenience to the parties, especially considering the discovery they have already completed. Third, proceeding to state court will place none of the parties at any disadvantage relative to their current positions in this litigation. Fourth and finally, given that only state-law issues remain in this case, comity dictates that the Court decline to decide those disputes. *Cf. Bray* v. *City of N.Y.*, 356 F. Supp. 2d 277, 287 (S.D.N.Y. 2004) (declining to exercise supplemental jurisdiction over state claims despite federal defenses).

**\*22** Therefore, the Court dismisses Plaintiff's Eighth and Ninth Causes of Action without prejudice to their refiling in state court.

### CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are GRANTED. Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action are DISMISSED WITH PREJUDICE. Plaintiff's Eighth and Ninth Causes of Action are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 340014

---

Footnotes

1    The Court draws the facts in this Opinion from the parties' submissions in connection with the motions for summary judgment, including the Local Rule 56.1 Statements of Defendants Barden ("Barden 56.1"), and Sidhu, Susco, and Saint Francis Hospital ("Saint Francis 56.1"); Plaintiff's opposition to Defendant Barden's 56.1 statement ("Pl. 56.1 Opp." (Dkt.

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 88 of 132

Jackson v. Barden, Not Reported in Fed. Supp. (2018)

2018 WL 340014

#145)); Plaintiff's Affidavit ("Pl. Aff." (Dkt. #147)); the deposition transcripts of Plaintiff ("Pl. Dep."), Mitchell Barden ("Barden Dep."), John Stern ("Stern Dep."), Donna Lehnert ("Lehnert Dep."), Ravinder Sidhu ("Sidhu Dep."), Sukhminder Singh ("Singh Dep."), and Michael Susco ("Susco Dep."); the declarations of Ravinder Sidhu ("Sidhu Decl."), Michael Susco ("Susco Decl."), Sukhminder Singh ("Singh Reply Decl."), and Lisa Slocum ("Slocum Decl."); and the exhibits attached to the declarations of Mitchell Barden ("Barden Decl., Ex. [ ]"), Adam Sansolo ("Sansolo Decl., Ex. [ ]"), and Ellen A. Fischer ("Fischer Decl., Ex. [ ]"). For convenience, the Court shall refer to Plaintiff's memorandum of law in opposition to summary judgment as "Pl. Opp." (Dkt. #144). Any document above lacking an accompanying docket number was filed under seal and will be refiled in redacted form pursuant to the Court's instructions.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The Court also pauses to extend its appreciation to Plaintiff's counsel, who provided exceptional representation to Plaintiff despite significant changes to counsel's clinical responsibilities during the pendency of this litigation. (*See* Dkt. #156).

2    Plaintiff contends the only violent behavior in which he engaged was the 1989 assault on his wife. (*See* Pl. Aff. ¶ 55). Though he admits that on another occasion around 1999 or 2000, he "attempted to hit [his] ex-girlfriend," he attempts to minimize this attack, stating "she turned away" and Plaintiff therefore missed and "did not strike her." (*Id.*).

3    During his deposition, Plaintiff admitted to additional convictions not contained in his Core History. (*See, e.g.*, Pl. Dep. 261:19-23 (admitting to "[m]ore than five" convictions); *id.* at 264:17-25 (admitting to conviction for assault with a dangerous weapon resulting in four-year prison sentence).

4    Despite this statement, the criminal history section of Plaintiff's Core History reflects only one conviction for driving while intoxicated. (*See* Barden Decl., Ex. N, at 3-4).

5    The Court discusses the further operation of MHL § 9.37 below.

6    During her deposition, Lehnert could not recall whether Stern answered this question. (*See* Lehnert Dep. 26:11).

7    Plaintiff claims Dr. Barden concocted this exchange after reading a prior complaint that Plaintiff filed in state court in which he described Dr. Barden's eyes as "devilish." (Pl. Aff. ¶ 34).

8    Certain of the moving parties make arguments concerning Plaintiff's potential danger to himself on that day (*see, e.g.*, Singh Br. 7-8), but the Court focuses in this Opinion on the basis cited by Dr. Barden in the Application for Involuntary Admission.

9    Plaintiff's testimony is unclear as to whether he was restrained before or after receiving medication: during his deposition, Plaintiff testified that the nurse medicated him *after* he was restrained, but his affidavit states that he was medicated *before* he was restrained. (*Compare* Pl. Dep. 165:1-9, *with* Pl. Aff. ¶¶ 38, 40, 42). *See generally* Mack v. United States, 814 F.2d 120, 124-25 (2d Cir. 1987) ("It is well settled in [the Second] [C]ircuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

10    Given Plaintiff's concession on this claim, Plaintiff's Sixth Cause of Action is hereby dismissed with prejudice.

11    The Court is aware that the 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word—genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). As of this past year, the Second Circuit continues to use both formulations. *Compare, e.g.*, Smith v. Barnesandnoble.com, LLC, 839 F.3d 163, 166 (2d Cir. 2016) ("The moving party bears the burden to demonstrate the absence of any genuine issues of material fact[.]"), *with, e.g.*, Harris v. Miller, 818 F.3d 49, 53 (2d Cir. 2016) (per curiam) ("[W]e conclude that there are genuine disputes of material fact[.]"). Indeed, the Circuit sometimes uses the terms interchangeably within the same decision. *Compare, e.g.*, Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016) ("[T]here is a genuine dispute of material fact[.]"), *with, e.g.*, id. at 168 ("We therefore think that [the nonmovant] has raised a genuine issue of material fact[.]"). The Court at times relies on the traditional phrasing in this Opinion.

12    Specifically, Plaintiff's First Cause of Action alleges that Dr. Barden violated the Fourth and Fourteenth Amendments by applying for Plaintiff's hospitalization without a finding of dangerousness; the Second Cause of Action alleges that

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    18

**Jackson v. Barden, Not Reported in Fed. Supp. (2018)**
Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 89 of 132
2018 WL 340014

Dr. Singh and Dr. Susco violated the Fourteenth Amendment by authorizing Plaintiff's hospitalization without a finding of dangerousness; the Third Cause of Action alleges that Dr. Singh violated the Fourteenth Amendment by failing to conduct a psychiatric evaluation of Plaintiff; the Fourth Cause of Action alleges that Dr. Susco violated the Fourteenth Amendment by conducting a psychiatric evaluation of Plaintiff that would not accurately estimate the degree of risk Plaintiff presented; the Fifth Cause of Action alleges that Dr. Barden violated the Fourteenth Amendment by applying for Plaintiff's hospitalization without finding that Plaintiff engaged in homicidal or other violent behavior; and the Seventh Cause of Action alleges that Dr. Sidhu violated the Fourteenth Amendment by authorizing the restraint and medication of Plaintiff when he was not creating an emergency at Saint Francis.

13    Plaintiff focuses on an amendment to MHL § 9.37 that defines "likelihood of serious harm" to include "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear *or* serious physical harm." MHL § 9.37(a)(2) (emphasis added). Among other things, Plaintiff contends that the italicized word should in fact be "of." (*See, e.g.*, Pl. Opp. 1 n.1). However, the statute makes clear that this amendment is not effective until July 1, 2020, and the Court will therefore rely on the definition contained in MHL § 9.01.

14    In *West* v. *Atkins*, the Supreme Court held that a physician who, under contract with the State, provided medical services to inmates at a state prison hospital on a part-time basis was a state actor. *See* 487 U.S. 42, 54-55 (1988). The Court reasoned that the State "employ[ed] physicians ... and defer[red] to their professional judgment, in order to fulfill" its constitutional obligation under the Eighth Amendment to provide prisoners medical care, and "[b]y virtue of this relationship, effected by state law, [the physician was] authorized and obliged to treat prison inmates," such as the plaintiff, and did so "clothed with the authority of state law." *Id.* at 55 (quoting *United States* v. *Classic*, 313 U.S. 299, 326 (1941)).

15    The Court recognizes that a patient's past behavior may be so different in kind, or so distant in time, that a medical professional would obtain no insight from it in determining the patient's present danger to himself or others. However, this case is far different, where the record overwhelmingly demonstrates that Plaintiff was given to [redacted], and that a number of medical professionals with longstanding, firsthand knowledge of Plaintiff's behavior were aware that he was not in full compliance with his medication protocols and was exhibiting obvious signs of [redacted].

16    Plaintiff also asserts that the Court need not assess whether his purported constitutional right was clearly established because "an exception to this rule exists when governmental officials violate state statutory or administrative law that create[s] the federal cause of action," and because "[MHL §] 9.37 gives rise to a cause of action, Dr. Barden forfeits his immunity by violating the statute." (Pl. Opp. 21). Even accepting Plaintiff's statement of law as true, however, the Court need not belabor why Plaintiff's argument fails: MHL § 9.37 does not contain an express private right of action, and Plaintiff has not argued, much less shown, that the Court should imply a private right of action. *See also Torres* v. *Faxton St. Lukes Healthcare*, 227 F. Supp. 3d 216, 240 (N.D.N.Y. 2017) ("[A] finding that MHL Article 9 implies a private right of action giving rise to liability appears to be wholly inconsistent with the intent of the legislative scheme." (citing *Mclean* v. *City of N.Y.*, 905 N.E.2d 194, 242 (N.Y. 2009))).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

771 F.3d 93
United States Court of Appeals,
Second Circuit.

Jaroslav KROSHNYI, Peter Redaj, Radomir
Maler, Stefan Holesa, Robert Ondusko, Andrzej
Szycowski, Jacob Imas, Keith McFarland,
Plaintiffs–Appellees–Cross–Appellants,
Pavel Vysovsky, Jana Bulikova,
Plaintiffs–Cross–Appellants,
Jozef Stofa, Milan Petrilak, Stanislav Teleky,
Stanislav Bulik, Ireneusz Sawczyszyn, Plaintiffs,
v.
U.S. PACK COURIER SERVICES, INC., U.S.
Pack Express, Ltd., U.S. Pack Network Corp.,
Defendants–Appellants–Cross–Appellees,
Peter Glazman, U.S. Transportation Services,
Inc., Defendants–Cross–Appellees. *

Docket Nos. 11–2789–cv, 11–4368–cv.
|
Argued: April 5, 2013.
|
Decided: Nov. 4, 2014.

**Synopsis**
**Background:** Delivery drivers brought action against
courier companies and their owner, alleging violations
of the Fair Labor Standards Act (FLSA), Federal
Insurance Contributions Act (FICA), New York Labor
Law (NYLL), New York Franchise Sales Act (FSA), and
other contract-related claims. The United States District
Court for the Southern District of New York (Lawrence
M. McKenna, J., 2007 WL 3130562, granted summary
judgment in favor of defendants on all of drivers' federal
claims under the FLSA and FICA, and on drivers' NYLL
and contract claims. Following trial on the remaining FSA
claims, a jury awarded damages to drivers, and the District
Court, McKenna, J., 2011 WL 4135037, later granted
those drivers their related attorneys' fees and costs. Parties
cross-appealed.

**Holdings:** The Court of Appeals, Susan L. Carney, Circuit
Judge, held that:

[1] exercise of supplemental jurisdiction over state law
claims was not abuse of discretion;

[2] FSA limitations period began to run on date franchises
were purchased;

[3] jury's verdict in favor of drivers on their FSA claims
would not be disturbed;

[4] grant of company's motion to amend answer to add
statute of frauds defense was not abuse of discretion;

[5] oral agreements as to commissions were not covered by
the statute of frauds; and

[6] genuine issue of material fact existed as to whether
drivers voluntarily and intentionally abandoned their
right to collect 60% commissions under oral agreements.

Affirmed in part, reversed in part, vacated in part, and
remanded.

West Headnotes (20)

**[1]    Federal Courts**
   👈 Supplemental jurisdiction

   Court of Appeals reviews a district court's
   exercise of supplemental jurisdiction over
   state-law claims for abuse of discretion. 28
   U.S.C.A. § 1367.

   39 Cases that cite this headnote

**[2]    Federal Courts**
   👈 Jurisdiction of Entire Controversy;
   Pendent and Supplemental Jurisdiction

   A federal court may decline to exercise
   supplemental jurisdiction over a state-law
   claim, if, among other factors, the claim raises
   a novel or complex issue of State law, or the
   district court has dismissed all claims over
   which it has original jurisdiction. 28 U.S.C.A.
   § 1367(c).

   38 Cases that cite this headnote

**[3]**    **Federal Courts**
   👉 Jurisdiction of Entire Controversy; Pendent and Supplemental Jurisdiction

Courts must consider the values of judicial economy, convenience, fairness, and comity when deciding whether to exercise supplemental jurisdiction. 28 U.S.C.A. § 1367(a).

14 Cases that cite this headnote

**[4]**    **Federal Courts**
   👉 Effect of dismissal or other elimination of federal claims

District court's exercise of supplemental jurisdiction over state law claims was not abuse of discretion, where, by the time the federal claims were dismissed, the case had been before the district court for over six years, discovery had been completed, dispositive motions had been submitted, and the case was nearly ready for trial. 28 U.S.C.A. § 1367(a).

27 Cases that cite this headnote

**[5]**    **Limitation of Actions**
   👉 Liabilities Created by Statute

Cause of action under New York Franchise Sales Act (FSA) accrued, and three-year limitations period began to run, on date act or transaction constituting the violation occurred, which was date when the franchises were purchased. N.Y.McKinney's General Business Law § 691(4).

5 Cases that cite this headnote

**[6]**    **Limitation of Actions**
   👉 Liabilities Created by Statute

Under the New York Franchise Sales Act (FSA), continuous violations do not toll the statute of limitations. N.Y.McKinney's General Business Law § 691(4).

3 Cases that cite this headnote

**[7]**    **Federal Courts**
   👉 Taking case or question from jury; judgment as a matter of law

Court of Appeals reviews de novo a district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court to determine whether judgment as a matter of law was appropriate; in doing so, the Court does not assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.

2 Cases that cite this headnote

**[8]**    **Antitrust and Trade Regulation**
   👉 Particular cases

Even if rescission was the maximum remedy available under the New York Franchise Sales Act (FSA), as claimed by franchisor, jury's verdict in favor of franchisees on their FSA claims would not be disturbed; because the district court instructed the jury in accordance with franchisor's own view of the law, jury's decision to award damages to franchisees turned on the jurors' implied factual findings concerning the calculation of franchisees' profits and losses over the course of the franchise arrangement. N.Y.McKinney's General Business Law § 691(1).

1 Cases that cite this headnote

**[9]**    **Federal Civil Procedure**
   👉 Evidence

   **Federal Civil Procedure**
   👉 Construction of evidence

A court may grant judgment notwithstanding the verdict only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor; indeed, there must be such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture.

**[10]** **Federal Courts**
🔑 Determination of damages, costs, or interest;remittitur

Reversal of judgments entered in favor of six of eight franchisees on their New York Franchise Sales Act (FSA) claims required remand to District Court for a recalculation of award of attorneys' fees. N.Y.McKinney's General Business Law § 691(1).

15 Cases that cite this headnote

**[11]** **Federal Civil Procedure**
🔑 Time for amendment in general

**Federal Civil Procedure**
🔑 Liberality in allowing amendment

**Federal Civil Procedure**
🔑 Injustice or prejudice

In the absence of any apparent or declared reason, such as undue delay, bad faith or dilatory motive on the part of the movant or undue prejudice to the opposing party, leave to amend should, as the rules require, be freely given. Fed.Rules Civ.Proc.Rule 15(a)(2), 28 U.S.C.A.

11 Cases that cite this headnote

**[12]** **Federal Courts**
🔑 Pleading

Court of Appeals reviews a district court's grant of leave to amend for abuse of discretion, and, except when required by the demands of justice in the particular case, almost invariably defers to the discretion exercised by the trial court.

1 Cases that cite this headnote

**[13]** **Federal Civil Procedure**
🔑 Time for amendment

**Federal Civil Procedure**
🔑 New defense

District court's grant of courier company's motion to amend answer to add statute of frauds defense in delivery drivers' breach of contract action brought under New York law was not abuse of discretion, despite fact that motion to amend was not filed until more than a year after filing of company's answer and four months after the close of discovery, where drivers suffered little, if any, prejudice from the grant of leave to amend, and there was no evidence of bad faith on the part of company. Fed.Rules Civ.Proc.Rule 15(a)(2), 28 U.S.C.A.

2 Cases that cite this headnote

**[14]** **Frauds, Statute Of**
🔑 Construction of statute in general

**Frauds, Statute Of**
🔑 Possibility of Performance

New York courts generally construe the statute of frauds narrowly, voiding only those oral contracts which by their very terms have absolutely no possibility in fact and law of full performance within one year. N.Y.McKinney's General Obligations Law § 5–701(a).

7 Cases that cite this headnote

**[15]** **Frauds, Statute Of**
🔑 Possibility of Performance

Oral agreements by courier company to pay drivers 60% commissions were capable of performance within one year, and thus were not covered by the statute of frauds, where such agreements were part of at-will employment agreements. N.Y.McKinney's General Obligations Law § 5–701(a).

6 Cases that cite this headnote

**[16]** **Labor and Employment**
🔑 Termination;cause or reason in general

Under New York law, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

Cases that cite this headnote

**[17]    Frauds, Statute Of**
👉 **Possibility of discharge or other termination without performance**

Under New York law, oral employment agreements lacking a fixed duration are not covered by the statute of frauds, because they could theoretically be terminated by either party within one year of their making. N.Y.McKinney's General Obligations Law § 5–701(a).

3 Cases that cite this headnote

**[18]    Estoppel**
👉 **Nature and elements of waiver**

Under New York law, waiver is the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable.

1 Cases that cite this headnote

**[19]    Estoppel**
👉 **Implied waiver and conduct constituting waiver**

Under New York law, implied waiver may be found where a party exhibits such conduct or failure to act as to evince an intent not to claim the purported advantage.

4 Cases that cite this headnote

**[20]    Federal Civil Procedure**
👉 **Employees and Employment Discrimination, Actions Involving**

Genuine issue of material fact as to whether delivery drivers voluntarily and intentionally abandoned their right to collect 60% commissions under oral agreement with courier company precluded summary judgment on drivers' claim alleging breach of such oral agreement.

Cases that cite this headnote

## Attorneys and Law Firms

**\*96**  Richard G. Kass, Bond, Schoeneck & King, PLLC, New York, NY, for Defendants–Appellants–Cross–Appellees and Defendants–Cross–Appellees.

Robert Wisniewski, Robert Wisniewski & Associates P.C., New York, NY, for Plaintiffs–Appellees–Cross–Appellants and Plaintiffs–Cross–Appellants.

Before: PARKER, CARNEY, Circuit Judges, and RAKOFF, District Judge. [**]

## Opinion

SUSAN L. CARNEY, Circuit Judge:

**\*\*1**  This case calls on us to review the district court's resolution of several questions of New York law under its supplemental jurisdiction—primarily, its application of certain state statutes governing franchising and wages to plaintiffs' claims for compensation arising from their work, from the late 1980s through 2000, as delivery drivers for one or more defendant corporations owned by defendant Peter Glazman. Plaintiffs contend that defendants systematically undercompensated them for their work, purporting to treat them as franchisees while reaping disproportionate profits at plaintiffs' expense. On that basis, plaintiffs filed this action in 2001, alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"); the Federal Insurance Contribution Act, 26 U.S.C. §§ 3101, et seq. ("FICA"); the New York Labor Law, N.Y. Labor Law §§ 190, et seq. ("NYLL"); the New York Franchise Sales Act, N.Y. Gen. Bus. Law §§ 680, et seq. ("FSA") [1]; and various contract-related claims.

Six years into in this long-running litigation, the district court dismissed plaintiffs' federal claims under the FLSA and FICA, but elected to exercise its supplemental jurisdiction to adjudicate the remaining state law claims, as to which dispositive motions had been submitted. [2] The district court granted summary judgment to defendants on plaintiffs' NYLL and contract claims for unpaid commissions, holding that the statute of frauds precluded any action premised on defendants' alleged oral agreements to pay those commissions. [3]

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

Plaintiffs then proceeded to trial on their FSA claims, which stemmed from defendants' alleged failure to comply with the Act's registration requirements and alleged use of fraudulent **\*97** and unlawful practices in connection with the franchise relationship. After trial, a jury awarded damages to eight plaintiffs on these claims, and (as envisioned by the FSA), the court awarded those plaintiffs their related attorneys' fees.

Defendants now appeal the district court's FSA rulings in plaintiffs' favor, contending principally that it was error for the district court to exercise supplemental jurisdiction over these state-law claims, and that plaintiffs' claims were in any event barred by the statute of limitations. Plaintiffs cross-appeal, challenging *inter alia* the district court's ruling that the statute of frauds barred their NYLL and contract claims for unpaid commissions.

For the reasons set forth below, we find no abuse of discretion in the district court's exercise of supplemental jurisdiction. We further conclude that the statute of limitations barred the FSA claims of six of the eight plaintiffs. Although we affirm the FSA award as to the remaining two plaintiffs, we determine that the related attorneys' fee award must be recalculated to reflect that modification in the substantive award. Finally, we decide—contrary to the district court—that the statute of frauds does not preclude plaintiffs from pursuing their NYLL and contract claims against defendants. Accordingly, we remand to the district court for further proceedings on these state-law claims and for recalculation of the FSA-related attorneys' fees.

## BACKGROUND

### A. The Parties and the Relevant Agreements

**\*\*2** Defendant Peter Glazman (also known as Peter Glassman) owns or controls defendants U.S. Pack Courier Services, Inc. ("USP Courier") and U.S. Pack Network Corp. ("USP Network") (collectively, "U.S. Pack" or "defendants"), corporations that provide package delivery services in the New York City metropolitan area.[4] Glazman served as president of USP Network throughout the plaintiffs' relationship with the U.S. Pack companies starting in the late 1980s. He became USP Courier's president after that corporation was formed in 1998. USP Network and USP Courier share offices and employees.

Over the years, Glazman has sought to expand his package-delivery business through franchising (i.e., the granting of rights to others to engage in the company's business under a prescribed brand and marketing plan, in exchange for a fee).[5] The New York Franchise Sales Act, N.Y. Gen. Bus. Law § 683(1), requires anyone who intends to sell franchises in the State to file an offering prospectus **\*98** before sales of, or even offers to sell, franchises.[6] Thus, in July 1996, USP Network filed a franchise offering prospectus with the New York State Department of Law. That franchise registration expired, however, on February 1, 1998. And although USP Courier—USP Network's successor—continued to sell franchises under similar terms, it never filed a franchise offering prospectus with the State.

A form Subscription Agreement ("SA"), which outlined the basic terms of the franchise arrangement, was attached as an exhibit to USP Network's 1996 prospectus. The SA required each subscriber to pay a $15,000 "subscription fee" in exchange for the right to receive delivery assignments through USP Network's central dispatch, and entitled each subscriber to a weekly paycheck based on accumulated commissions earned for deliveries made. Although subscribers could pay the entire subscription fee up front, many chose to pay in installments that were deducted weekly from their paychecks. Interest was due on the unpaid balance, however, and as of the publication of the 1996 prospectus, USP Network set the interest rate at 10% per annum.[7]

USP Network also charged subscribers a one-time "training fee" of $50, a $30 generic "weekly fee," and a "beeper fee" of $5 to $7.50 per week. Moreover, according to the prospectus, subscribers were personally responsible for a host of operational expenditures, including the purchase or rental of a white cargo van (for purchase, estimated at $15,000 to $20,000); insurance premiums (estimated at $2,500 to $4,000); vehicle registration fees and motor vehicle taxes (estimated at $60 to $110); gasoline (estimated at $25 per tank); and other items, such as uniforms, hand truck equipment, and maps.[8] USP Network treated subscribers as independent contractors and, accordingly, did not withhold any taxes from subscribers' paychecks.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

The SA provided that commission payments made by U.S. Pack to subscribers for deliveries would be based principally on the "type of delivery service requested [by the customer]," [9] and "the distance of the delivery." J.A. 190. A "Schedule of Amounts to be Paid to Subscribers," appended to the SA, contained tables listing related payment amounts. *Id.* at 226–93.

**3** On various dates between 1987 and 2000, each plaintiff began to work as a delivery driver for U.S. Pack. [10] Almost all plaintiffs **99** were recent Eastern European immigrants, and many had limited proficiency in the English language. In deposition testimony or at trial, most plaintiffs acknowledged having signed some form of written agreement with U.S. Pack; some denied, however, that the document signed was the SA attached to the USP Network offering prospectus. [11] Some plaintiffs also testified that defendants did not give them sufficient time to review the documents they were asked to sign and did not provide them copies of the documents, even when plaintiffs specifically requested them. In total, defendants produced signature pages signed by only six plaintiffs.

The parties agree that defendants promised, in one form or another, to pay plaintiffs a fee for each delivery completed, rather than an hourly wage. They disagree, however, on how that fee was to be calculated. Plaintiffs contend that defendants orally promised to pay them a 60% commission on each delivery—that is, 60% of whatever the customer paid U.S. Pack for the delivery. [12] Several plaintiffs testified that—although they sometimes suspected they were not receiving the promised rates— each time they asked defendant Glazman about their pay, Glazman reaffirmed that U.S. Pack paid its drivers 60% commissions. Defendants contend, however, that there was no agreement, oral or otherwise, to pay 60% commissions. Presumably referring to the "Schedule of Amounts to be Paid to Subscribers" appended to the SA, Glazman testified at trial that there was "a price list which we agreed to pay at a minimum to the driver," but he qualified the assertion by saying further that "the terms changed all the time, depends on the client you acquire or the work you do." J.A. 684:12–16.

### B. Procedural History

In 2001, plaintiffs filed their initial complaint, [13] alleging principally violations of the FLSA and its state

counterpart, the NYLL, as well as violations of the FSA **100** and breach of contract. Plaintiffs averred that, despite defendants' desire to treat them as "independent contractors" for tax and labor law purposes, they were actually defendants' "employees," because defendants controlled the manner in which they performed their work. Accordingly, plaintiffs invoked the protections of the FLSA and the NYLL. As relevant here, plaintiffs alleged that defendants violated section 198 of the NYLL, because defendants failed to pay them all the wages they were owed—that is, the difference between the 60% commissions they were promised and the amounts they were actually paid for each delivery. The same allegations formed the basis for plaintiffs' breach of contract claims.

Additionally, plaintiffs claimed that defendants violated two provisions of the FSA: section 683(1), which prohibits a franchisor from selling a franchise without first registering an "offering prospectus" with the New York State Department of Law (the "prospectus claim"); and section 687(2), which prohibits fraud in connection with the offer or sale of a franchise (the "fraud claim"). As to the fraud claim, plaintiffs alleged that, to induce plaintiffs' purchase of the franchises, defendants fraudulently represented that plaintiffs would earn 60% commissions on deliveries.

**4** Over the course of the proceedings, the issues narrowed. In 2007, the district court granted defendants' motion for summary judgment on all federal claims. [14] By this point, the district court had presided over the case for six years, developing an intimate knowledge of the parties and the governing case law. Discovery was complete, and the case was ready for trial. The district court therefore elected (without objection) to exercise supplemental jurisdiction over the remaining state-law claims. The court then granted summary judgment for defendants on the breach of contract and the NYLL claims, concluding that the claims were barred by the statute of frauds because they were based on an alleged oral agreement to pay commissions that lacked an express termination provision and thus (in the district court's view) could not be performed within one year. *Vysovsky I,* 2007 WL 3130562, at *7–8, *13. [15]

After the court's summary judgment ruling, eight plaintiffs (Holesa, Imas, Kroshnyi, Maler, McFarland, Ondusko, Redaj, and Szycowski) proceeded to trial on the remaining FSA claims. The jury ultimately found the

corporate defendants liable on all of those claims, except McFarland's prospectus claim under section 683(1). It awarded damages ranging from $3,180 to $27,839 per claim. The jury found Glazman not liable, however, on the claims made against him in his individual capacity.

After trial, defendants moved pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law, arguing *inter alia* that (1) plaintiffs' FSA claims were barred by the FSA's three-year statute of limitations, and (2) the jury's award of damages on the FSA claims contravened the court's jury instructions, which **\*101** capped FSA damages at rescission. [16] The district court denied the motion in large part, *see Vysovsky II,* 2011 WL 1842297, at \*2–6, but made some modifications to the damages awarded. [17] Finally, pursuant to the FSA, the district court awarded attorneys' fees to the prevailing plaintiffs. [18] The sum awarded—$55,885—equaled the roughly 33% contingency fee all plaintiffs agreed to pay under their retainer agreements. *Vysovsky III,* 2011 WL 4135037, at \*1.

Both parties now appeal. [19] Defendants argue primarily that (1) the district court abused its discretion in exercising supplemental jurisdiction over the state-law claims; (2) the judgments in favor of six plaintiffs should be reversed on the ground that those plaintiffs' FSA claims are time-barred; and (3) no plaintiff is entitled to any damages under the FSA because, in accordance with the district court's jury instructions, any such damages are capped at rescission and the evidence at trial showed that each plaintiff made a "net profit" on his franchise.

The eight plaintiffs who prevailed at trial on their FSA claims, as well as Bulikova and Vysovsky, cross-appeal principally from the court's summary judgment ruling on their NYLL and breach of contract claims. Plaintiffs argue, *inter alia,* that the statute of frauds does not bar these claims because, in their view, the oral agreement to pay 60% commissions is an at-will employment contract that could be performed within one year of its making. In addition, plaintiffs appeal the award of attorneys' fees, arguing that the district court erred in its calculation of the fee award. We address each of these arguments below.

### *DISCUSSION*

### A. Exercise of Supplemental Jurisdiction

**\*\*5** Defendants contend that the district court abused its discretion by retaining supplemental jurisdiction over plaintiffs' state-law claims after dismissing all federal claims at the summary judgment stage. Although defendants did not object to the district court's exercise of jurisdiction at that time, they now argue that the court should not have retained jurisdiction because it interpreted the FSA in a novel way. Since a ruling in defendants' favor would dispose of the appeal and cross-appeal, we address this issue first.

**\*102** [1] [2] [3] We review a district court's exercise of supplemental jurisdiction over state-law claims for abuse of discretion. *See Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 118 (2d Cir.2013); *see also Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003). District courts have supplemental jurisdiction over state-law claims that "form part of the same case or controversy" as other claims over which the court has original jurisdiction. 28 U.S.C. § 1367(a). A court "may decline to exercise supplemental jurisdiction," however, if, among other factors, "the claim raises a novel or complex issue of State law," or "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c). Courts must consider "the values of judicial economy, convenience, fairness, and comity" when deciding whether to exercise supplemental jurisdiction. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

[4] We conclude that the district court did not abuse its discretion when it decided that the "advanced stage of the litigation and the Court's long familiarity with the issues in the case, combined with the likely hardship to both parties should plaintiff be forced to re-file in state court" weighed in favor of exercising supplemental jurisdiction. *Vysovsky I,* 2007 WL 3130562, at \*6. By the time the federal claims were dismissed, the case had been before the district court for over six years. Furthermore, discovery had been completed, dispositive motions had been submitted, and the case would soon be ready for trial. *See Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1055 (2d Cir.1990) (affirming district court's retention of supplemental jurisdiction "given the extensive proceedings involving the pendent claims prior to the dismissal of the federal claim"). Finally, although we ultimately conclude that the district court erred in some of its interpretations of New York law, the state-law issues

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d 1167

were not so groundbreaking as to preclude the exercise of jurisdiction, especially in light of the circumstances in which the discretionary decision arose. *See Mauro v. S. New England Telecomms., Inc.,* 208 F.3d 384, 388 (2d Cir.2000). We therefore affirm the district court's decision to exercise supplemental jurisdiction over plaintiffs' state-law claims, and now proceed to the merits of this appeal.

### B. FSA Claims

Defendants also appeal from the judgments entered against them on plaintiffs' FSA claims. [20] They contend that the FSA's three-year statute of limitations runs from the inception of the franchise agreement, thereby barring any recovery for the six plaintiffs—Holesa, Imas, Maler, Ondusko, Redaj, and Szycowski—who entered into franchise agreements before March 26, 1998. Defendants also argue that, in any event, none of the plaintiffs can recover damages on his FSA claims because the Act limits plaintiffs' remedies to rescission of the franchise agreement and return to the status quo ante. Because each of the plaintiffs is alleged to have collected more revenue from his franchise than he paid in franchise fees, defendants contend, applying the remedy of rescission would actually require plaintiffs to return their "net profit" to U.S. Pack. We address these two arguments in turn.

### 1. Statute of Limitations

**6 [5]** The FSA's statute of limitations provides that an action "shall not be maintained **103** to enforce a liability created under this section unless brought before the expiration of three years after the act or transaction constituting the violation." N.Y. Gen. Bus. Law § 691(4). Plaintiffs filed their complaint in this action on March 26, 2001, alleging that defendants: (a) sold them franchises without having an offering prospectus registered with the State, in violation of section 683(1) (the prospectus claim); and (b) committed fraud in connection with the sale of franchises, in violation of section 687(2), because they induced plaintiffs to enter franchises with a false promise to pay 60% commissions for deliveries (the fraud claim). For both claims, therefore, the "act or transaction constituting the violation" occurred when the franchises were purchased. *See United Magazine Co. v. Murdoch Magazines Distribution, Inc.,* 146 F.Supp.2d 385, 407 (S.D.N.Y.2001) ("*United Magazine* "), *aff'd,* 279 Fed.Appx. 14, 19 (2d Cir.2008) (holding that "the

limitations period begins to run at the time that the parties first enter into the franchise agreement"); *Leung v. Lotus Ride, Inc.,* 198 A.D.2d 155, 604 N.Y.S.2d 65, 67 (1st Dep't 1993) (FSA claims based on "franchise agreements that were executed more than three years prior to commencement of the action" properly dismissed as untimely); *see also Bayit Care Corp. v. Tender Loving Care Health Care Servs. of Nassau Suffolk, LLC,* 843 F.Supp.2d 381, 385 (E.D.N.Y.2012) ("In assessing the timeliness of claims made under the FSA, courts have generally determined that the three-year limitations period begins to run when the franchise contract is entered into, and that continuous violations do not toll the statute of limitations." (internal quotation marks omitted)). As a result, the FSA claims of the six plaintiffs who purchased their franchises prior to March 26, 1998, fall outside the FSA's three-year limitations period.

Plaintiffs make two arguments in support of their contention that the FSA claims at issue were nonetheless timely filed. First, they argue that the statute of limitations began to run anew when their franchises were "transferred" from USP Network to USP Courier in April 1999—less than two years before plaintiffs filed their complaint in March 2001, and well within the three-year limitations period. When the transfer occurred, U.S. Pack provided delivery drivers with a document entitled "Rules and Regulations of U.S. Pack Drivers." The document purported to be an "Agreement" between USP Network, USP Courier, and the driver. According to plaintiffs, entry into this transfer agreement reflected the start of a new franchise relationship.

In our view, however, plaintiffs' transfer theory fails at the start. The first paragraph of the transfer agreement provides that "[n]othing contained in this Agreement is intended to alter ... your Subscription Agreement with U.S. PACK NETWORK CORP. and/or U.S. PACK COURIER SERVICES, INC, as the case may be." J.A. 328. Moreover, plaintiffs and defendant Glazman testified that there was no change in the day-to-day operations of U.S. Pack or its relationship with its drivers as a result of the transfer. Plaintiffs have pointed to no evidence establishing that the alleged "transfer" from USP Network to USP Courier constituted the beginning of a new franchise agreement that would reset the statute of limitations. *See United Magazine,* 146 F.Supp.2d at 407 (rejecting plaintiffs' claim that changes to their franchise agreements restarted the limitations period); *see also Bayit*

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 98 of 132

Kroshnyi v. U.S. Pack Courier Services, Inc., 771 F.3d 93 (2014)
2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

*Care Corp.,* 843 F.Supp.2d at 385 (noting that, under the FSA, the "definition of 'offer to sell' excludes 'the renewal or extension of an existing franchise where there is no interruption in the operation of **104** the franchised business by the franchisee' ") (quoting N.Y. Gen. Bus. Law § 681(11)). We therefore reject plaintiffs' timeliness argument made on this ground.

**\*\*7** Second, plaintiffs claim that because most of them did not pay their franchise fee in a lump sum when they first entered an agreement with U.S. Pack, but rather paid the fee through weekly deductions from pay, defendants committed a continuing violation of the FSA each time they deducted a franchise fee payment. Therefore, plaintiffs argue, any plaintiff whose paycheck reflected a deduction for a franchise fee installment payment after March 26, 1998, has a timely claim.

**[6]** This argument also fails to persuade. Although we have not yet addressed the issue in a precedential opinion, at least one of the district courts in our Circuit has held (in a decision we later affirmed by summary order) that under the FSA, "continuous violations do not toll the statute of limitations." *United Magazine,* 146 F.Supp.2d at 407. Plaintiffs have failed to point us to any New York authority supporting a contrary interpretation, *cf. Fantastic Enters., Inc. v. S.M.R. Enters., Inc.,* 143 Misc.2d 124, 540 N.Y.S.2d 131, 134 (Sup.Ct.1988) (rejecting plaintiffs' argument that the FSA imposes a continuing obligation on franchisors, because "to find otherwise would serve to emasculate the statute of limitations"), and we see no reason to depart from *United Magazine's* reasoning under the circumstances presented here. Indeed, this result is congruent, in our view, with the language and purpose of the FSA, which requires certain disclosures and prohibits fraud in connection with the "offer" and "sale" of franchises, but does not seek to regulate the ongoing operations of a franchise. *See* N.Y. Gen. Bus. Law §§ 683(1), 687(2), 691(1); *see also Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 21 (2d Cir.1988); David J. Kaufmann & David W. Oppenheim, Practice Commentaries to New York Franchise Act, N.Y. Gen. Bus. Law § 681 *et seq.,* at VII(E) (McKinney 2013).

Thus, the statute of limitations bars the claims of all plaintiffs who purchased franchises from U.S. Pack before March 26,1998. Only Ondusko, Kroshnyi, and McFarland bought their franchises after this date. Ondusko, however, purchased his franchise not from

U.S. Pack, but from another driver, Vysovsky. Therefore, Ondusko's claim is derivative of Vysovsky's. And because Vysovsky purchased his franchise before March 26,1998, Ondusko's claim is also time-barred.

In sum, only Kroshnyi and McFarland have asserted timely FSA claims. We therefore reverse the district court's judgment with respect to the FSA claims of Holesa, Imas, Maler, Ondusko, Redaj, and Szycowski.

## 2. Available Remedies

We now consider U.S. Pack's argument that the remaining FSA plaintiffs, Kroshnyi and McFarland, are nevertheless barred from recovering damages on their FSA claims because the Act limits their remedies to rescission.

**[7]** The remedies provision of the FSA provides in relevant part:

> [a] person who offers or sells a franchise in violation of [various sections of the FSA, including sections 683 and 687] is liable to the person purchasing the franchise for damages and, if such violation [w]as willful and material, for rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs.

**\*\*8** N.Y. Gen. Bus. Law § 691(1). Defendants contend that this provision limits plaintiffs' remedies under the FSA to rescission (i.e., the unwinding of the franchise agreement **105** and the refunding of the franchise fee, minus any profits earned). Accordingly, defendants maintain, section 691(1) prohibits the award of damages to plaintiffs—like Kroshnyi and McFarland—who allegedly earned a net profit on their franchise. Building on that premise, defendants argue that the district court erred when it refused to overturn the jury's damages awards on the FSA claims and grant judgment for defendants as a matter of law. [21]

Defendants offer primarily two arguments to support their reading of the FSA's remedies provision.[22] First, because section 691(1) provides for "damages" based on any violation of the FSA, but provides for "rescission" only in cases of "willful and material" violations, defendants claim that rescission must be the maximum remedy available under the Act. It would not make sense, the argument goes, to permit plaintiffs to recover damages that would put them in a better position than a rescission remedy, because plaintiffs need not demonstrate willfulness or materiality to obtain damages, but *must* do so to rescind the agreement.

Second, defendants cite a related provision of the statute, section 691(2), which provides that a defendant-franchisor can avoid liability for FSA violations altogether if, before the initiation of suit, the franchisor contacts the plaintiff-franchisee and offers "to refund the consideration paid together with interest at six percent per year from the date of payment, less the amount of income earned by the franchisee from the franchise." N.Y. Gen. Bus. Law § 691(2). Defendants claim that this provision demonstrates that the FSA does not contemplate damages for plaintiffs who earned more income from their franchise than they paid in franchise fees (i.e., those who earned a "net profit"). According to defendants, the rescission offer under section 691(2) would not provide any benefit to a plaintiff who made a "net profit" because the income earned from the franchise would exceed the consideration paid; under those circumstances, rescission would result only in the plaintiff-franchisee having to hand over her profits to the defendant-franchisor. To avoid this "absurd" result, defendants argue, we should interpret section 691(1) as limiting recovery under the FSA to plaintiffs who suffered a net loss on their franchise. Appellants' Br. at 15.

**[8]** In our view, however, we need not delve into this thorny question of New York law to resolve the instant appeal. Even assuming *arguendo* that defendants' interpretation of section 691(1) is correct, and rescission is the maximum remedy available under the statute, we see no reason to disturb the jury's verdict in favor of Kroshnyi and McFarland on their FSA claims. Indeed, as explained below, because the district court instructed the jury in accordance with U.S. Pack's own view of **\*106** the law,[23] the jury's decision to award damages to these plaintiffs under the FSA turns on the jurors' implied *factual findings* concerning the calculation of plaintiffs' profits and losses over the course of the franchise arrangement—findings that are entitled to substantial deference on appeal.

**\*\*9** With respect to the prospectus claim, for example, the district court instructed the jury that it could award rescission if the failure to register was willful and material, but "[i]f you find that ... U.S. Pack's failure to register the offering prospectus was not willful and material, then those plaintiffs are entitled to an award of damages *short of rescission.*" J.A. 817 (emphasis added). Moreover, in connection with the fraud claim, the court explained to the jury:

> Damages for fraud must be in an amount intended to restore the plaintiffs to the position they occupied before the commission of the fraud. This means that plaintiffs' damages should be an amount equal to the net out-of-pocket expenses, which each plaintiff incurred as a result of deciding to participate in the franchise. *If you find that any or all of the plaintiffs made a net profit on their franchise, then they are not entitled to damages for their claim of fraud.*

J.A. 819 (emphasis added). After receiving these instructions, the jury awarded Kroshnyi $4,325 on his prospectus claim and $7,783 on his fraud claim. It awarded McFarland nothing on his prospectus claim and $3,640 on his fraud claim.

**[9]** On appeal, defendants contend that, because each plaintiff received more money in commissions from U.S. Pack than he paid in franchise fees, the jury's damages award is inconsistent with both the court's instructions and the evidence adduced at trial.[24] Appellants' Br. at 19. But what defendants are really asking us to do is to reject the jury's implicit findings of fact that plaintiffs ultimately suffered a "net loss" on their franchises, and to grant judgment notwithstanding the verdict. That we may do "only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor." *Doctor's Assocs., Inc. v. Weible,* 92

F.3d 108, 111–12 (2d Cir.1996) (internal quotation marks omitted). Indeed, there must be "such a complete absence of evidence supporting the verdict that the jury's findings **\*107** could only have been the result of sheer surmise and conjecture." *Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 542 (2d Cir.1994) (internal quotation marks omitted). That is not this case.

Defendants contend that the franchise fees charged to each plaintiff were capped at $15,000. But because both Kroshnyi and McFarland paid the fees through weekly deductions from pay [25] (along with 10% interest on any unpaid balance), it appears neither plaintiff knew exactly how much he was charged in total, and the evidence was open to interpretation. [26] Furthermore, in deciding whether either plaintiff made a "net profit" on his franchise, the jury could properly consider the significant operational expenses that each plaintiff incurred in the course of running his franchise, such as the rental of a cargo vehicle, insurance premiums, vehicle maintenance, taxes, tolls, and fuel, as well as various other expenses like the rental of a radio and beeper, and the cost of uniforms and equipment. Indeed, the evidence at trial showed that U.S. Pack deducted large sums from Kroshnyi and McFarland's weekly commission checks for vehicle rental, vehicle maintenance, the lease of radios and beepers, and other charges. [27] And while neither plaintiff testified about the specific amounts expended on fuel, insurance premiums, uniforms, equipment, taxes, and the like, the jury had before it the 1996 offering prospectus and SA, which stated that drivers bore responsibility for **\*108** these expenses and provided an estimated cost range for each. [28] *See* J.A.162–63.

**\*\*10** Considering all of the evidence in the light most favorable to plaintiffs—as we must—we cannot say that a reasonable juror would have been "compelled" to conclude that plaintiffs made a net profit on their franchises. *See Tuccio v. Marconi,* 589 F.3d 538, 540 (2d Cir.2009) (stating that judgment as a matter of law is warranted "only if, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror would be compelled to find in favor of the moving party"); *see also Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 496 (2d Cir.1995) ("[W]hen reviewing the sufficiency of the damages evidence, we are guided by the principle that if a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be

proved with reasonable certainty."). Therefore, assuming without deciding that defendants are correct that the FSA caps damages at rescission and that plaintiffs who make a net profit on their franchises have no remedy under the statute, we nonetheless affirm the district court's award of damages in favor of Kroshnyi and McFarland on their FSA claims. [29]

### 3. Attorneys' Fees

**[10]**    The FSA provides that a prevailing plaintiff is entitled to recover reasonable attorneys' fees and costs. N.Y. Gen. Bus. Law § 691(1). On cross-appeal, plaintiffs argue that the district court abused its discretion because it failed to calculate the "lodestar" value when awarding fees. Because we reverse the judgments entered in favor of six of the plaintiffs on their FSA claims, as discussed above, we must remand for a recalculation of attorneys' fees in any event. Upon remand, we strongly suggest that the district court begin its calculation by first performing a lodestar analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate. *See Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552–55, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010) (addressing lodestar analysis under federal fee-shifting statute); *Matakov v. Kel–Tech Const., Inc.,* 84 A.D.3d 677, 924 N.Y.S.2d 344, 345–46 (1st Dep't 2011) (applying the lodestar method under New York law).

### C. Breach of Contract and NYLL Claims

We turn next to plaintiffs' argument on cross-appeal that the district court erred when it granted summary judgment for defendants on the breach of contract and NYLL claims, concluding that the statute of frauds barred the claims. Almost all **\*109** plaintiffs testified that Glazman and others orally promised to pay them a 60% commission for each package delivered. [30] Defendants deny the existence of this agreement. According to Glazman, he "would not disclose" to drivers the amounts that customers paid U.S. Pack for deliveries because it was a "company secret." J.A. 645. Instead, drivers were paid according to a "price list which we agreed to pay at a minimum to the driver, but the terms changed all the time." *Id.* at 684.

### 1. Statute of Frauds Defense

#### a. Amendment of Answer

**11** **[11]** **[12]** As an initial matter, plaintiffs argue that the district court abused its discretion by permitting defendants to amend their answer to assert, somewhat belatedly, a statute of frauds defense. The Federal Rules provide that courts "should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a)(2). Indeed, "[i]n the absence of any apparent or declared reason ... such as undue delay, bad faith or dilatory motive on the part of the movant ... [or] undue prejudice to the opposing party by virtue of allowance of the amendment ... the leave sought should, as the rules require, be 'freely given.' " Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). We review the district court's grant of leave to amend for abuse of discretion, and, "[e]xcept when required by the demands of justice in the particular case, ... almost invariably defer to the discretion exercised by the trial court." Evans v. Syracuse City Sch. Dist., 704 F.2d 44, 47 (2d Cir.1983).

Plaintiffs filed their second (and final) amended complaint on June 21, 2004. Defendants responded with their answer on August 11, 2004. Not until November 15, 2005—more than a year after filing the answer and four months after the close of discovery—did defendants move to amend their answer to assert the statute of frauds defense (as well as the defenses of estoppel, release, and waiver). Defendants filed their motion to amend jointly with their motion for summary judgment.

Plaintiffs contend that they suffered "extreme" prejudice from the late amendment because they had no opportunity to conduct discovery about whether there were any terms in the oral agreement that would prevent it from being performed within one year. Appellees' Reply Br. at 18. They also argue that they were prejudiced because if the statute of frauds defense had been asserted sooner, it would have affected their settlement calculations. We are not persuaded.

**[13]** In our view, plaintiffs suffered little, if any, prejudice from the grant of leave to amend. Discovery was not necessary because each plaintiff was a party to the alleged oral agreement and therefore, presumably, well aware of the agreement's terms. In any event, the district

court explained that "[e]xtensive discovery was conducted on the circumstances surrounding the oral and written agreements." Vysovsky I, 2007 WL 3130562, at *3. Because defendants raised the statute of frauds defense in their motion for summary judgment, plaintiffs had an adequate opportunity to argue against its application to this case. And although the late assertion of the defense may have had an effect on plaintiffs' assessment of settlement value, plaintiffs still had ample opportunity to **110** settle between November 2005, when defendants moved to amend and for summary judgment, and October 2007, when the court issued its decision on both motions.

Because plaintiffs have neither suffered significant prejudice from the grant of the motion to amend, nor pointed to any evidence of bad faith on the part of U.S. Pack, we conclude that the district court acted within its discretion in granting U.S. Pack's motion to amend its answer to assert a statute of frauds defense.

#### b. Merits

**12** Plaintiffs further argue that the district court erred when it concluded that the alleged oral agreements to pay 60% commissions could not be performed within one year and were therefore barred by the statute of frauds. New York's statute of frauds provides, in relevant part, as follows:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime[.]

N.Y. Gen. Obl. Law § 5–701(a).

**[14]** New York courts generally construe the statute of frauds narrowly, voiding only those oral contracts "which by their very terms have absolutely no possibility in fact and law of full performance within one year." D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 454, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984). Indeed, "[w]herever an agreement has been found to be susceptible of fulfillment within that time, in whatever manner and

however impractical, [the New York Court of Appeals] has held the one-year provision of the Statute to be inapplicable, a writing unnecessary, and the agreement not barred." *Id.* at 455, 483 N.Y.S.2d 164, 472 N.E.2d 992.

**[15]**    Plaintiffs do not allege that the oral commission agreements contained an express termination provision. [31] They argue, nonetheless, that the agreements were capable of performance within one year, because they were part of an at-will employment agreement, and New York law presumes such agreements may be terminated at any time by either party. We agree.

**[16]    [17]**    Under New York law, "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987); *see also Reddington v. Staten Island Univ. Hosp.,* 511 F.3d 126, 137 (2d Cir.2007). For this reason, New York courts have consistently held that oral employment agreements lacking a fixed duration are not covered by the statute of frauds, because they could theoretically be terminated by either party within one year of their making. *See, e.g., Cron v. Hargo Fabrics, Inc.,* 91 N.Y.2d 362, 367, 670 N.Y.S.2d 973, 694 N.E.2d 56 (1998) (alleged oral agreement to pay bonuses as part of an at-will employment relationship not barred by statute of frauds); *111 Hubbell v. T.J. Madden Constr. Co.,* 32 A.D.3d 1306, 823 N.Y.S.2d 318, 319 (4th Dep't 2006); *Stucklen v. Kabro Assocs.,* 18 A.D.3d 461, 795 N.Y.S.2d 256, 257 (2d Dep't 2005); *Air Masters, Inc. v. Bob Mims Heating & Air Conditioning Serv., Inc.,* 300 A.D.2d 513, 752 N.Y.S.2d 388, 389 (2d Dep't 2002). [32]

To support its conclusion that plaintiffs had to allege an express termination provision to relieve the alleged oral commission agreements of the requirements of the statute of frauds, the district court relied on *Burke v. Bevona,* 866 F.2d 532 (2d Cir.1989). But *Burke* arose from a very different set of facts: there, the plaintiff based his breach of contract claim on his allegation that a union local promised him that he would have a job "for as long as you live," or "for as long as you want, until you retire." *Id.* at 534. Because the alleged lifetime employment agreement in *Burke* was *not* terminable at-will, it would be barred by the statute of frauds unless it had an express termination provision. *Id.* at 538. *Burke* does not purport to overrule the long line of New York cases discussed above. *See, e.g.,*

*Berardi v. Fundamental Brokers, Inc.,* Nos. 89 Civ. 5143, 90 Civ. 0646(JSM), 1992 WL 27169, at *2–3 (S.D.N.Y. Feb. 5, 1992) (distinguishing *Burke* and holding that an express termination provision was not required to take the oral agreement to pay bonuses to employees outside the statute of frauds).

**13**    We conclude, therefore, that with respect to plaintiffs' breach of contract and NYLL claims, the district court erred in granting summary judgment for defendants based on the statute of frauds defense.

## 2. Waiver Defense

**[18]    [19]**    Finally, we briefly address defendants' argument that even if plaintiffs' breach of contract and NYLL claims are not barred by the statute of frauds, we may affirm the district court's grant of summary judgment on the alternative ground that plaintiffs, by their course of conduct, impliedly waived these claims. Waiver is "the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982). Implied waiver may be found where a party exhibits "such conduct or failure to act as to evince an intent not to claim the purported advantage." *Hadden v. Consolidated Edison Co. of N.Y.,* 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978). It is well established, however, that "negligence, oversight, or thoughtlessness" does not create a waiver, and waiver "cannot be inferred from mere silence." *Peck v. Peck,* 232 A.D.2d 540, 649 N.Y.S.2d 22, 23 (2d Dep't 1996).

Defendants assert that plaintiffs knew they were not paid 60% commissions on each delivery but failed to object to the calculation of their commission payments until the filing of this lawsuit. Although plaintiffs' weekly commission statements made no reference to the delivery fees **112** customers paid to U.S. Pack, defendants argue that plaintiffs could have deduced how much customers were paying by "speaking with the customers" or "reading U.S. Pack's advertising materials," Appellants' Reply Br. at 9, and from that data, calculated the amounts they claimed to be owed. They also contend that four plaintiffs (Holesa, Imas, Ondusko, and Szycowski) admitted that they did not believe they were receiving 60% commissions, and yet they continued to deliver packages for U.S. Pack.

Therefore, defendants argue, plaintiffs "acquiesced in the way they were being paid" and waived any right to collect 60% commissions. *Id.* at 10.

[20] Based on our review of the record, we conclude that plaintiffs have at the very least raised a genuine issue of fact as to whether they voluntarily and intentionally abandoned their right to collect 60% commissions, thus precluding us from affirming summary judgment for defendants on this alternative basis. *See Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 685 (2d Cir.1983) (stating that where waiver is not established "directly, unmistakably or unequivocally," issue of intent to waive right is "properly left to the trier of fact"). A jury could conclude that plaintiffs, most of whom had limited proficiency in English, were unaware that they were not receiving 60% commissions. Plaintiffs' inability or failure to compare U.S. Pack's advertising materials to their commission statements is at least as consistent with mere "negligence, oversight, or thoughtlessness," which is not enough to create waiver, as it is with the "voluntary and intentional abandonment of a known right." The testimony by Holesa, Imas, Ondusko and Szycowski also fails to establish that those plaintiffs knew that they were not receiving 60% commission payments *and* voluntarily and intentionally waived that right.[33] Therefore, the district court's grant of summary judgment for defendants on the breach of contract and NYLL claims cannot be upheld under defendants' alternative theory of waiver.

**\*\*14** In sum, we conclude that the FSA's statute of limitations runs from the inception of the plaintiffs' franchise relationships with defendants. Accordingly, the statute of limitations bars the claims of the six plaintiffs (Holesa, Imas, Maler, Ondusko, Redaj, and Szycowski)

who began working for U.S. Pack more than three years before the filing of the complaint. We nevertheless affirm the jury's award of FSA damages to plaintiffs Kroshnyi and McFarland, both of whom filed timely claims. We further conclude, however, that the district court erred in granting summary judgment on plaintiffs' breach of contract and NYLL claims based on the statute of frauds. A jury could find that the oral agreements to pay 60% commissions were employment agreements, presumed terminable at-will, and thus capable of performance within one year. The statute of frauds therefore does not bar their enforcement. We have considered the parties' remaining arguments and find them to be without merit.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment in favor of **\*113** Kroshnyi and McFarland on their FSA claims, but **REVERSE** the district court's judgment in favor of the other six plaintiffs (Holesa, Imas, Maler, Ondusko, Redaj, and Szycowski). We also **VACATE** the district court's award of attorneys' fees on the FSA claims and **REMAND** for reconsideration and recalculation of the award. Finally, we **VACATE** the district court's grant of summary judgment on the breach of contract and NYLL claims and **REMAND** to the district court for further proceedings consistent with this opinion.

### All Citations

771 F.3d 93, 2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

Footnotes

\*     The Clerk of Court is directed to amend the caption of this case to conform to the above listing of the parties.

\*\*     The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

1     Although the statute is sometimes referred to as the "Franchise Act" rather than the "Franchise Sales Act," because the district court used the latter nomenclature (along with the common abbreviation "FSA"), we do the same here for the sake of consistency.

2     The district court's opinions may be found at *Vysovsky v. Glassman,* No. 01 Civ. 2531(LMM), 2007 WL 3130562 (S.D.N.Y. Oct. 23, 2007) ("*Vysovsky I* "); *Vysovsky v. Glazman,* 2011 WL 1842297 (S.D.N.Y. May 11, 2011) ("*Vysovsky II* "); and *Vysovsky v. Glassman,* 2011 WL 4135037 (S.D.N.Y. Sept. 15, 2011) ("*Vysovsky III* ").

3     Plaintiffs originally brought two different categories of claims under the NYLL: (1) claims for unpaid wages or commissions under N.Y. Labor Law § 198; and (2) claims for unlawful deductions from pay under N.Y. Labor Law § 193. As noted above, the district court granted summary judgment to defendants on the section 198 claims, concluding that the oral contract upon which those claims were based was unenforceable under the statute of frauds. Thereafter, all but one

Case 9:18-cv-00096-DNH-ML   Document 88   Filed 03/25/19   Page 104 of 132

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

plaintiff—Jana Bulikova—abandoned her section 193 claims completely. And although Bulikova proceeded to trial on her section 193 claim, the jury found for defendants on that claim. On appeal, Bulikova raises no argument related to the adverse judgment on her section 193 claim. Thus, the only NYLL claims at issue in this appeal are the section 198 claims dismissed at summary judgment. For convenience, we use the phrase "NYLL claims" to refer solely to plaintiffs' wage claims under section 198.

4    Two additional Glazman-controlled corporations, U.S. Pack Express, Ltd., and U.S. Transportation Services, Inc., were originally named as defendants in this action, but it is undisputed that none of the plaintiffs entered franchise agreements with either of these defendants.

5    As relevant here, the FSA defines a "franchise" as a contract or agreement, either expressed or implied, and whether oral or written, between two or more persons by which:

   (a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or

   (b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee.

   N.Y. Gen. Bus. Law § 681(3).

6    The FSA provides in relevant part:

   It shall be unlawful and prohibited for any person to offer to sell or sell in this state any franchise unless and until there shall have been registered with the department of law, prior to such offer or sale, a written statement to be known as an 'offering prospectus' concerning the contemplated offer or sale, which shall contain the information and representations set forth in and required by this section.

   *Id.* § 683(1).

7    The term of the SA was 20 years, but the SA permitted USP Network to cancel the agreement at any time within the first six months in its "sole discretion." J.A. 196.

8    The SA is ambiguous as to the frequency with which subscribers would expect to incur these costs.

9    According to the SA, U.S. Pack generally provided four types of delivery services: (1) "Urgent Exclusive"; (2) "Economy Rush"; (3) "Same Day 5:00 P.M. Special"; and (4) "Overnight." J.A. 190.

10   As relevant here, plaintiff-appellant Andrzej Szycowski began working as a driver in the late 1980s; Jana Bulikova and Pavel Vysovsky began working as drivers in 1995; Stefan Holesa and Radomir Maler in 1996; Jacob Imas in 1997; Jaroslav Kroshnyi, Robert Ondusko, and Peter Redaj in 1998; and Keith McFarland in 2000. As discussed *infra* note 13, additional plaintiffs were named in the original complaint, but were dismissed from the case for various reasons and did not appeal.

11   Several plaintiffs worked for U.S. Pack before USP Network filed its 1996 offering prospectus. At least one of these plaintiffs was asked to sign a new SA with USP Network in 1996; he had previously signed a different agreement in 1987.

12   Plaintiff Kroshnyi testified that Milan Cuba, a U.S. Pack supervisor, told him that he would receive a 65% commission, but Kroshnyi understood that everyone else received 60%.

13   Plaintiffs joined and departed the suit as the case progressed. For example, Jozef Stofa and Ireneusz Sawczyszyn were dismissed from the case before the district court ruled on the summary judgment motion. The district court later granted summary judgment against Stanislav Bulik and Stanislav Teleky on their FSA claims, concluding that their claims were barred by the statute of limitations because Bulik and Teleky stopped working for U.S. Pack in April 1997 and October 1997, respectively. Neither Bulik nor Teleky pursued any claims at trial, and neither is a party to this appeal. The district court similarly granted summary judgment against Jana Bulikova on her FSA claims, also on statute of limitations grounds. Bulikova does not challenge that ruling on appeal, but she joins in the cross-appeal from the grant of summary judgment on the NYLL and contract claims based on unpaid commissions.

   In the midst of trial, the district court also dismissed the claims of two plaintiffs—Pavel Vysovsky and Milan Petrilak —who were unable to obtain visas to come to the United States for trial. Vysovsky raises no arguments related to the dismissal of his FSA claims, but joins in the arguments related to the NYLL and contract claims. Petrilak is not a party to this appeal. Thus, only those plaintiffs listed in note 10, *supra*, are named appellants whose rights are being adjudicated in this appeal.

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

14   The district court dismissed the FLSA claims because plaintiffs fell under that statute's "Motor Carrier Exemption." *Vysovsky I,* 2007 WL 3130562, at *5. The district court dismissed plaintiffs' FICA claims brought under 26 U.S.C. § 3102, because section 3102 does not provide a private right of action. *Id.* Plaintiffs do not challenge these rulings on appeal.

15   The court dismissed the other common law claims based on plaintiffs' failure to contest defendants' motion for summary judgment as to those claims. *Vysovsky I,* 2007 WL 3130562, at *6. On appeal, plaintiffs do not challenge that dismissal, other than of their claims for breach of contract.

16   Before the case went to the jury, defendants moved for judgment as a matter of law on the FSA claims, but the district court deferred ruling on the motion until after the jury returned a verdict.

17   As relevant here, the district court vacated the award of damages on Maler's and Holesa's prospectus claims. *See Vysovsky II,* 2011 WL 1842297, at *3–4. Those two plaintiffs entered franchise agreements in September 1996, when U.S. Pack's offering prospectus was on file with the New York State Department of Law. *Id.* Maler and Holesa do not challenge this ruling on appeal.

18   The "Civil remedies" section of the FSA provides that persons who commit a "willful and material" violation of sections 683 or 687 are liable for the franchisee's "reasonable attorney fees and court costs." N.Y. Gen. Bus. Law § 691(1). In this context, a New York court has held that "willful" means "no more than voluntary and intentional, as opposed to inadvertent." *Reed v. Oakley,* 172 Misc.2d 655, 661 N.Y.S.2d 757, 759 (Sup.Ct.1996). In any event, defendants do not challenge the district court's conclusion that the FSA authorizes an award of attorneys' fees under the circumstances presented here.

19   The court entered judgment against defendant U.S. Transportation Services, Inc., as well as the U.S. Pack defendants, but the notice of appeal does not list U.S. Transportation Services, Inc., as an appellant.

20   As noted above, the jury found the individual defendant Glazman not liable on these claims.

21   We review de novo a district court's denial of a motion for judgment as a matter of law, "applying the same standards as the district court to determine whether judgment as a matter of law was appropriate." *Izzarelli v. R.J. Reynolds Tobacco Co.,* 731 F.3d 164, 167 (2d Cir.2013). In doing so, we do not assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. *See, e.g., Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 120 (2d Cir.1998).

22   Defendants also argue that the damages available to a plaintiff who succeeds on an FSA fraud claim under section 687 are the same as the damages available for a common law fraud claim: that is, return to the status quo ante. As explained *infra,* however, we need not reach those arguments to dispose of the instant appeal, and do not address it further.

23   Plaintiffs, for their part, disagree with defendants' narrow reading of the FSA's remedies provision and argue (for the first time on appeal) that the district court erred when it instructed the jury that FSA damages are capped at rescission. Because plaintiffs failed to object to the jury instructions in the court below, however, they have waived this argument on appeal, *see SCS Commc'ns, Inc. v. Herrick Co.,* 360 F.3d 329, 343 (2d Cir.2004) ("[a] party who fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal" (internal quotation marks omitted)), and we perceive no manifest injustice that would warrant reaching this waived argument here.

24   Defendants also argue, almost in passing, that there was insufficient evidence adduced at trial to establish a causal link between defendants' alleged violation of the FSA's registration requirements and any harm that befell plaintiffs. This failure of proof, defendants contend, provides another ground on which to reverse the jury's verdict on plaintiffs' prospectus claims. We disagree, at least with respect to Kroshnyi (as explained *supra,* McFarland was awarded no damages on his prospectus claim, and no other plaintiff filed a timely claim). Kroshnyi purchased his franchise in May 1998, when no relevant prospectus was on file with the Attorney General. In our view, a reasonable jury could infer that defendants deliberately failed to meet their statutory obligations in this regard in an effort to conceal their unfair business practices and facilitate sales to unsuspecting franchisees.

25   According to records produced at trial, Kroshnyi grossed approximately $28,786 in commissions in 1998, $46,857 in 1999, and $8,856 in 2000. McFarland grossed roughly $37,000 in commissions over a two-and-one-half-year period from February 2000 to July 2002, although the exact amount earned during each of those years is less than clear. Plaintiffs earned those commissions, however, over the course of a brutal work schedule. Kroshnyi testified that when he began his job at U.S. Pack, he was working twelve to seventeen (and, at times, as much as twenty-four) hours a day, five days per week, and sometimes weekends as well. McFarland testified that he worked on U.S. Pack business approximately twelve to fifteen hours a day, seven days a week.

26   We note also that, to the extent defendants are correct that the proper calculation of rescissory damages under section 691(1) should be informed by the formula provided for pre-suit rescission offers under section 691(2), the starting point for calculating plaintiffs' damages here would be the $15,000 paid in franchise fees *plus* six percent interest per year from

2014 WL 5572456, 90 Fed.R.Serv.3d 227, 23 Wage & Hour Cas.2d (BNA) 1167

the date of payment (here, $900 per year over a period of approximately eight to ten years). *See* N.Y. Gen. Bus. Law § 691(2) (stating that a "rescission offer" is an offer "to refund the consideration paid *together with interest at six percent per year from the date of payment,* less the amount of income earned by the franchisee from the franchise" (emphasis added)). Thus, if section 691(2)'s formula controls the calculation (as defendants suggest), in assessing whether plaintiffs made a "net profit," one must consider whether plaintiffs netted more income from their franchise than the total amount they paid in franchise fees *plus interest.*

27    Kroshnyi testified that $271.15 was deducted from his pay each week for his vehicle rental, and $24.85 per week for his radio and beeper. McFarland testified that as much as $271 was deducted weekly for vehicle rental, $50 for vehicle maintenance, and $12 for the lease of his radio. McFarland also testified that he was sometimes charged a deduction for parking tickets, and that he was once required to pay out of pocket for damage to his rented cargo van incurred after an accident he claimed was not his fault.

    According to defendant Glazman's testimony, most drivers were charged about $250–270 per week for their vehicle rental and franchise fee, so the $271 amount that both plaintiffs recalled might, in actuality, have represented the combined cost of the franchise fee and rental. But what matters for our purposes is that a reasonable jury could have resolved this factual dispute in plaintiffs' favor, finding that U.S. Pack charged each man as much as $271.15 per week for vehicle rental alone.

28    To take but one example, the offering prospectus estimated that, as of 1996, gasoline for cargo vans would cost subscribers approximately $25 a tank (a conservative estimate, even for the times). To the extent the jury credited Kroshnyi and McFarland's testimony that they spent up to 15–24 hours per day making deliveries throughout the tri-state area and beyond, the jury could reasonably infer that each plaintiff used as much as a tank of gasoline per workday, providing a basis for the jury reasonably to attribute thousands of dollars to each plaintiff in fuel costs alone.

29    Although we affirm the FSA verdicts in favor of Kroshnyi and McFarland, we note that, to the extent there is any overlap between those FSA claims and any of the revived contract or NYLL claims pursued upon remand, the district court must ensure against duplicative recoveries. For example, the district court might, in its discretion, require Kroshnyi or McFarland to disclaim their FSA awards before they may recover additional damages on any successful contract or NYLL claims. That, however, is a question we leave to the district court to consider in the first instance, if necessary.

30    The lone exception, Kroshnyi, testified that when he asked a supervisor whether U.S. Pack paid 60% commissions (a number he had heard from other drivers), the supervisor replied, "[F]or you it's 65 [percent]." Kroshnyi believed he was promised more because the supervisor "always said [he] did [a] good job." J.A. 504.

31    Although, as noted *supra* note 7, the 1996 offering prospectus granted U.S. Pack the right to cancel the franchise agreement within six months of the franchise start date for any reason, plaintiffs have not argued that this termination provision was incorporated into their oral agreements.

32    We reject defendants' argument that the oral commission agreements were not part of an employment agreement because plaintiffs presented themselves as "independent contractors" rather than "employees" at the trial of their FSA claims. That plaintiffs opted to proceed on their FSA claims after the erroneous dismissal of their breach of contract and NYLL claims does not preclude them from pursuing the incorrectly-dismissed claims on remand to the district court, so long as those claims rest upon a plausible factual basis. *See, e.g., Kruse v. Wells Fargo Home Mortg., Inc.,* 383 F.3d 49, 55 n. 3 (2d Cir.2004) (noting that the Federal Rules "permit[ ] pleading inconsistent theories in the alternative"). If plaintiffs do ultimately succeed on their breach of contract and NYLL claims at trial, however, the district court must ensure that plaintiffs do not receive duplicative damages.

33    Although Imas "started suspecting" at the end of the 1990s that he was not receiving 60% commissions, J.A. 451, he also testified that "I have no proof, only suspicions," J.A. 438, and that when drivers asked, "[A]re we still making 60?" at company meetings, Glazman would respond, "[N]othing changed. Everything like used to be." J.A. 438. Holesa and Szycowski testified similarly. Ondusko testified that he began to suspect he was not receiving 60% commissions only "[a]fter the case began." J.A. 614.

* * *

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, \*2–3
(N.D.N.Y.), *af'd without op., 175 F.3d 1007 (2d Cir.1999);
see also Batista v. Walker,* 1995 WL 453299, at \*1
(S.D.N.Y.1995) (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

**I. Local Rule 7.1(a)(3)**

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception
Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?
>
> A. I think he asked me how am I feeling, how did this happen?
>
> Q. And what did you say?
>
> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.
>
> Q. What did you say?

> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—
>
> Q. Which was—
>
> A. —and that I started this.
>
> Q. And is that the truth?
>
> A. No.
>
> Q. Why did you tell the nurse that?
>
> A. Because I was being forced to.
>
> Q. Forced to how?
>
> A. By the officers that [sic] was there.
>
> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?
>
> A. Yes, ma'am.
>
> Q. Why did you do that?
>
> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" . [3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be

inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

[T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

*6 Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may

ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

Footnotes

1    Local Rule 7.1(a)(3) provides:
          Summary Judgment Motions
          Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 112 of 132

2011 WL 1103045

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3    Officer Rock is not a defendant herein.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

Padilla v. Correction Care Solutions, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 113 of 132

2018 WL 550610

2018 WL 550610
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emilio PADILLA, Plaintiff,
v.
CORRECTION CARE
SOLUTIONS, et al., Defendants.

9:17-CV-1150 (MAD/TWD)
|
Signed 01/22/2018

**Attorneys and Law Firms**

EMILIO PADILLA, 16000236, Onondaga County
Justice Center, 555 South State Street, Syracuse, NY
13020, pro se.

### DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge

#### I. INTRODUCTION

 *1 Pro se plaintiff Emilio Padilla ("Plaintiff")
commenced this civil rights action asserting claims
arising out of his detention at the Onondaga County
Justice Center ("Onondaga County J.C."). Dkt. No. 1
("Compl."). By Decision and Order filed on November
29, 2017 (Dkt. No. 4) (the "November Order"), this
Court granted Plaintiff's IFP application and reviewed the
sufficiency of the Complaint in accordance with 28 U.S.C.
§ 1915(e) and 28 U.S.C. § 1915A. On the basis of that
review, the Court dismissed the Complaint for failure to
state a claim upon which relief could be granted. See Dkt.
No. 8, generally. In light of his pro se status, Plaintiff
was afforded an opportunity to submit an Amended
Complaint. See id. at 11. Presently before the Court
is Plaintiff's Amended Complaint. Dkt. No. 9 ("Am.
Compl.").

#### II. LEGAL STANDARD
The legal standard governing the dismissal of a pleading
for failure to state a claim pursuant to 28 U.S.C. §
1915A(b) was discussed at length in the November Order
and it will not be restated in this Decision and Order. See
Dkt. No. 8 at 2-4. The Court will construe the allegations

in the Amended Complaint with the utmost leniency. See,
e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding
that a pro se litigant's complaint is to be held "to a
less stringent standards than formal pleadings drafted by
lawyers.").

#### III. NOVEMBER ORDER and SUMMARY OF
#### AMENDED COMPLAINT [1]
In the original Complaint, Plaintiff asserted Fourteenth
Amendment claims related to deliberate indifference
to his serious medical needs against the County of
Onondaga, Onondaga County J.C., "Medical Staff," and
CCS Correction Care Solution, and "Pharmaceutical
Company." See Compl., generally. In the November
Order, the Court dismissed Plaintiff's claims holding
as follows: (1) Plaintiff failed to sufficiently allege
a widespread policy or custom related to Onondaga
County; (2) all claims against Onondaga C.J. were barred
pursuant to the Eleventh Amendment; (3) the "Medical
Staff" is not a "person" as required by Section 1983; and
(4) claims against CCS and the Pharmaceutical Company
were dismissed for failure to plead that the private parties
are state actors. See Dkt. No. 8, generally.

 *2 In the Amended Complaint, Plaintiff adds the
following new defendants: Dr. Monika Zirath ("Zirath")
and Nurse Practitioner Jasminique Bobb-Diallo ("Bobb-
Diallo"). [2] See Am. Compl. at 1. The Amended
Complaint does not contain any claims against Onondaga
County, Onondaga C.J., the Medical Staff, or the
"Pharmaceutical Company." [3]

Plaintiff alleges that CCS entered into a contract with
Onondaga County to provide medical care for pretrial
detainees. Am. Compl. at 2. In April 2017, Plaintiff
was treated by Zirath, an employee of Correction Care
Solution ("CCS") for complaints related to a shoulder
injury. Id. at 3, 9. Zirath told Plaintiff that an x-ray
would be taken "within the next few days," but suspected
that Plaintiff suffered from arthritis and prescribed
Naproxen/Naprosyn. Id. at 3-4. Zirath did not explain the
possible side effects of the medication. Id. at 4.

In July 2017, Plaintiff noticed that he was rapidly gaining
weight. Am. Compl. at 4. On July 23, 2017, Plaintiff
requested sick call because his thighs were swollen and his
urine was "very dark." Id.; Dkt. No. 1-1 at 15. Plaintiff did
not receive a response. Am. Compl. at 4. On July 25, 2017,

Plaintiff submitted two additional sick call requests for medical attention because his entire body began to swell. *Id.* at 4-5.; Dkt. No. 1-1 at 16-17. Plaintiff did not receive a response. Am. Compl. at 5. On July 26, 2017, Plaintiff submitted another sick call slip. *Id.* at 5; Dkt. No. 18.

On July 31, 2017, Plaintiff requested sick call because he could not urinate, had chest pain, and could not walk. Am. Compl. at 7; Dkt. No. 1-1 at 19. Later that day, Nurse Harrish examined Plaintiff and took his vitals. [4] Am. Compl. at 5. Plaintiff's blood pressure was 150/100. *Id.* Harrish denied Plaintiff's request to go to the hospital and told him to lay down and elevate his feet. *Id.* Later that evening, Plaintiff submitted another sick call slip. *Id.*

Plaintiff was examined by defendant Bobb-Diallo, a CSC employee. [5] Am. Compl. at 5, 9. Plaintiff told Bobb-Diallo that he could not urinate and that he was experiencing chest pains. *Id.* at 8. Bobb-Diallo diagnosed Plaintiff with high blood pressure and provided blood pressure medication and a water pill. *Id.* at 5-6. Bobb-Diallo directed Plaintiff to drink a lot of fluids. *Id.* at 6. As a result, in a few days, Plaintiff gained sixty pounds. Am. Compl. at 6.

A few days later, Plaintiff told Bobb-Diallo that he needed to go to a hospital and she replied, "let the medication work." Am. Compl. at 6. At the time, the nurse was aware that there was protein in Plaintiff's urine and she observed the swelling in his ankles, legs, and feet. *Id.* at 5, 8. Plaintiff was directed to return to his cell. *Id.* at 6, 7.

On August 1, 2017, at 3:00 a.m. Plaintiff was examined by a nurse and, at 8:00 a.m., he was rushed to St. Joseph's Hospital. Am. Compl. at 8. At the hospital, Plaintiff was diagnosed with protein in his urine, heart failure, and acute kidney failure. *Id.*; Dkt. No. 1-1 at 1. On August 8, 2017, Plaintiff was discharged from the hospital and advised to stop taking Naprosyn. Dkt. No. 1-1 at 2.

**\*3** Construed liberally, the Amended Complaint contains Fourteenth Amendment claims against Zirath and Bobb-Diallo and supervisory claims against CCS. *See* Am. Compl., *generally.* Plaintiff seeks monetary damages. *See id.* at 10.

## IV. ANALYSIS

### A. Private Actors

Plaintiff claims that CCS, Zirath, and Bobb-Diallo, employees of CCS, "acted under color of law to deprive plaintiff of his constitutional rights." *See* Am. Compl. at 3. The law related to private entities and § 1983 actions was discussed in the November Order and will not be restated herein. *See* Dkt. No. 8 at 9-10.

"[T]he provision of medical care to incarcerated prisoners is a public function, even if private physicians contract with the government to provide those services." *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 365 (S.D.N.Y. 2001) (citing *West v. Atkins*, 487 U.S 42, 56 (1988)) ("It is only those physicians authorized by the State to whom the inmate may turn."). "With regard to doctors who treat prison inmates, the Supreme Court has held that it is 'the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State' in a suit under 42 U.S.C. § 1983." *Doe v. Torres*, No. 05 CIV. 3388, 2006 WL 290480, at \*9 (S.D.N.Y. Feb. 8, 2006) (citing *West*, 487 U.S. at 55-56) ("[A] physician employed by [a state] to provide medical services to state prison inmates ... act[s] under color of state law for purposes of § 1983 when undertaking his duties in treating [a prisoner's] injury.").

Here, defendants treated Plaintiff at the jail. At this juncture, Plaintiff has sufficiently alleged that defendants' were acting under the color of state law for the purposes of Section 1983. *See Young v. Smith*, No. 07-CV-6312, 2008 WL 4561605, at \*4 (W.D.N.Y. Oct. 10, 2008) (denying the defendants' motion to dismiss as that the exact nature of the relationship between the physician and the State would be clarified during discovery); *see also Burgess v. County of Rensselaer*, No. 03-CV-0652 (NPM/RFT), 2006 WL 3729750, at \*4 (N.D.N.Y. Dec. 18, 2006) (denying summary judgment filed by nurse holding that her employer may be a state actor for purposes of § 1983). Thus, the Court will proceed to analyze the section 1983 claims against CCS, Zirath, and Bobb-Diallo.

### B. Fourteenth Amendment Claims

As discussed in the November Order, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) altered the subjective standard for claims of deliberate indifference under the Fourteenth Amendment. *See* Dkt. No. 8 at 6. Specifically, to state a claim of deliberate indifference to medical needs

Padilla v. Correction Care Solutions, Not Reported in Fed. Supp. (2018)

2018 WL 550610

under the Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants "knew, or should have known, that the condition posed an excessive risk to health or safety." *See id.* The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment. *See Darnell*, 849 F.3d at 30. The objective component of a deliberate indifference medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted).

### 1. Claims Against Bobb-Diallo

 **\*4** With respect to Bobb-Diallo, Plaintiff claims that she violated his Fourteenth Amendment rights related to medical care for heart failure and acute kidney failure. *See* Am. Compl. at 8. At this juncture, plaintiff has adequately plead a serious medical condition to satisfy the objective component of the deliberate indifference analysis. *See Rivera v. Fed. Bureau of Prisons*, No. 08 CIV. 5590, 2009 WL 585828, at *5 (S.D.N.Y. Mar. 5, 2009) (holding that kidney failure is sufficiently serious medical condition for the purposes of a deliberate indifference claim). Regarding the subjective analysis, Plaintiff contends that Bobb-Diallo was aware that there was protein in his urine, that his legs were swollen, and that he was having chest pains and deliberately ignored a serious risk to his health and safety resulting in his condition worsening. *See* Am Compl. at 5, 7, 8, 9. Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that Plaintiff's Fourteenth Amendment claims against Bobb-Diallo survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Claims Against Zirath

A different conclusion is reached however, with respect to Zirath. Plaintiff alleges that he treated with Zirath on one occasion in April 2017 for complaints of shoulder pain. *See* Am. Compl. at 3-4, 9. "A medical need is considered serious if it presents 'a condition of urgency that may result in degeneration or extreme pain.' " *Linares*

*v. Kudlack*, No. 03-CV-1408 (LEK), 2007 WL 4287700, at *5 (N.D.N.Y. Dec. 4, 2007) (quoting *Chance*, 143 F.3d at 702). Plaintiff claims that he suffered from a shoulder injury but the Amended Complaint lacks facts related to what his physical or medical condition was or further, that it produced pain.

Even assuming Plaintiff sufficiently pleaded that he suffered from a serious medical need, he has failed to allege that Zirath "knew, or should have known, that the condition posed an excessive risk to health or safety." The Fourteenth Amendment claims against Zirath are based upon the assertion that she failed to adequately apprise Plaintiff of the potential side effects of Naproxen/Naprosyn. The fact that a medication has "side effects, [...], is certainly insufficient to state a deliberate indifference claim inasmuch as most prescription medications have side effects[.]" *Bryant v. Wright*, No. 09 CIV 2456, 2010 WL 3629443, at *8 (S.D.N.Y. Aug. 31, 2010) *aff'd*, 451 Fed.Appx. 12 (2d Cir. 2011). "Inadvertent failures to impart medical information, simple lack of due care, and simple negligence do not make out a violation of either the substantive or procedural aspects of the Due Process Clause of the Fourteenth Amendment." *Lara v. Bloomberg*, No. 04 CV 8690, 2008 WL 123840, at *4 (S.D.N.Y. Jan. 8, 2008) (internal quotation marks and citation omitted) (holding that pretrial detainee failed to satisfy deliberate indifference element of claim of failure to receive medical information because the plaintiff did not allege that the doctors' purported failure to inform Plaintiff of the side effects of his medication were driven by the doctors' desire to require Plaintiff to accept the treatment offered). Plaintiff's dispute is nothing more than a quarrel with the nature of his treatment. *See Wright v. Conway*, 584 F.Supp.2d 604, 607 (W.D.N.Y. 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed."). At most, Zirath's actions constitute negligence, which is not actionable in a § 1983 claim. *See Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991). Thus, Plaintiff's claims against Zirath are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure state a claim upon which relief may be granted.

### C. Claims Against CCS

In *Rojas v. Alexander's Department Store, Inc.*, the Second Circuit held, "[p]rivate employers are not liable under §

2018 WL 550610

1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official ... policy of some nature caused a constitutional tort.' " *Garcia v. Armor Health Care Inc.*, No. 16-CV-1996, 2016 WL 3647870, at *3 (E.D.N.Y. July 1, 2016) (quoting *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658, 691 (1978)) (internal quotation marks omitted). "[A] plaintiff can prevail against a municipality [or private company acting under color of state law] by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them." *Grafton v. Cty. of Nassau*, No. 15-CV-4564, 2016 WL 8711072, at *9 (E.D.N.Y. July 15, 2016) (citing *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012)) ("[A] plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights.").

 **\*5** Here, the Amended Complaint lacks any facts suggesting that Bobb-Diallo's conduct was part of a CCS policy or custom. Thus, Plaintiff's claims against CCS are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure state a claim upon which relief may be granted. *See Garcia*, 2016 WL 3647870, at *3.

**V. CONCLUSION**
**WHEREFORE**, it is hereby

**ORDERED** that the Amended Complaint (Dkt. No. 9) is accepted for filing and is deemed the operative pleading; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket to include the following defendants: Zirath and Bobb-Diallo; and it is further

**ORDERED** that the following claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Fourteenth Amendment claims against Zirath; and (2) claims against CCS; and it is further

**ORDERED** that the Fourteenth Amendment claims against Bobb-Diallo survive the Court's sua sponte review

under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response; and it is further

**ORDERED** that Zirath and CCS; are **DISMISSED** as defendants herein; and it is further

**ORDERED**, the Clerk shall issue a summons and forward it, along with copies of the Amended Complaint, to the United States Marshal for service upon the remaining defendant. The Clerk shall forward a copy of the summons and Amended Complaint to the Office of the County Attorney of Onondaga County, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the Amended Complaint be filed by the remaining defendant, or his/her counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket report in accordance with this Order; and it is further

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 550610

Padilla v. Correction Care Solutions, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00096-DNH-ML     Document 88     Filed 03/25/19     Page 117 of 132

2018 WL 550610

## Footnotes

1   Plaintiff's original complaint included exhibits. Dkt. No. 1-1. Plaintiff incorporated, by reference, the same exhibits attached to the original complaint, but failed to actually attach the exhibits to the Amended Complaint. "Although it is well settled that an amended complaint supersedes a prior complaint in its entirety, it is clear to the court that plaintiff intended to attach the exhibits to his amended complaint." *Wellington v. Langendorf*, No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at *3 (N.D.N.Y. July 15, 2013). To require Plaintiff to file an amended complaint that includes the original exhibits is, "an unnecessary procedural hoop that would waste resources and delay resolution of this action." *Alexander v. U.S.*, No. 13-CV-678, 2013 WL 4014539, at *4 (N.D. Cal. Aug. 5, 2013). Because Plaintiff is a pro se plaintiff, the Court will consider the exhibits and documentation attached to the original Complaint as incorporated by reference in the Amended Complaint.

2   The Clerk of the Court is directed to add these defendants to the docket report for this action.

3   The Clerk of the Court is directed to dismiss County of Onondaga, Onondaga County J.C., the Medical Staff, and the Pharmaceutical Company as defendants herein.

4   Harrish is not named as a defendant.

5   The Amended Complaint does not contain facts related to when this examination occurred.

---

**End of Document**                                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00096-DNH-ML    Document 88    Filed 03/25/19    Page 118 of 132

Robinson v. Delgado, Not Reported in F.Supp. (1998)
1998 WL 278264

1998 WL 278264
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and
Lieutenant; and Donald Selsky, Director of
Inmate Special Housing Program, Defendants.

No. 96–CV–169 (RSP/DNH).
|
May 22, 1998.

## Attorneys and Law Firms

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

## ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that
they violated his right to due process in the course
of a disciplinary proceeding and subsequent appeal.
On September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived
him of a liberty interest within the meaning of the Due
Process Clause. Plaintiff did not oppose the summary
judgment motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face
of the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear
error on the face of the record. After being warned

by defendants' motion that he must offer proof in
admissible form that his disciplinary confinement imposed
an "atypical and significant hardship on the inmate
in relation to the ordinary incidents of prison life,"
Robinson failed to offer any such proof. *Sandin v. Conner,*
515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418
(1995). Consequently, he cannot maintain a due process
challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it
is further

ORDERED that the Clerk of the Court serve a copy of
this order on the parties by ordinary mail.

HURD, Magistrate J.

## REPORT—RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local
rules of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth,
and Fourteenth Amendment rights under the United
States Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56.
However:

> When a motion for summary
> judgment is made and supported as
> provided in this rule, an adverse
> party may not rest upon the mere
> allegations or denials of the adverse
> party's pleading, but the adverse
> party's response, by affidavits or
> as otherwise provided in this rule,
> must set forth specific facts showing
> that there is a genuine issue for

trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report–Recommendation, by regular mail, upon the parties to this action.

**All Citations**

Not Reported in F.Supp., 1998 WL 278264

---

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4382986
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

TRADE WIND DISTRIBUTION, LLC, Plaintiff,

v.

UNILUX AG, Defendant.

No. 10 Civ. 5716(BMC).
|
Sept. 20, 2011.

### MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

**\*1** In this diversity case, plaintiff alleges that defendant breached their distribution contract pursuant to which plaintiff was granted an exclusive territory within the United States. The defendant, a German company, seeks to dismiss in reliance on forum selection clauses contained in the contracting documents which provide for litigation in Germany. For the reasons set forth below, the motion is granted.

### BACKGROUND

On a motion to dismiss based on a forum selection clause, facts should be considered in the light most favorable to the plaintiff. See *Phillips v. Audio Active Ltd.* 494 F.3d 378, 384 (2d Cir.2007). With this in mind, the Court assumes for the purpose of this motion that the following facts are true.

Trade Wind is a distributor of windows and doors with its principal place of business in Huntington Station, New York. Unilux is a German manufacturer of custom-made windows and doors. In March, 2007, Trade Wind and Unilux signed a contract by which TradeWind was granted the exclusive right to sell Unilux products within a specific geographical area (the "Contract Area"). The parties refer to this contract as the "Distributor's Contract." TradeWind's complaint alleges that Unilux breached the Distributor's Contract by permitting other distributors to sell Unilux products within the Contract

Area, causing TradeWind to suffer damages exceeding six million dollars. TradeWind further alleges that it incurred costs while repairing certain Unilux products, at Unilux's behest, that the Distributor's Contract did not obligate TradeWind to incur. TradeWind therefore brings a claim of unjust enrichment to recover "an amount no less than $4,829.41," which Unilux still owes in connection with these repairs.

Annexed to the Distributor's Contract is a set of terms and conditions defined in the Distributor's Contract as the "AGB." The Distributor's Contract references the AGB in four different places. Section 1(2), on the first page of the Distributor's Contract, introduces the AGB by stating: "[TradeWind] sells exclusively according to the current business regulations of the manufacturer (AGB). Along with this contract there are valid business regulations (General Terms) from the manufacturer (see appendix AGB)." Section 7(2) of the Distributor's Contract states: "The current valid version of [Unilux]'s general terms and conditions of business, which are also applicable in commerce between other customers and [Unilux], are also valid for any business conducted between [Unilux] and [TradeWind]. The current valid version of [Unilux]'s general terms and conditions of business (AGB) are enclosed with this contract." A notation appears, at the bottom of the last page of the Distributor's Contract, as follows:

**Attachments**

AGB (General Terms)

The Distributor's Contract and the AGB each contain a forum selection clause. They are not identical. The Distributor's Contract's forum selection clause can be found in § 11(3):

> **\*2** Jurisdiction for any disputes in relation to this agreement or in business executed by it is the manufacturer's place of business in Salmtal/Germany. Each contract partner also has the right to sue the other at their general jurisdiction.

The AGB's forum selection clause can be found in § 9 of that document:

> Place of jurisdiction for all contractual legal disputes, including both cheque and bill of exchange disputes, is Trier. Legal proceedings can, however, be initiated by both parties at the place of performance. The seller is able to initiate legal proceedings at the business location of the buyer.

The AGB also contains a choice-of-law provision specifying that "German Law applies exclusively." The Distributor's Contract does not contain a choice-of-law provision.

Unilux argues that the AGB and the Distributor's Contract are one agreement and that, therefore, the AGB's choice-of-law provision requires me to interpret both forum selection clauses under German law. Unilux further argues that dismissal of the complaint is proper because the forum selection clauses in the Distributor's Contract and the AGB each mandate exclusive jurisdiction in Germany.

TradeWind argues that the AGB is separate and distinct from the Distributor's Contract, and that German law therefore does not govern my interpretation of the forum selection clause contained in the Distributor's Contract. Because the instant dispute arises from provisions of the Distributor's Contract, rather than the AGB, TradeWind argues that the only forum selection clause applicable to this dispute is the one contained in the Distributor's Contract. Interpreted under federal or state law, TradeWind reads this clause to permit, but not mandate, jurisdiction over this dispute in Germany.

## DISCUSSION

The prevailing Second Circuit framework regarding the enforceability of forum selection clauses is a burden-shifting analysis in which the party seeking enforcement must first demonstrate that the forum selection clause validly mandates foreign jurisdiction. *See Altvater*

*Gessler–J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.,* 572 F.3d 86, 89 (2d Cir.2009) (citing *Phillips v. Audio Active, Ltd.,* 494 F.3d 378, 383–84 (2d Cir.2007)). To meet this initial burden under federal law, the Second Circuit requires a party to show that (1) the clause was reasonably communicated to the opposing party; (2) the clause provides for mandatory, rather than permissive, jurisdiction; and (3) the plaintiffs claims are subject to the forum selection clause. If this is demonstrated, there is a presumption of enforceability that the party opposing enforcement can rebut only upon a "sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.' " *Id.* at 383–84 (quoting *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). [1]

### A. Applicable Law

#### 1. The AGB's Choice–of–Law Provision Applies to the Distributor's Contract

**\*3** The validity and scope of a choice-of-law provision is a threshold question that a federal court, sitting in diversity, should decide based on the forum state's law rather than the law specified in the clause. *See, e.g., Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 332–33 (2d Cir.2005). Under New York law, multiple writings "may be read as one contract only if the parties so intended," and that intent can be gleaned from the "circumstances surrounding the transaction." *Arciniaga v. Gen. Motors Corp.,* 460 F.3d 231, 237 (2d Cir.2006) (citing *Rudman v. Cowles Commc'ns, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972)). In determining whether TradeWind and Unilux intended to read the Distributor's Contract and the AGB together, this Court should consider whether the two writings "form a part of a single transaction and are designed to effectuate the same purpose ." *TVT Records v. Island Def Jam Music Grp.,* 412 F.3d 82, 89 (2d Cir.2005) (quoting *This is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir.1998) (applying New York law)).

The parties manifestly intended the AGB to be part-and-parcel of the Distributor's Contract. The seven-page Distributor's Contract makes reference to the AGB four times, including a notation that the AGB is attached as an "appendix." Indeed, TradeWind's Amended Complaint attaches the Distributor's Contract and the AGB as one twelve-page exhibit, defined in the Amended Complaint

simply as "the Distributor's Contract." Moreover, the Distributor's Contract expressly specifies that the AGB is "valid for any business conducted between [Unilux] and [TradeWind]," rather than exclusively applying to transactions between TradeWind and its customers. The term "any business" is broad, and undermines TradeWind's argument that the AGB should be incorporated into the Distributor's Contract only for very limited purposes.

As TradeWind notes, the AGB and the Distributor's Contract contain a few contradictory terms that are difficult to reconcile when the documents are read as one contract. For example, the Distributor's Contract provides for payment two days before any goods are loaded in Salmtal, whereas the AGB states that payment is always due upon delivery. Contradictions between terms tend to show that the parties did not intend for the two writings to be read as a single contract. However, New York law seeks to give effect to all of a contract's provisions to the greatest extent possible. The Second Circuit has interpreted New York law as requiring that "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." *Seabury Constr. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 69 (2d Cir.2002) (quoting *Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.,* 760 F.2d 390, 395–96 (2d Cir.1985)). This requirement applies not only when the conflicting provisions are located in the same document, but also when one document incorporates the provisions of another. New York law therefore acknowledges that parties may intend to incorporate the terms of one document into another despite the existence of some inconsistencies.

**\*4** Furthermore, the contradictions that exist between the AGB and the Distributor's Contract are overwhelmed by evidence that the parties nevertheless intended the documents to form one agreement. The numerous references to the AGB within the Distributor's Contract; the fact that the two documents were physically appended to each other; and the way the two documents dovetail to form a complete agreement governing TradeWind's distribution of Unilux products leads me to conclude that the parties intended to incorporate the AGB to the fullest extent possible. Because there is no term in the Distributor's Contract that contradicts the AGB's

choice-of-law provision, German law governs the entire agreement.

The issue of the AGB's incorporation is intermingled with the question of enforceability of each forum selection clause—a question that, as discussed below, is governed by German contract law. It is therefore worth noting that German law leads me to the same conclusion. TradeWind and Unilux each submitted a declaration of a German attorney, who provided their respective interpretations of German law regarding the enforceability of forum selection clauses. Both attorneys agree that the AGB qualifies as "standard business terms" under § 305(1) of the German Civil Code ("Burgerliches Gesetzbuch," hereinafter "BGB").

Unilux's expert informs this Court that, under German law, the determination of whether "standard business terms" are incorporated into a contract "is based upon common intention between the parties, which the parties can explicitly declare" in the contract. TradeWind does not dispute this interpretation of German law on this issue. I therefore agree with Unilux's interpretation of German law on this point: the provision of the Distributor's Contract providing that the AGB is "valid for any business conducted between [Unilux] and [TradeWind]" demonstrates the parties' intention to incorporate the AGB into the Distributor's Contract. The AGB and the Distributor's Contract would therefore be interpreted as a single agreement even under German law.

### 2. German Law Governs the Enforceability of Both Forum Selection Clauses

When a choice-of-law provision covers a contractual dispute, "the law selected in that clause dictates how the contract's provisions should be interpreted." *Fin. One,* 414 F.3d at 332. However, when a contract includes both a choice-of-law provision and a forum selection clause, federal courts have disagreed over whether to interpret the meaning and scope of a forum selection clause under federal law or the law selected in the choice-of-law provision. *See Phillips,* 494 F.3d at 385 (collecting cases). The Second Circuit has not explicitly ruled on this issue, but has stated in dicta that the Court "cannot understand why the interpretation of a forum selection clause should be singled out for application of any law other than that chosen to govern the contract as a whole." *Id.* at 386.

2011 WL 4382986

**\*5** District courts within the Second Circuit have read *Phillips* to indicate that "where a contract includes a choice of law clause, the chosen forum's law governs the interpretation of the forum selection clause." *Evergreen Nat'l Indem. Co. v. Capstone Bldg. Corp.,* No. 3:7–1189, 2008 WL 349457, at \*2 (D.Conn. Feb. 6, 2008); *accord U.S. Bank Nat'l Ass'n v. Abies & Hall Builders,* 582 F.Supp.2d 605, 612 (S.D.N.Y.2008). Several other circuits agree. *See, e.g., Preferred Capital, Inc. v. Sarasota Kennel Club, Inc.,* 489 F.3d 303, 308 (6th Cir.2009); *Yavuz v. 61 MM, Ltd.,* 465 F.3d 418, 428 (10th Cir.2006); *Northwestern Nat'l Ins. Co. v. Donovan,* 916 F.2d 372, 374 (7th Cir.1990) (Posner, J.). Because I find these cases to be well-reasoned and because the *Phillips* dicta is indicative of the Second Circuit's view on this matter, I find that German law should guide my interpretation of whether Unilux has met its initial burden of demonstrating that these forum selection clauses point toward mandatory jurisdiction in Germany.

**B. Interpretation of the Forum Selection Clauses in the Distributor's Contract and the AGB**

**1. Both Forum Selection Clauses Apply to this Dispute**
Because the forum selection clauses in the AGB and the Distributor's Contract contain different language, TradeWind and Unilux disagree as to which, if either, forum selection clause applies. TradeWind argues that the clauses are contradictory, which renders them both "ineffective." In response, Unilux argues that the clauses do not contradict, and that, even if they did, the forum selection clause in the Distributor's Contract would take priority over the AGB.

Both parties agree that § 305(c) of the BGB provides that contradictory terms in a single contract may result in the invalidity of both terms. According to TradeWind, the forum selection clauses are contradictory because the AGB's forum selection clause provides for jurisdiction in Trier, whereas the clause in the Distributor's Contract provides for jurisdiction in Salmtal. However, I am persuaded that these clauses both point toward jurisdiction in the Regional Court of Trier, Germany.

As both experts explain in their declarations, Germany's trial-level courts are divided between local (or "district") courts, which handle claims worth less than 5,000, and "regional" courts handling claims worth more than 5,000. A claim properly brought in the city of Trier would

be directed either to the District Court of Trier or the Regional Court of Trier, depending on the amount in controversy. A claim properly brought in the city of Salmtal would be directed either to the District Court of Wittlich or the Regional Court of Trier, depending on the amount in controversy. In other words: the cities of Salmtal and Trier are both within the jurisdiction of the Regional Court of Trier, and a claim worth more than 5,000 brought in either city would be directed to the Regional Court of Trier. Because TradeWind claims damages in excess of $6 million,[2] both forum selection clauses direct the parties to the Regional Court of Trier. The two forum selection clauses are therefore harmonious and neither would be invalidated under the BGB.

**\*6** Although TradeWind did not address the argument in its brief, its expert argued, in his declaration, that both forum selection clauses are "ineffective" because they purport to send all types of claims to Salmtal and Trier. As the parties explain, these jurisdictions would not be appropriate for "legal dunning" (a term which the parties do not define, but which presumably consists of debt collection actions) or "fair competition" proceedings, as German law provides a mandatory jurisdiction for these proceedings and parties are not permitted to stipulate to a different location. The parties agree that § 40 of Germany's Code of Civil Procedure states that a forum selection clause is unenforceable if it purports to direct these particular claims to a forum other than that which is specified by German law. But TradeWind does not raise a "legal dunning" or a "fair competition" claim in this case, and TradeWind does not assert that a forum selection clause is unenforceable for claims that are appropriate in the specified jurisdiction simply because the clause would be unenforceable for other types of claims.

**2. The Forum Selection Clauses Mandate German Jurisdiction for TradeWind's Breach–of–Contract Claims**
In determining whether a forum selection clause provides for exclusive jurisdiction in Germany, the parties' experts agree that German law generally requires me to determine the parties' true "intentions." The parties' intentions may be "determined by means of the wording and, if necessary, by interpretation in accordance with the circumstances and the interest of the parties." The parties also agree that German law provides for no presumption that the parties intended exclusive, rather than permissive, jurisdiction.

Because TradeWind's contract claims arise from the terms of the Distributor's Contract, rather than the AGB, it is likely that the parties intended the forum selection clause contained in it to govern those claims. However, this forum selection clause is arguably ambiguous as to whether the parties intended it to mandate, rather than merely to permit, jurisdiction in Germany. The first sentence does not definitively limit the parties to Germany; it simply states that "jurisdiction for any disputes ... is [Unilux]'s place of business in Salmtal/Germany." Because this sentence uses the term "any," it is possible that the parties simply meant to say that Germany would be an acceptable, but not mandatory, jurisdiction for any type of dispute. The second sentence, which states that "[e]ach contract partner also has the right to sue the other at their general jurisdiction," qualifies the first sentence and could reasonably be interpreted to say that the parties intended to permit American jurisdiction only if the suit were brought by Unilux. However, the word "their" in this second sentence is also ambiguous. If "their" means "the other party's," this sentence limits TradeWind to suing Unilux in Germany. But if "their" means "their own," this sentence would permit TradeWind to sue Unilux to New York.

**\*7** However, any ambiguity in this forum selection clause is resolved by reference to the AGB's forum selection clause. This clause states that jurisdiction for "all contractual legal disputes ... is Trier." In 1972, the German Supreme Court held that a forum selection clause stating that a specific court has jurisdiction of "all disputes[ ] is ordinarily to be interpreted in such a way that in the case of claims against a party whose home court shall have jurisdiction, the sole (exclusive) jurisdiction of this court has been agreed." [3] Although case law is not binding on Germany's lower courts to the same extent that it is on American courts, this precedent is a persuasive indication that German courts would interpret the AGB's forum selection clause as mandatory.

Even without reference to German case law, I find that the AGB's forum selection clause manifests the parties' intention to limit American jurisdiction to suits brought by Unilux. The third sentence of the clause, stating that "[Unilux] is able to initiate legal proceedings at the business location of [TradeWind]," is clearly meant to carve out an exception to the first sentence. If the first

sentence was not meant to limit jurisdiction to Germany, this third sentence would be unnecessary.

Because I find that any ambiguities of the Distributor's Contract's forum selection clause are easily resolved by reference to the AGB, I conclude that the parties intended to bar TradeWind from suing Unilux anywhere other than Germany. It is therefore not necessary for me to resolve the contradictory German law provided by the parties regarding whether ambiguous terms should be construed in favor of Unilux or TradeWind. In addition, I am not persuaded by TradeWind's point that the Distributor's Contract uses the word "exclusively" in other parts of the contract, as this does not mean that the exact word "exclusively" was used every time the parties meant to create an exclusion.

### C. Enforceability of Forum Selection Clauses in the Distributor's Contract and the AGB

Having determined that Unilux has met its initial burden of demonstrating that the forum selection clauses mandate jurisdiction of TradeWind's breach-of-contract claims in Germany, the burden shifts to TradeWind to rebut the presumption of enforceability. Because "the enforcement of forum clauses is an essentially procedural issue ... while choice of law provisions generally implicate only the substantive law of the selected jurisdiction," this final analysis is governed by federal law. *Phillips,* 494 F.3d at 384 (internal citation omitted).

The Second Circuit gives "substantial deference" to valid forum selection clauses, particularly when the choice of forum was made "in an arms-length negotiation by experienced and sophisticated businessmen." *New Moon Shipping Co. v. MAN B & W Diesel AG,* 121 F.3d 24, 29 (2d Cir.1997) (quoting *Bremen,* 407 U.S. at 12). A mandatory forum selection clause "should be enforced unless the enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *TradeComet.com,* 647 F.3d at 475 (quoting *Bremen,* 407 U.S. at 10). The Second Circuit has explained that a party may demonstrate that a clause is unreasonable by showing that: "1.) its incorporation was the result of fraud or overreaching; 2.) the law to be applied in the selected forum is fundamentally unfair; 3.) enforcement contravenes a strong public policy of the forum state; or 4.) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived

of his day in court." *Phillips,* 494 F.3d at 392 (citing *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993)).

**\*8** TradeWind does not assert, in its brief, that any of the foregoing circumstances are present. Indeed, TradeWind's brief does not even allege that jurisdiction in Germany would be unfair or inconvenient. Its expert's declaration is the only place where such an argument can be found. He states that "[f]he fact that the jurisdiction chosen by the AGB is nearby [Unilux]'s location while the other party must travel to another continent (and no international airport being nearby the city of Trier), indicates that it is an unreasonable disadvantage[.]" This argument is nearly identical to the argument rejected by the Second Circuit in *Phillips.* Like the plaintiff in *Phillips,* TradeWind simply claims that jurisdiction in Germany would be "more costly or difficult, but not that it is impossible." *Phillips,* 494 F.3d at 393. TradeWind alleges no circumstances which would prevent it from bringing suit in Germany indeed, TradeWind's complaint is full of references to TradeWind's substantial capacity for making investments and travelling internationally. Moreover, TradeWind has not asserted that the "disadvantage" posed by the forum selection clause exceeds "the obvious concomitants of litigation abroad," or was not foreseeable when it agreed to litigate in Germany. *See id.* TradeWind has therefore failed to rebut the presumption of enforceability of the forum selection clause.

### D. TradeWind's Unjust Enrichment Claim

In connection with TradeWind's unjust enrichment claim, which TradeWind claims is unrelated to the Distributor's Contract, the complaint demands damages in "an amount no less than $4,829.41." Federal jurisdiction in this case is predicated on 28 U.S.C. § 1332(a), which provides that diverse parties may sue in federal court if "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." Because TradeWind seeks more

than $6 million in damages for its breach-of-contract claims, I have supplemental jurisdiction over TradeWind's related unjust enrichment claim under 28 U.S.C. § 1367(a).

Having dismissed the breach-of-contract claims, I have discretion to retain supplemental jurisdiction over TradeWind's unjust enrichment claim under 28 U.S.C. § 1367(c)(3). According to the Second Circuit, a district court may exercise this discretion in order to further "fairness" or "judicial efficiency," or to resolve any "novel or unsettled issues of state law." *Mauro v. Southern New England Telecomms., Inc.,* 208 F.3d 384, 388 (2d Cir.2000). However, when all claims that independently support federal jurisdiction have been dismissed, "the balance of factors ... will [usually] point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie–Mellon Univ. v. Cohill* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). I see no reason why these parties should be litigating in two fora when all of their disputes can be resolved in one. Moreover, the breach of contract claim dwarfs the unjust enrichment claim. Because TradeWind has provided this Court with no particular justification to retain supplemental jurisdiction over its unjust enrichment claims, I decline to retain jurisdiction and the claim is dismissed without prejudice.

### *CONCLUSION*

**\*9** Defendant's motion to dismiss is granted and the complaint is dismissed. The Clerk of the Court is directed to enter judgment accordingly.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4382986

Footnotes

1    The enforcement of a forum selection clause through dismissal under Rule 12(b) is a "well-established practice" within the Second Circuit. *TradeComet.com LLC v. Google, Inc.,* 647 F.3d 472. 475 (2d Cir.2011). Because the Supreme Court and the Second Circuit have declined to specify a particular procedural mechanism for bringing such a motion—indeed, the Second Circuit has expressly " 'refused to pigeon-hole forum selection clause enforcement claims into a particular clause of Rule 12(b)' " —defendant's motion is proper and I need not specify that any particular sub-section of Rule 12(b) guides this analysis.

2    More than 4 million, under the current exchange rate.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4382986

3    Another district court within the Second Circuit has applied this German precedent to find that a forum selection clause using the phrase "all disputes" designates mandatory jurisdiction. *See Future Indus. of Am., Inc. v. Advanced UV Light GMBH,* No. 3:9–966, 2010 U.S. Dist. LEXIS 90310, at *13–14 (D.Conn. Sept. 1, 2010).

---

**End of Document**                                       © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Bektic-Marrero v. Goldberg, S.D.N.Y., March 7, 2012

2008 WL 2096593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard WILSON, Plaintiff,
v.
Sgt. KING; C.O. John Doe # 1; C.O. John Doe # 2; Dr. E. Weissman; Dr. Ellis; Dr. Michael Aronis; P.A. Tichenor; Nurse Travers, Defendants.

No. 9:08-CV-0509 (GLS).
|
May 16, 2008.

**Attorneys and Law Firms**

Richard Wilson, pro se.

## MEMORANDUM-DECISION and ORDER

GARY L. SHARPE, District Judge.

### I. Background

**\*1** Presently before this Court is a civil rights complaint filed by Richard Wilson. Wilson has also filed an application for leave to proceed with this action *in forma pauperis.*

In his *pro se* complaint, Wilson asserts claims arising out of his confinement at Upstate Correctional Facility. [1] Wilson claims that defendants failed to protect him from a known risk of injury by his cellmate, who assaulted Wilson on May 27, 2005. Dkt. No. 1 at 3-5. Wilson further claims that he was denied medical care for the serious injuries suffered in the assault, and was later found unconscious and unresponsive in his cell. *Id.* at 7. Following surgery on his ruptured spleen, Wilson remained hospitalized for eleven days. *Id.* at 8-9. Wilson claims that defendants acted with deliberate indifference to his serious medical condition upon his return to Upstate Correctional Facility. Also included in the complaint is a claim that defendant Michael Aronis, MD, the surgeon at Alice Hyde Medical Center, rendered substandard care and committed several errors in the course of the surgery.

*Id.* For a complete statement of Wilson's claims, reference is made to the complaint.

### II. Discussion

#### (A) *In forma pauperis* application

Based upon a review of Wilson's *in forma pauperis* application, the Court finds that he has demonstrated sufficient economic need.

#### (B) The sufficiency of the complaint

Since the Court has found that Wilson meets the financial criteria for commencing this case *in forma pauperis,* the Court must consider the sufficiency of the complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* the Court:

(2) [S]hall dismiss the case at any time if the Court determines that-

* * *

(B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B). Thus, even if a plaintiff meets the financial criteria to commence an action *in forma pauperis,* it is the Court's responsibility to determine that a complaint may properly be maintained in the District before it may permit the plaintiff to proceed with his or her action *in forma pauperis.*

In this case, Wilson asserts several claims for the alleged violation of his constitutional rights pursuant to 42 U.S.C. § 1983. Parties may not be held liable under this section unless it can be established that they have acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir.1994); *Wise v. Battistoni,* No. 92-CV-4288, 1992 WL 380914 (S.D .N .Y. Dec. 10, 1992). It is the duty of the plaintiff to allege state action on the part of each defendant named in a complaint, and a court may dismiss an action under 28 U.S.C. § 1915(e) against a defendant where the plaintiff fails to plead such a nexus. *See, e .g., Carollo-Gardner v. Diners Club,* 628 F.Supp. 1253, 1256-57 (E.D .N.Y.1986); *DeMatteis v. Eastman*

*Kodak Co.,* 511 F.2d 306, 311 (2d Cir.), *modified on other grounds,* 520 F.2d 409 (2d Cir.1975 .).

**\*2** Plaintiff has named Dr. Michael Aronis as a defendant in this action. Dr. Aronis is identified as the surgeon who operated on plaintiff in May, 2005 at Alice Hyde Medical Center. Plaintiff has not alleged any nexus between the State of New York and this individual, nor does it appear that Alice Hyde Medical Center is a "state actor" for purposes of § 1983. *See Schlein v. Milford Hospital,* 561 F.2d 427 (2d Cir.1977) (private hospital, while regulated by the state, may not be sued as a state actor under 42 U.S.C. § 1983).

Since Wilson's complaint, which is brought pursuant to 42 U.S.C. § 1983, does not allege any state action on the part of this defendant, Michael Aronis is dismissed as a defendant in this action . [2]

WHEREFORE, it is hereby

ORDERED, that Wilson's *in forma pauperis* application (Dkt. No. 2) is granted. The Clerk of the Court shall provide the superintendent of the facility, designated by Wilson as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that Wilson is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915, and it is further

ORDERED, that "Dr. Michael Aronis" is dismissed as a defendant in this action, and it is further

ORDERED, that the Clerk issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the summons and complaint to the Office of the New York State Attorney

General, together with a copy of this Order, and it is further

ORDERED, that a response to the complaint be filed by the defendants or their counsel as provided for in the Federal Rules of Civil Procedure after service of process on the defendants, and it is further

ORDERED, that Wilson take reasonable steps to ascertain the identity of the "John Doe" defendants referred to in the complaint, and it is further

ORDERED, that the Clerk provide a copy of Wilson's authorization form to the Financial Deputy of the Clerk's Office, and it is further

ORDERED, that *any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Wilson must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. *Wilson is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action,* and it is further

ORDERED, that the Clerk serve a copy of this Order on Wilson by regular mail.

**\*3** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2096593

---

Footnotes

1    Wilson is presently incarcerated at Wyoming Correctional Facility. Dkt. No. 1 at 1.

2    To the extent Wilson seeks to assert state law medical malpractice claims against Dr. Aronis, it does appear that the Court has subject matter jurisdiction over such claims. See 28 U.S.C. § 1332(a).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4561605
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Christopher Shawn YOUNG, Plaintiff,
v.
Dr. Alan SMITH, Dr. Gerald Coniglio,
Thomas Eagen C.O.R.C. Director, and
James T. Conway (Supt.A.C.F.), Defendants.

No. 07-CV-6312 CJS.
|
Oct. 10, 2008.

**Attorneys and Law Firms**

Christopher Young, Attica, NY, pro se.

Gary M. Levine, New York State Office of the Attorney General, Rochester, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

INTRODUCTION

**\*1** This is an action pursuant to 42 U.S.C. § 1983 ("Section 1983") in which plaintiff Christopher Young ("Plaintiff"), a prison inmate confined at Attica Correctional Facility, is claiming that his constitutional rights were violated. Now before the Court is Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6). For the reasons that follow, the application is granted in part and denied in part.

BACKGROUND

Unless otherwise noted, the following facts are taken from the Complaint [# 1] in this action. [1] On the evening of March 30, 2006, Plaintiff was playing basketball in the prison recreation yard when he suffered a knee injury, and specifically, a ruptured patellar tendon. Plaintiff was taken to Wyoming County Community Hospital ("the hospital"), where he was examined by emergency room physician Alan Smith, M.D. ("Smith"). Smith determined that Plaintiff required surgery, and he scheduled Plaintiff to see an orthopedic surgeon the following morning. In the meantime, Smith provided Plaintiff with pain medication, a leg "immobilizer" and crutches. The following morning, Plaintiff was returned to the hospital and examined by Gerald Coniglio, M.D. ("Coniglio"), an orthopedic surgeon. Congilio scheduled surgery to take place four days later, on April 4, 2006. On April 4, 2006, Coniglio operated on Plaintiff's knee. However, in June 2006, the orthopedic repair allegedly failed. On June 27, 2006, Coniglio again operated on Plaintiff's knee, and removed portions of Plaintiff's knee cap.

Subsequently, Plaintiff filed inmate grievances alleging improper medical treatment by Smith and Coniglio. Specifically, Plaintiff complained that he should not have been forced to wait several days for the initial surgery, that Coniglio should not have removed part of his kneecap, and that Coniglio should have provided a prosthetic knee cap replacement. The Inmate Grievance Review Committee ("IGRC") denied the grievances, and Plaintiff appealed to the Attica Superintendent, defendant James Conway ("Conway"). Conway affirmed the determinations of the IGRC. With regard to Plaintiff's claim that the initial surgery was delayed, Conway stated that such "[s]urgery was not needed or recommended and the level of care for your injury was deemed urgent, not emergent. As such you received treatment in an appropriate period of time." [2] In response to Plaintiff's complaints concerning Congilio's second surgery, Conway stated, "Contrary to you claim, your kneecap was not removed by the outside surgeon. Only broken fragments of the kneecap were removed. They were removed because their continued present [sic] would have negatively impacted your best medical interests." Plaintiff then appealed to the Central Office Review Committee ("CORC"), which affirmed Conway's determinations. CORC's decisions were signed by defendant Thomas Eagen ("Eagen"), the Director of CORC. With regard to Plaintiff's complaint about the timing of his first surgery, Eagen observed that "[t]he attending orthopedic physician did not feel the grievant's injury required emergency surgery." As for Plaintiff's complaint concerning Coniglio's second surgery, Eagen stated: "CORC notes that the grievant consented to undertake a second surgery for a re-ruptured left patellar tendon with his attending surgeon. CORC notes that

medical records indicate that the surgeon recommended for approval for a prosthetic kneecap, but was denied by the Department's Utilization Provider."

**\*2** On June 22, 2007, Plaintiff commenced the instant action against Smith, Coniglio, Conway and Eagen. With regard to Smith, Plaintiff asserts claims for "medical malpractice-personal injury (violating Eighth Amendment)," based on Smith's decision not to arrange surgery on an emergency basis. As for Coniglio, Plaintiff describes his claim as "medical malpractice violation of my Eighth Amendment rights." In that regard, Plaintiff alleges that Coniglio improperly delayed, and then botched, the initial surgery, and that during the second surgery, he removed part of Plaintiff's knee cap against his wishes, and failed to provide a prosthetic replacement. Next, Plaintiff alleges that Conway committed "medical malpractice (denial of medical treatment) violating my Eighth Amendment rights," by denying Plaintiff's grievances. And finally, Plaintiff alleges that Eagen committed "medical malpractice personal injury-denial of medical treatment (violating Eighth Amend.)," by affirming Conway's determinations.

Defendants subsequently filed the subject motion to dismiss [# 6]. Both Smith and Coniglio contend that the Complaint fails to state a claim against them, for two reasons. First, they allege that medical malpractice is not actionable as a constitutional violation under Section 1983, and second, they allege that, as private doctors, they were not "acting under color of state law," for purposes of Section 1983. Conway and Eagen argue that they are also entitled to dismissal, since the claims against Smith and Coniglio fail to state a claim. Alternatively, Conway and Eagen maintain that, even if the Complaint states Eighth Amendment claims, they were not personally involved, since they were entitled to rely on Smith's and Coniglio's medical expertise.

## ANALYSIS

In ruling upon a motion to dismiss made pursuant to FRCP 12(b) (6), the Court must construe

> the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable

inferences in the plaintiff's favor. Although the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice. To survive dismissal, the plaintiff must provide the grounds upon which her claim rests through factual allegations sufficient to raise a right to relief above the speculative level.

*Reddington v. Staten Island Univ. Hosp.,* 511 F.3d 126, 131 (2d Cir.2007) (citations and internal quotation marks omitted).

To defeat a 12(b)(6) motion, a plaintiff is not required to plead facts sufficient to establish a prima facie case. *See, Leibowitz v. Cornell Univ.,* 445 F.3d 586, 591 (2d Cir.2006) (Observing that in *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 508 122 S.Ct. 992 (2002), the Supreme Court held that a complaint "need not include specific facts establishing a prima facie case of discrimination and instead must contain only a short and plain statement of the claim showing that the pleader is entitled to relief.") (internal quotation marks omitted). Nevertheless, a plaintiff who chooses to plead particular facts may thereby "plead herself out of court." *See, Jackson v. Marion County,* 66 F.3d 151, 153 (7th Cir.1995) ("[A] plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts.") (citations omitted) (Posner, J.).

**\*3** Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

* * *

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122, 127 (2d Cir.2004). Plaintiff is asserting Eighth Amendment claims directed at his medical treatment, and the legal standard for such claims is clear:

In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.

Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury

in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

**\*4** *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations omitted). Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. *See, Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id.* (citation omitted).

Applying the foregoing principles of law, the Court finds, at the outset, that to the extent that Plaintiff is alleging claims for medical malpractice against Smith and Coniglio, those claims must be dismissed. The Court reaches a different conclusion, though, concerning Plaintiff's allegations that Smith and Coniglio were deliberately indifferent to his serious medical needs. In that regard, Smith and Coniglio contend that, as private doctors, they were not acting under color of state law. However, private doctors who provide medical care to state-prison inmates may be subject to liability under Section 1983. *See, Sykes v. McPhillips,* 412 F.Supp.2d 197, 202 (N.D.N.Y.2006) ("It is clear that medical care providers working in a prison are state actors. It is also clear that hospitals and physicians that provide care outside of the prison facility may be held to be state actors when they work pursuant to contract.") (*citing West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)); *see also, Doe v. Torres,* No. 05 Civ.3388 JSR GWG, 2006 WL 290480 at \*9 (S.D.N.Y. Feb.8, 2006) ("With regard to doctors who treat prison inmates, the Supreme Court has held that it is 'the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State' in a suit under 42 U.S.C. § 1983.") (*quoting West v. Atkins,* 487 U.S. at 55-56 (1988)). Here, the exact nature of the relationship between Smith, Coniglio and the State of New York is unclear from

the Complaint, but will presumably be clarified during discovery. In the meantime, the doctors' motion to dismiss must be denied.

On the other hand, the Court agrees that the Complaint fails to state a claim against Conway or Eagen, since neither were directly involved in the complained-of medical decisions, and both were entitled to rely on the medical opinions of Smith and Coniglio. *See, Graham v. Wright,* No. 01 Civ.9613 NRB, 2003 WL 22126764 at *1 (S.D.N.Y. Sep.12, 2003) (Granting Rule 12(b)(6) motion)[3]; *see also, Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691 at * 9 (S.D.N.Y. Apr.23, 2002) (Holding that prison "[s]upervisors are entitled to rely on and adopt the recommendations of prison doctors without incurring a charge of personal involvement.") (citation omitted). Here, Plaintiff has not alleged that Conway and Eagen were personally involved in the alleged constitutional violations, and the claims against them are therefore dismissed.

CONCLUSION

**\*5** For the foregoing reasons, Defendant's motion to dismiss [# 6] is granted in part and denied in part. The medical malpractice claims and the claims against Conway and Eagen are dismissed. The Eighth Amendment claims against Smith and Coniglio may go forward.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4561605

Footnotes

1    "In considering a motion under Fed.R.Civ.P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint. If, on such a motion, 'matters outside the pleading are presented to and not excluded by the court,' the court should normally treat the motion as one for summary judgment pursuant to Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b) .... In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered. In addition, even if not attached or incorporated by reference, a document upon which the complaint solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (citations and internal quotations omitted).

2    In the Complaint, Plaintiff states: "[Conway] denied said appeal stating that 'Surgery was not needed nor recommended,' [and] this was after the initial surgery was already performed. This shows that Supt. Conway did not even look into the matter." However, the Court reads Conway's full response to indicate only that *emergency surgery,* which Plaintiff wanted, "was not needed or recommended."

3    "It is well established that supervisory officials are 'generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment.' *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.1996). In the instant case, plaintiff has not suggested that defendant Keane, as part of his investigation of plaintiff's grievance, failed to appropriately rely on the opinion of medical staff in coming to his determination, nor has he alleged that defendant Keane was deliberate or malicious in his ultimate denial of the grievance. Accordingly, we find that plaintiff has failed to state a claim against Keane and dismiss plaintiff's claim against him in his individual capacity." *Id.*

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.